9

United States District Court
Southern District of Texas
FILED

JUN 1 5 2001

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JORGE G. ALANIZ                                  :
                                                 :
VS.                                              :          CIVIL ACTION B-00-136
                                                 :
CITY OF PORT ISABEL, TEXAS           :

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the City of Port Isabel, Texas, Defendant in the above-styled and numbered cause, and makes this motion for summary judgment as to all claims asserted by Plaintiff in this cause, and for such would respectfully show as follows:

I.

## THE CLAIM

Plaintiff filed this action alleging that he was subjected to discriminatory and retaliatory actions by the Defendant after he filed a complaint with a governmental agency concerning Defendant's wage and hour practices. Plaintiff asserts a claim pursuant to 29 U.S.C. §215(a) (3). Plaintiff seeks actual damages and attorney's fees.

II.

## GROUNDS FOR SUMMARY JUDGMENT

Defendant would show the Court that there are no genuine issues as to any material facts, and that Defendant is entitled to judgment as a matter of law on all claims asserted by Plaintiff.

Defendant is entitled to summary judgment as to Plaintiff's retaliation claim because the uncontroverted summary judgment evidence establishes that Plaintiff was an employee-at-will and

that there is no "but for" causal connection between Plaintiff's termination of employment and his wage and hour complaint.

Defendants are entitled to summary judgment as to Plaintiff's claim for attorney's fees because in the absence of any meritorious claim, as set forth above, there is no basis for granting this relief.

III.

SUMMARY OF FACTS

Plaintiff began his employment with the City of Port Isabel in the 1983 as a patrolman. (*See Deposition of Jorge Alaniz, p. 19, ll. 1-17*). Plaintiff had no written contract of employment. (*See Affidavit of Nancy Davalos*). Plaintiff's employment was terminated on September 16, 1998, by letter of termination of the same date. *(See Deposition of Jorge G. Alaniz, p. 60, l. 23 to p. 61, l. 21)*.

In July 1997, Plaintiff filed a complaint with Mr. Abraham Leal and Mr. Nicosio Flores, both agents of the United States Department of Labor Employment Standards Administration, Wage and Hour Division, complaining of unpaid overtime. *(See Responses to Defendant's First Set of Interrogatories, Responses Nos. 2, 3 and 4)*. Several members of the Port Isabel Police Department, including Pete Collazo and Daniel Marchan, also made the same complaint. (*See Responses to Defendant's First Set of Interrogatories, Response No. 6*).

In 1998, Pete Collazo, as Acting Chief of Police, demoted Plaintiff from the rank of captain to patrolman. (*See Deposition of Jorge G. Alaniz, p. 21, ll. 1-8, p. 25, l. 1-16*). Acting Chief Collazo had the authority to discipline Plaintiff; however, he did not explain to Plaintiff why he was demoted. (*See Deposition of Jorge G. Alaniz, p. 31, ll. 1-23*). Plaintiff never had any discussions with Acting Chief Collazo regarding the reasons for the demotion, nor did Plaintiff ask. (*See Deposition of*

CM/PDF - www.fenrir.com

*Jorge G. Alaniz, p. 32, I. 24 through p. 33, I. 9*).  While it was Plaintiff's belief that he was demoted because he requested a policy change for compensation (overtime), no one has told him that was the reason for his demotion, <u>nor does he have any evidence to support that belief</u>.  (*See Deposition of Jorge G. Alaniz, p. 34, I. 10-22, p. 36, I. 11-15*).

Later in 1998, Plaintiff was reinstated back to the rank of sergeant by the new Chief of Police, Joel Ochoa.  (*See Deposition of Jorge G. Alaniz, p. 37, II. 18-24, p. 39, II. 11-20*).  Within a matter of months, Chief Joel Ochoa terminated Plaintiff's employment in September 1998.  (*See Deposition of Jorge G. Alaniz, p. 48, II. 15-23, p. 49, II. 14-20*).  It is undisputed that the decision to terminate Plaintiff's employment was made by Chief Joel Ochoa.  (*See Deposition of Jorge G. Alaniz, p. 66, II. 3-10*).  It is also undisputed that <u>Plaintiff has no evidence that Chief Ochoa's reasons for terminating him were other than those contained in the termination letter</u>.  (*See Deposition of Jorge G. Alaniz, p. 70, II. 1-9*).

At least seven other officers presented wage claims like the Plaintiff, including Michael Longoria, Adam Lopez, Pete Collazo, Martin Salinas, Danny Marchan, Michael Hatley and David Strief.  (*See Deposition of Jorge G. Alaniz, p. 75, II. 10-24*).  Plaintiff admits that no retaliatory action was taken against any of them.  (*See Deposition of Jorge G. Alaniz, p. 76, I. 25 through p. 77, I. 4*).  Plaintiff also admits that he has no information that leads him to believe that the City Commission of the City of Port Isabel took any action to approve Chief Ochoa's decision to terminate him.  (See Deposition of Jorge G. Alaniz, p. 93, II. 1-5).

## IV.

In support of this motion, Defendant relies on the live pleadings, the affidavits attached hereto, the transcript of Plaintiff's testimony given during his deposition, the discovery requests and responses attached hereto and the memorandum of points and authorities filed with this motion.

**WHEREFORE, PREMISES CONSIDERED**, Defendant prays that the Court set this motion for hearing, with proper notice to Plaintiff, and that at the conclusion of the hearing the Court enter judgment in favor of Defendant and against Plaintiff, taxing costs against Plaintiff, and granting Defendant such further general relief to which it is justly entitled.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 W. Price, Suite 9
Brownsville, Texas 78520
(210) 542-5666
(210) 542-0016 (Telefax)

By: _____
RICARDO MORADO
Texas State Bar No. 14417250
Federal ID No. 1213

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Defendants' Motion for Summary Judgment was forwarded to opposing counsel as follows:

Mr. Ivan Andarza
ANDARZA & DE COSS, P.C.
815 Ridgewood
Brownsville, Texas 78520

**Certified Mail Return Receipt Requested #7106 4575 1294 1175 7378**

on this the _15th_ day of June, 2001.

_____
RICARDO MORADO

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JORGE G. ALANIZ                        :
                                       :
VS.                                    :           CIVIL ACTION B-00-136
                                       :
CITY OF PORT ISABEL, TEXAS             :

## ORDER SETTING HEARING ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

On this day came on to be considered Defendants' Motion For Summary Judgment, and the

Court is of the opinion that said motion should be heard.

IT IS THEREFORE ORDERED that Defendants' Motion For Summary Judgment be set for

hearing on the _____ day of _____, 2001, at _____ o'clock a.m.

SIGNED this _____ day of _____, 2001.


                                    _____
                                    UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JORGE G. ALANIZ | : | |
| | : | |
| VS. | : | CIVIL ACTION B-00-136 |
| | : | |
| CITY OF PORT ISABEL, TEXAS | : | |

## FINAL SUMMARY JUDGMENT

On this day, the Court heard the motion for summary judgment filed in this cause by the City of Port Isabel, Texas, Defendant in this cause. All parties appeared by and through their respective counsel. The Court, after examining the pleadings and the summary judgment evidence and hearing the arguments of counsel, determines that Defendant is entitled to summary judgment as follows:

IT IS, THEREFORE, ORDERED, ADJUDGED, and DECREED that Plaintiff, Jorge G. Alaniz, take nothing against Defendant the City of Port Isabel, Texas, and that Defendant recover from Plaintiff all costs incurred in this action, for which let execution issue.

All relief not expressly granted herein is denied.

Done this _____ day of _____, 2001.

_____
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JORGE G. ALANIZ                          :

VS.                                      :          CIVIL ACTION B-00-136

                                         :

CITY OF PORT ISABEL, TEXAS               :

## AFFIDAVIT

BEFORE ME, the undersigned authority, on this day personally appeared **Ricardo**

**Morado**, and after being duly sworn, deposes and says:

1.  My name is Ricardo Morado; and I am over eighteen years old, have never
    been convicted of a crime and am fully competent to make this affidavit.

2.  I am the attorney of record for the City of Port Isabel in this cause.

3.  On November 20, 2000, I sent to Plaintiff, through his counsel, Defendant's First
    Set of Interrogatories to Plaintiff.

4.  Attached hereto is a true and correct copy of the Responses to Defendant's
    First Set of Interrogatories, which I received on February 1, 2001.

RICARDO MORADO

SUBSCRIBED AND SWORN TO BEFORE ME by the said RICARDO MORADO,

affiant, to which witness my hand and seal of office on this the __15th__ day of June, 2001.

Notary Public, State of Texas

# Responses to Defendant's First Set of Interrogatories

CM/PDF – www.faxbo.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

JORGE G. ALANIZ                          §
                                         §
VS.                                      §          CIVIL ACTION B-00-136
                                         §
CITY OF PORT ISABEL, TEXAS               §

## RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

TO:     City of Port Isabel, Texas by and through its attorney of record, Ricardo Morado,
        Roerig, Oliveira & Fisher, L.L.P., 855 West Price Rd, Suite 9, Brownsville, Texas
        78520.

INTERROGATORY NO. 1: Please state the name, residence address, social security
        number, and driver's license number of the person(s) answering these
        interrogatories.

Answer:      Jorge G. Alaniz
             32717 Melon Drive
             Los Fresnos, Texas 78566
             SS#:        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
             Tx DL#:     05529010

INTERROGATORY NO. 2: Please state the date(s) on which Plaintiff files a complaint
        or complaints with any governmental agency concerning wage and hour practices
        and please identify the name(s) of each agency to whom the complaint was made.

Answer:      A complaint was filed on July 1997 with the United States Department of
             Labor Employment Standards Administration Wage and Hour Division.

INTERROGATORY NO. 3: For each agency identified in your response to interrogatory
        number 2, please identify by full name and title each and every person to whom
        the complaint was made or presented.

Answer:      The complaint was filed with Mr. Abraham Leal, Investigator, and Mr.
             Nicosio Flores, District Director of the United States Department of Labor
             Employment Standards Administration Wage and Hour Division.



FEB 0 1 2001

INTERROGATORY NO. 4:  For each date listed in your response to interrogatory number 2, please state the substance of the complaint or complaints you made to each governmental agency you identified.

Answer:     The basis of my complaint was the unpaid overtime from my employer.

INTERROGATORY NO. 5:  Please identify by full name each and every agent of Defendant who subjected Plaintiff to verbal threats or reprisals, and for each threat or reprisal, state the date on which it occurred, and describe the general substance of the threat or reprisal.

Answer:     I complained about not being paid for overtime to Mr. Pete Collazo, acting Chief of Police, and when this happened I was demoted from Investigator to a non-titled position with no assigned duties on or about July '97.

Manuel Hinojosa, Port Isabel City Manager, told me to just take the demotion on or about July '97.

Chief Ochoa fired me from my position on or about September 1998.

Richard Moore, City Commissioner, objected to include myself in the settlement with wage and hour for having made the complaint.

INTERROGATORY NO. 6:  Please identify by full name and address each and every person who, to your knowledge, was aware of your complaints concerning Defendant's wage and hour practices and state how each person gained such knowledge or awareness about your complaints.

Answer:     Mr. Manuel Hinojosa, City Manager          Was advised about the
            Port Isabel City Hall                       complaint.
            305 E. Maxan St.
            Port Isabel, Texas 78578

            Joel Ochoa, Chief of Police                 Was the person that fired me.
            Port Isabel Police Department
            110 W. Hickman Ave.
            Port Isabel, Texas 78578

            Pete Collazo, Acting Chief of Police        Also made the same
            110 W. Hickman Ave.                         complaint.
            Port Isabel, Texas 78578

            Richard Moore, City Commissioner            He told Chief Ochoa to fire
            305 E. Maxan St.                            me from my department.
            Port Isabel, Texas 78578

Danny Marchan, Officer                    Also made the same
Port Isabel Police Department             complaint.
110 W. Hickman Ave.
Port Isabel, Texas 78578

INTERROGATORY NO. 7:  Please state the full name and last known address, giving
the street, number, city, state, country, and telephone number of every person
known to you or to your attorney or any representative acting on your behalf who
has any knowledge regarding the facts and circumstances surrounding the
happening, incident and /or occurrence referred to in your complaint made the
basis of this suit, including, but not limited to, eyewitnesses to such event as well
as medical witnesses or other persons having any knowledge thereof, and state
insofar as o know the nature of such knowledge.  (If any of these witnesses
identified in your answers to these interrogatories are related to you in any way,
please so indicate by stating the nature of such relationship.)

Answer:     Danny Marchan                    Also made same complaint.
            Port Isabel Police Department
            110 W. Hickman Ave.
            Port Isabel, Texas 78578

            Manuel Hinojosa, City Manager    Was advised about complaint.
            Port Isabel City Hall
            305 E. Maxan St.
            Port Isabel, Texas 78578

            Pete Collazo                     Also made same complaint.
            Port Isabel Police Department
            110 W. Hickman Ave.
            Port Isabel, Texas 78578

            Sharon Claghorn                  Heard first appeal on firing.
            Port Isabel City Manager
            305 E. Maxan St.
            Port Isabel, Texas 78578

            Pat Marchan, Mayor               Hearing officer on firing and stated
            Port Isabel City Hall            to sue the City of Port Isabel.
            305 E. Maxan St.
            Port Isabel, Texas 78578

            Martin Cantu                     Advised on situation as the other
            Ex-Commissioner
            Address Unknown

| | |
|---|---|
| Quirino Martinez, Ex-Mayor<br>Address Unknown | Was constantly telling me I was<br>fired. |
| Richard Moore, City Commissioner<br>Port Isabel City Hall<br>305 E. Maxan St.<br>Port Isabel, Texas 78578 | I was told by Chief Joel Ochoa that<br>he wanted the chief to fire me from<br>the department. |
| Thomas Salazar<br>Address unknown | Present at the hearing on my firing. |
| David Gorcham<br>Port Isabel Police Department<br>110 W. Hickman Ave.<br>Port Isabel, Texas 78578 | Present at the hearing on my firing. |
| Homer Reyna<br>South Padre Island Police Department<br>South Padre Island, Texas | Present at the hearing on my firing. |
| Ronald Moore<br>Port Isabel Police Department<br>110 W. Hickman Ave.<br>Port Isabel, Texas 78578 | Present at the hearing on my firing. |
| Lee Hatley<br>Address Unknown | Present at the hearing on my firing. |
| Juan Manuel Ayala, Officer<br>Cameron County Sheriff Dept.<br>847 E. Harrison St.<br>Brownsville, Texas 78520 | Present at the hearing on my firing. |

INTERROGATORY NO. 8:  List the names, addresses, phone numbers, and official
titles, if any, of all expert witnesses, who, it is contemplated, may be called upon
to testify in support of your claim in this action; and indicate the nature and
substance of the testimony which is expected will be given by each such witness;
and, if any such prospective witnesses are related to you, state the relationship.

Answer:       None at this time.

INTERROGATORY NO. 9:  List the names, addresses and phone numbers of all witnesses, who it is contemplated, will be called upon to testify in support of you claim in this action; and indicate the nature and substance of the testimony which is expected will be given by each such witness; and, if any such prospective witnesses are related to you, state the relationship.

| | | |
|---|---|---|
| Answer: | Nicasio Flores | Texas Workforce Commission |
| | Sharon Claghorn | Aware the reason for firing was not reason by City of Port Isabel. |
| | Manuel Hinojosa | He knew the reason for my firing. |
| | Danny Marchan | Had personal knowledge of what had happened.  He also made a complaint about no overtime pay. |
| | Martin Cantu | knew about Richard Moore wanting to fire me and not pay me on the wage and hour settlement. |

INTERROGATORY NO. 10:  Please list your employment history since September of 1998, stating in your answer the employer's name and address, you supervisor's name, your job title, the nature of you duties, the beginning and ending dates of each employment, and your ending salary for each employment.

| | | |
|---|---|---|
| Answer: | Dates: | Employment |
| | September 1998 to June 1999 | Unemployed |
| | June 1999 to Present | United States Department of Transportation Federal Motor Carrier Safety Division |

Supervisor:    Aaron Munoz
Position:        Special Agent (Investigator)
Starting Salary:        $34,575.00

## AFFIDAVIT

THE STATE OF TEXAS      |

BEFORE ME, the undersigned authority, on this day personally appeared JORGE G. ALANIZ, and after being duly sworn, deposes and says:

"My name is JORGE G. ALANIZ, and I am over the age of eighteen years, and I have personal knowledge of, and I am competent and authorized to testify to the facts set forth herein; I have read the foregoing interrogatories and the answers thereto are true and correct."

_____
JORGE G. ALANIZ

SUBSCRIBED AND SWORN TO BEFORE ME by the said JORGE G. ALANIZ, affiant, to which witness my hand and seal of office on this the ___*86*___ day of ___*JANUARY*___, ~~2000~~. *2001*

Notary Public, State of Texas

*J.C. VASQUEZ*
Notary's Name Printed:

*1-5-2005*
My Commission Expires:

Respectfully submitted,

IVAN A. ANDARZA
**ANDARZA & DE COSS, P.C.**
1718 Boca Chica Blvd.
Brownsville, Texas 78520
Phone: (956)   550-8330
Fax:    (956)   982-1909

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded via certified mail, return receipt requested, to Ricardo Morado, Roerig, Oliveira, & Fisher, L.L.P., at 855 West Price Rd., Brownsville, Texas, Texas 78520 on January _31_ , 2001.

IVAN A . ANDARZA

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JORGE G. ALANIZ                          :
                                         :
VS.                                      :          CIVIL ACTION B-00-136
                                         :
CITY OF PORT ISABEL, TEXAS               :

## AFFIDAVIT

BEFORE ME, the undersigned authority, on this day personally appeared **Ricardo**

**Morado**, and after being duly sworn, deposes and says:

1.    My name is Ricardo Morado; and I am over eighteen years old, have never been convicted of a crime and am fully competent to make this affidavit.

2.    I am the attorney of record for the City of Port Isabel in this cause.

3.    On March 1, 2001, I took the oral deposition of Mr. Jorge Garcia Alaniz, the Plaintiff in this cause.

4.    Attached hereto is a true and correct copy of the original transcript of his deposition, with exhibits, sent to me by the Court Reporter and bearing the Court Reporter's seal and signature.


RICARDO MORADO


SUBSCRIBED AND SWORN TO BEFORE ME by the said RICARDO MORADO,

affiant, to which witness my hand and seal of office on this the __15th__ day of June, 2001.


Notary Public, State of Texas

NORMA ALICIA HERNANDEZ
Notary Public, State of Texas
My Commission Expires 12-10-2003

# Deposition of
# Jorge G. Alaniz

CitiPDF - www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JORGE G. ALANIZ,            ) (
        Plaintiff          ) (
                           ) (
VS.                        ) (    CIVIL ACTION B-00-136
                           ) (
CITY OF PORT ISABEL, TEXAS, ) (
        Defendant          ) (

---

ORAL DEPOSITION OF
JORGE GARCIA ALANIZ
MARCH 1, 2001

---

ORAL DEPOSITION OF JORGE GARCIA ALANIZ,

produced as a witness at the instance of the DEFENDANT,

taken in the above styled and numbered cause on

MARCH 1, 2001, reported by CORINNA N. GARCIA, Certified

Court Reporter No. 5210, in and for the State of Texas,

at the offices of Roerig, Oliveira & Fisher, L.L.P.,

855 West Price Road, Brownsville, Texas, pursuant to

the Federal Rules of Civil Procedure.

**ORIGINAL**

2

## APPEARANCES

COUNSEL FOR PLAINTIFF:

    IVAN ANDARZA
    ANDARZA & DE COSS, P.C.
    815 Ridgewood
    Brownsville, Texas  78520

COUNSEL FOR DEFENDANT:

    RICARDO MORADO
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 West Price Road, Suite 9
    Brownsville, Texas  78520

ALSO PRESENT:

    Joel Ochoa


## INDEX

| | PAGE |
|---|---|
| Appearances ................................... | 2 |
| JORGE GARCIA ALANIZ | |
| Examination by Mr. Morado ...................... | 3 |
| Errata Sheet/Signature Page .................... | 99 |
| Reporter's Certificate ........................ | 100 |
| Attached to the end of the transcript:  Stipulations | |

## EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 1 | Letter Dated 09-16-98 ................... | 61 |

3

JORGE GARCIA ALANIZ,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. MORADO:

10:13:19  Q.  State your full name, please.

10:13:22  A.  Jorge Garcia Alaniz.

10:13:24  Q.  Mr. Alaniz, my name is Ricardo Morado, and I'm

10:13:28  an attorney.  I represent the City of Port Isabel in

10:13:31  connection with a lawsuit that you have filed in

10:13:32  Federal court, being Civil Action No. B-00-136.  Do you

10:13:38  understand that?

10:13:39  A.  Yes.

10:13:40  Q.  We're here this morning in my offices for the

10:13:42  purposes of taking your deposition in connection with

10:13:44  that lawsuit.  Do you understand that?

10:13:46  A.  Yes.

10:13:46  Q.  Have you ever been deposed in any proceeding,

10:13:49  any other lawsuit, prior to today?

10:13:52  A.  Yes.

10:13:52  Q.  How many times have you gone through

10:13:54  depositions?

10:13:57  A.  Maybe a handful, five -- five times.

10:14:02  Q.  Okay.  Have you ever been a party to a lawsuit

10:14:03  other than this one?

10:14:05  A.  Yes.

10:14:05 1    Q.  How many times have you been a party to a
10:14:08 2    lawsuit?
10:14:08 3    A.  Twice.
10:14:08 4    Q.  Okay.  In this lawsuit, you are the plaintiff,
10:14:11 5    the person bringing the lawsuit.  Do you understand
10:14:15 6    that?
10:14:16 7    A.  Yes.
10:14:16 8    Q.  On these other two occasions that you've been
10:14:19 9    party to a lawsuit, have you been the plaintiff or the
10:14:22 10   defendant?
10:14:22 11   A.  Once -- plaintiff, once.
10:14:24 12   Q.  Okay.  Tell me about the lawsuit -- the other
10:14:28 13   lawsuit in which you were a plaintiff.  When was that
10:14:32 14   filed, more or less?
10:14:34 15   A.  On a car accident?
10:14:37 16   Q.  Whenever it was.
10:14:38 17   A.  It was filed maybe two years ago.  Exactly, I
10:14:42 18   don't know, but two years.
10:14:43 19   Q.  So approximately 1998 or '99?
10:14:46 20   A.  Sure.
10:14:47 21   Q.  And was it in state court?
10:14:49 22   A.  Yes.
10:14:51 23   Q.  Okay.  Do you remember whose court?
10:14:52 24   A.  No, sir.
10:14:54 25   Q.  Do you remember the name of the judge?

| | | |
|---|---|---|
| 10:14:55 | 1 | A.   No. |
| 10:14:56 | 2 | Q.   Did you ever -- did you have to try the case? |
| 10:14:59 | 3 | A.   No, it didn't go. |
| 10:15:00 | 4 | Q.   It settled? |
| 10:15:01 | 5 | A.   It was settled. |
| 10:15:02 | 6 | Q.   Do you remember against whom the case was |
| 10:15:04 | 7 | pending?  Who was the defendant? |
| 10:15:06 | 8 | A.   The company was A&A Waste Disposal out of |
| 10:15:15 | 9 | Mission. |
| 10:15:19 | 10 | Q.   And this accident was a result -- I'm sorry. |
| 10:15:23 | 11 | This lawsuit was a result of an automobile accident you |
| 10:15:26 | 12 | had with an A&A vehicle? |
| 10:15:28 | 13 | A.   Correct. |
| 10:15:30 | 14 | Q.   Okay.  Were you personally involved in that |
| 10:15:31 | 15 | accident? |
| 10:15:32 | 16 | A.   No. |
| 10:15:33 | 17 | Q.   Was someone in your family involved? |
| 10:15:35 | 18 | A.   My wife and my daughter. |
| 10:15:37 | 19 | Q.   What's your wife's name? |
| 10:15:39 | 20 | A.   Rosa. |
| 10:15:45 | 21 | Q.   And your daughter? |
| 10:15:47 | 22 | A.   Jessica. |
| 10:15:49 | 23 | Q.   So Rosa and Jessica were in a motor vehicle |
| 10:15:53 | 24 | which was involved in an accident with an A&A vehicle? |
| 10:15:57 | 25 | A.   Correct. |

10:15:58  1        Q.   When did the accident occur?

10:16:01  2        A.   I think it's November '98, I believe.  I'm not

10:16:05  3    too sure on the month, but somewhere in there.

10:16:09  4        Q.   And who was your attorney in connection with

10:16:11  5    this civil lawsuit?

10:16:21  6        A.   Let me see if I remember the name.

10:16:26  7        Q.   You're going to hurt his feelings if you don't.

10:16:31  8        A.   I can't remember his name, sir.

10:16:33  9        Q.   Okay.  I'm going to leave a blank here in your

10:16:36 10    deposition.  When you read the transcript of your

10:16:40 11    deposition, if you remember the name of the attorney

10:16:41 12    who represented you, go ahead and fill it in.

10:16:46 13        A.   Oh, I'll remember.  Okay.

10:16:46 14        Q.   Then the second time that you were involved in

10:16:49 15    a lawsuit was as a defendant, where somebody sued you,

10:16:54 16    correct?

10:16:55 17        A.   No, I'm sorry.  No.  I was never sued.  What I

10:16:58 18    meant to say was that once I was the one -- I was

10:17:02 19    involved in the accident, and the other one, my wife

10:17:04 20    was involved in an accident.  I wasn't --

10:17:06 21        Q.   So in this second lawsuit prior to today, you

10:17:10 22    were the plaintiff?

10:17:11 23        A.   Right.

10:17:13 24        Q.   And when was that lawsuit filed, more or less?

10:17:15 25        A.   That lawsuit was filed in like '94.

| | | |
|---|---|---|
| 10:17:24 | 1 | Q. And was it Jorge Alaniz versus somebody? |
| 10:17:28 | 2 | A. Uh-huh. |
| 10:17:29 | 3 | Q. You need to -- |
| 10:17:30 | 4 | A. Yes. I'm sorry, yes. |
| 10:17:33 | 5 | Q. Who was the defendant? |
| 10:17:33 | 6 | A. I can't remember the defendant. I know my |
| 10:17:36 | 7 | attorney on that one. |
| 10:17:38 | 8 | Q. Who was your attorney? |
| 10:17:40 | 9 | A. Mr. Marchan. |
| 10:17:41 | 10 | Q. Ray Marchan? |
| 10:17:43 | 11 | A. Yes, sir. |
| 10:17:46 | 12 | Q. Did that case go to trial? |
| 10:17:47 | 13 | A. No. |
| 10:17:52 | 14 | Q. Were you the only plaintiff? |
| 10:17:54 | 15 | A. Yes. |
| 10:17:59 | 16 | Q. And that was as a result of an automobile |
| 10:18:03 | 17 | accident also? |
| 10:18:04 | 18 | A. Yes, sir. I remember the name of this |
| 10:18:05 | 19 | attorney, if you want, now. |
| 10:18:07 | 20 | Q. Sure. |
| 10:18:07 | 21 | A. Bruce Thorpe. |
| 10:18:25 | 22 | Q. Okay. All right. Let me go over some ground |
| 10:18:29 | 23 | rules for deposition. We got into the discussion |
| 10:18:32 | 24 | regarding the lawsuits a little bit ahead of ourselves. |
| 10:18:36 | 25 | Do you understand you've just taken an oath to tell the |

10:18:39 1    truth?

10:18:39 2        A.  Yes, sir.

10:18:40 3        Q.  Okay.  Because you've taken the oath to tell

10:18:41 4    the truth, the testimony that you give during the

10:18:44 5    course of the deposition in this informal setting has

10:18:47 6    the same practical effect as if we were sitting right

10:18:50 7    now in front of a judge and jury.  Do you understand

10:18:53 8    that?

10:18:54 9        A.  Yes, sir.

10:18:54 10       Q.  Because of that, Mr. Alaniz, it becomes very

10:18:57 11   important for you to answer truthfully, to the best of

10:18:59 12   your ability, every question that I pose to you, all

10:19:03 13   right?

10:19:04 14       A.  Yes, sir.

10:19:04 15       Q.  If I ask you a question that you do not

10:19:06 16   understand or which makes no sense to you or you didn't

10:19:10 17   hear it or anything like that, will you please ask me

10:19:13 18   to repeat it or rephrase it before you begin your

10:19:16 19   answer?

10:19:16 20       A.  Yes, sir.

10:19:17 21       Q.  Okay.  In other words, I want you to feel

10:19:20 22   comfortable that you have understood my question before

10:19:23 23   you begin responding, all right?

10:19:25 24       A.  Yes, sir.

10:19:26 25       Q.  Okay.  During the course of the deposition, if

10:19:29  1    you need to take a break to get something to drink, to

10:19:31  2    use the facilities, to stretch your legs, whatever,

10:19:34  3    will you please let me know that you need a break, and

10:19:41  4    I'll be more than happy to afford you some time to do

10:19:41  5    so.

10:19:41  6        A.  Yes.

10:19:42  7        Q.  With respect to any questions that I ask of you

10:19:44  8    during the deposition which can be answered "yes" or

10:19:46  9    "no," would you please answer them "yes" or "no,"

10:19:51 10    rather than using "uh-huh, huh-uh," because the court

10:19:56 11    reporter can only accurately record what you say.  And

10:19:59 12    in order to get an accurate recording of your answer,

10:20:04 13    "yes" or "no" will work most effectively.  Will you do

10:20:07 14    that?

10:20:08 15        A.  Yes, sir.

10:20:08 16        Q.  Now, where do you live?

10:20:10 17        A.  Los Fresnos.

10:20:11 18        Q.  What's your address?

10:20:12 19        A.  32717 Melon Drive.

10:20:19 20        Q.  How long have you lived there?

10:20:23 21        A.  Nine years.

10:20:27 22        Q.  And you live there with your wife?

10:20:30 23        A.  Yes.

10:20:30 24        Q.  Who else lives with you?

10:20:31 25        A.  My daughter.

| | | |
|---|---|---|
| 10:20:32 | 1 | Q.  Is it just the three of you? |
| 10:20:34 | 2 | A.  Yes, sir. |
| 10:20:35 | 3 | Q.  How old is your daughter? |
| 10:20:36 | 4 | A.  My daughter is eight. |
| 10:20:40 | 5 | Q.  Where did you live before you lived at -- on |
| 10:20:44 | 6 | Melon Drive in Los Fresnos? |
| 10:20:47 | 7 | A.  At the B&E Trailer Park in Port Isabel. |
| 10:20:52 | 8 | Q.  How long did you live there? |
| 10:20:53 | 9 | A.  Like nine years. |
| 10:20:55 | 10 | Q.  Okay.  Do you remember what your address was |
| 10:20:59 | 11 | there? |
| 10:20:59 | 12 | A.  No, they didn't have an address at first.  I |
| 10:21:03 | 13 | never used it for mailing. |
| 10:21:05 | 14 | Q.  What's your wife's maiden name? |
| 10:21:07 | 15 | A.  Rosales. |
| 10:21:10 | 16 | Q.  How long have you and she been married? |
| 10:21:11 | 17 | A.  Eight years. |
| 10:21:13 | 18 | Q.  Is this your only marriage? |
| 10:21:16 | 19 | A.  No. |
| 10:21:22 | 20 | Q.  Does she work? |
| 10:21:23 | 21 | A.  No. |
| 10:21:30 | 22 | Q.  You were previously married one other time? |
| 10:21:33 | 23 | A.  Yes. |
| 10:21:33 | 24 | Q.  Okay.  Did that marriage end in divorce? |
| 10:21:36 | 25 | A.  Yes. |

10:21:36 1    Q.  Who were you married to before you married Rosa
10:21:39 2  Rosales?
10:21:40 3    A.  Leticia.
10:21:47 4    Q.  Leticia whom?
10:21:49 5    A.  Flores.
10:21:53 6    Q.  And when were you married to Leticia Flores?
10:22:12 7    A.  I believe it was in -- I can't remember the
10:22:22 8  year.
10:22:23 9    Q.  When were you divorced from her?
10:22:26 10   A.  1998.
10:22:36 11   Q.  No, that can't be right.
10:22:38 12   A.  No.  1989.
10:22:43 13   Q.  Well, let's think about this, Mr. Alaniz.  You
10:22:46 14  told me that you've been married to Rosa Rosales for
10:22:51 15  eight years.
10:22:52 16   A.  Eight years.
10:22:52 17   Q.  I would assume that you were divorced from your
10:22:54 18  first wife before you married Ms. Rosales.
19   A.  Yes.
10:22:57 20   Q.  If you've been married eight years to
10:22:59 21  Ms. Rosales, that means that you married Ms. Rosales
10:23:05 22  perhaps around 1993?
10:23:06 23   A.  '93.  I remember that.
10:23:07 24   Q.  So you were divorced from your first wife
10:23:10 25  sometime prior to the date of your marriage in 1993.

| | | |
|---|---|---|
| 10:23:13 | 1 | A.   '89. |
| 10:23:14 | 2 | Q.   '89? |
| 10:23:15 | 3 | A.   '89. |
| 10:23:17 | 4 | Q.   How many years were you married to Leticia |
| 10:23:19 | 5 | Flores?  More than ten? |
| 10:23:27 | 6 | A.   Ten. |
| 10:23:33 | 7 | Q.   Did you and Leticia Flores have any children? |
| 10:23:36 | 8 | A.   No. |
| 10:23:50 | 9 | Q.   Where does Ms. Flores live now? |
| 10:23:53 | 10 | A.   I don't know. |
| 10:23:59 | 11 | Q.   Where did she last live, to your knowledge, the |
| 10:24:02 | 12 | last place you remember her living? |
| 10:24:05 | 13 | A.   Chicago was the last. |
| 10:24:10 | 14 | Q.   Where was she from originally when you -- |
| 10:24:12 | 15 | A.   La Feria. |
| 10:24:22 | 16 | Q.   Do you remember the names of her parents? |
| 10:24:26 | 17 | A.   They were deceased. |
| 10:24:30 | 18 | Q.   All right.  Tell me about your educational |
| 10:24:32 | 19 | background.  Did you graduate from high school? |
| 10:24:35 | 20 | A.   Graduated from Santa Rosa High School. |
| 10:24:38 | 21 | Q.   What year? |
| 10:24:41 | 22 | A.   Graduated in 1980. |
| 10:24:44 | 23 | Q.   Then after graduating from Santa Rosa High, did |
| 10:24:47 | 24 | you continue on with your education? |
| 10:24:49 | 25 | A.   Pan American University. |

13

| | | |
|---|---|---|
| 10:24:55 | 1 | Q. Did you complete a degree program? |
| 10:24:57 | 2 | A. No. |
| 10:24:58 | 3 | Q. How many years did you go to Pan Am? |
| 10:24:59 | 4 | A. Two. |
| 10:25:00 | 5 | Q. From 1980 to '82? |
| 10:25:02 | 6 | A. Right. |
| 10:25:05 | 7 | Q. And then did you drop out of the program? |
| 10:25:08 | 8 | A. Yes. |
| 10:25:10 | 9 | Q. So after dropping out of Pan Am, have you |
| 10:25:13 | 10 | continued your education any further? |
| 10:25:16 | 11 | A. As far as college, no. |
| 10:25:18 | 12 | Q. Okay. I presume, at some point, you went to a |
| 10:25:21 | 13 | law enforcement academy? |
| 10:25:24 | 14 | A. Academy. |
| 10:25:25 | 15 | Q. Which academy did you attend? |
| 10:25:27 | 16 | A. Rio Grande Valley Regional Academy. |
| 10:25:38 | 17 | Q. Okay. When? |
| 10:25:40 | 18 | A. '82. |
| 10:25:43 | 19 | Q. After Pan Am? |
| 10:25:45 | 20 | A. Uh-huh. Yes, sir. |
| 10:25:50 | 21 | Q. And did you complete the academy successfully |
| 10:25:53 | 22 | during the first attempt? |
| 10:25:54 | 23 | A. Yes, sir. |
| 10:25:55 | 24 | Q. How long was that training program? |
| 10:25:57 | 25 | A. I believe it was three months. |

10:26:04 1     Q.  And after completing the academy in 1982, did

10:26:09 2  you have some type of diploma or certification from the

10:26:14 3  academy?

10:26:15 4     A.  Yes, sir.

10:26:15 5     Q.  What was that?

10:26:16 6     A.  The diploma for completion of the academy.

10:26:20 7     Q.  Is that also known as the basic peace officer

10:26:24 8  certification?

10:26:25 9     A.  Yes, sir.

10:26:36 10    Q.  Now, after receiving that certification, were

10:26:39 11  you licensed by the state at some point?

10:26:42 12    A.  Yes, sir.

10:26:42 13    Q.  When?

10:26:42 14    A.  That same time.

10:26:44 15    Q.  Same time?

10:26:45 16    A.  Yes, sir.

10:26:45 17    Q.  This would still be all in 1982?

10:26:49 18    A.  '82.

10:26:55 19    Q.  All right.  Since that time, since receiving

10:26:58 20  your basic peace officer's certification, have you had

10:27:03 21  any further formal education?

10:27:05 22    A.  I have my master's peace officer.

10:27:17 23    Q.  Is that a certification?

10:27:20 24    A.  Yes, sir.

10:27:20 25    Q.  When did you receive that?

10:27:24  1      A.   Let me see -- '96.

10:27:27  2      Q.   Just five years ago?

10:27:29  3      A.   Uh-huh.  Yes, sir.

10:27:31  4      Q.   From whom, from where?

10:27:33  5      A.   State of Texas.

10:27:37  6      Q.   Did that require you to attend some classes --

10:27:41  7      A.   Yes, sir.

10:27:41  8      Q.   -- or some program prior to receiving the

10:27:45  9  certification?

10:27:46 10      A.   It requires so many hours, plus years of

10:27:53 11  experience.

10:27:53 12      Q.   Okay.  When you say "so many hours," is this

10:27:53 13  part of a continuing program where, perhaps annually,

10:27:56 14  you would take a few classes or a few hours and

10:28:01 15  accumulate them over time until you had enough?

10:28:05 16      A.   Yes.

10:28:05 17      Q.   Okay.  So it was not a situation where you went

10:28:09 18  to a university or an academy for three or four months

10:28:15 19  at a time to complete your master's program and get

10:28:18 20  this master's certification?

10:28:20 21      A.   No.

10:28:22 22      Q.   Any further education after receiving your

10:28:24 23  master's peace officer's certification?

10:28:29 24      A.   In law enforcement?

10:28:31 25      Q.   Any formal education.

10:28:33  1      A.   I've taken the one where I'm at right now, my

10:28:36  2   job, which is hazardous materials, or it's

10:28:39  3   inspector -- safety inspector certification.

10:28:47  4      Q.   And when did you receive the safety inspector

10:28:49  5   certification?

10:28:51  6      A.   I received it in 1999.

10:29:00  7      Q.   From whom?

10:29:01  8      A.   From the Federal government.

10:29:09  9      Q.   Did you have to go off to school somewhere to

10:29:11 10   be trained for this certification?

10:29:15 11      A.   Yes.

10:29:15 12      Q.   Where?

10:29:16 13      A.   El Paso.

10:29:17 14      Q.   What was the name of the facility or the

10:29:19 15   program?

10:29:19 16      A.   The program, North American -- North American

10:29:25 17   level 1 inspectors.

10:29:28 18      Q.   North American level 1 inspectors, and it was

10:29:32 19   sponsored by the United States Government?

10:29:34 20      A.   Right.

10:29:34 21      Q.   A particular branch of the government?

10:29:36 22      A.   United States Department of Transportation.

10:29:51 23      Q.   How long was this program?

10:29:54 24      A.   Five weeks.

10:29:58 25      Q.   Every day?

10:29:59 1      A.  Yes, sir, except for weekends.

10:30:03 2      Q.  And did you successfully complete the program

10:30:05 3  in your first attempt?

10:30:07 4      A.  Yes, sir.

10:30:08 5      Q.  Okay.  Any other formal education you've had

10:30:11 6  since?

10:30:12 7      A.  No, sir.

10:30:20 8      Q.  During the two years that you went to UT Pan

10:30:25 9  Am, did you study any particular field, or were you

10:30:27 10 just, as they say, taking basics?

10:30:30 11     A.  It was basics.  It was a minor in criminal

10:30:35 12 justice.

10:30:36 13     Q.  How many total hours did you accumulate?

10:30:43 14     A.  I believe it was 51.

10:30:46 15     Q.  Just shy of completing your sophomore year?

10:30:50 16     A.  Yes, sir.

10:30:58 17     Q.  What's your date of birth?

10:31:00 18     A.  August 13th, 1962.

10:31:17 19     Q.  You're currently working for the United States

10:31:29 20 Department of Transportation Federal Motor Carrier

10:31:34 21 Safety Division?

10:31:35 22     A.  Safety Administration, Safety Administration.

10:31:40 23     Q.  Safety Administration.  And you've been working

10:31:41 24 for that office since June of 1999?

10:31:45 25     A.  Correct.

10:31:45  1      Q.  So you're coming up on two years?

10:31:47  2      A.  Yes, sir.

10:31:48  3      Q.  All right.  Did you complete your North

10:31:56  4  American level 1 inspection -- inspector program prior

10:32:01  5  to June of 1999?

10:32:04  6      A.  During June.

10:32:05  7      Q.  Okay.  Before you began your employment with

10:32:23  8  the Federal government in June of 1999, where was the

10:32:30  9  last place you had worked?

10:32:30 10      A.  Port Isabel, the City of Port Isabel.

10:32:41 11      Q.  Do you recall the dates from which you worked

10:32:46 12  at the City of Port Isabel?

10:32:50 13      A.  Not offhand, sir.

10:32:54 14      Q.  Do you remember when you were terminated from

10:32:57 15  the City of Port Isabel?

10:32:59 16      A.  It's hard for me because I know that I received

10:33:01 17  a letter stating a certain date, but I know that when

10:33:06 18  we went to appeal for the unemployment, I was given

10:33:08 19  another date.  So there's two dates, in other --

10:33:10 20      Q.  What are the two dates?

10:33:12 21      A.  I can't remember the exact two dates.

10:33:15 22      Q.  Maybe approximate dates?

10:33:18 23      A.  September.

10:33:19 24      Q.  Of what year?

10:33:20 25      A.  Of '98.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366  (956) 428-0755  (956) 542-1020

10:33:38 1      Q.  Okay.  When did you start working for the City

10:33:40 2  of Port Isabel?

10:33:44 3      A.  I know it was March -- March of -- I don't want

10:33:56 4  to guess at it, but something like '83 or '84.

10:34:00 5      Q.  So in the early to mid '80s?

10:34:02 6      A.  Right.  Yes, sir.

10:34:06 7      Q.  To perhaps September of 1998?

10:34:09 8      A.  Yes, sir.

10:34:13 9      Q.  So you worked for the City of Port Isabel 14 or

10:34:16 10  15 years, more or less?

10:34:17 11      A.  Yes, sir, more or less.

10:34:25 12      Q.  During that 14 or 15-year period, did you work

10:34:29 13  anywhere else?

10:34:29 14      A.  No, sir.

10:34:33 15      Q.  What position did you hold when you first began

10:34:36 16  working for the City of Port Isabel?

10:34:38 17      A.  Patrolman.

10:34:48 18      Q.  And then, at some point, were you promoted?

10:34:51 19      A.  Yes, sir.

10:34:51 20      Q.  To what?

10:34:53 21      A.  Corporal.

10:34:54 22      Q.  When?  You can just give me the year, if you

10:35:00 23  remember.

10:35:00 24      A.  I would say around '86.

10:35:03 25      Q.  Uh-huh.  Then were you promoted again?

| | | |
|---|---|---|
| 10:35:07 | 1 | A.  Sergeant. |
| 10:35:13 | 2 | Q.  Roughly, when? |
| 10:35:15 | 3 | A.  '88. |
| 10:35:18 | 4 | Q.  Were you promoted again? |
| 10:35:20 | 5 | A.  First sergeant. |
| 10:35:23 | 6 | Q.  It's sergeant and then first sergeant? |
| 10:35:27 | 7 | A.  First sergeant. |
| 10:35:35 | 8 | Q.  When? |
| 10:35:36 | 9 | A.  The next year, '89. |
| 10:35:38 | 10 | Q.  Uh-huh.  Were you promoted again? |
| 10:35:43 | 11 | A.  Investigator. |
| 10:35:48 | 12 | Q.  And when? |
| 10:35:51 | 13 | A.  I would say a year later after that. |
| 10:35:53 | 14 | Q.  1990 or so? |
| 10:35:55 | 15 | A.  Yes, sir. |
| 10:35:55 | 16 | Q.  Any other promotions? |
| 10:36:02 | 17 | A.  Then I went to sergeant of investigators. |
| 10:36:06 | 18 | Q.  Sergeant of investigators? |
| 10:36:07 | 19 | A.  Yes. |
| 10:36:10 | 20 | Q.  What year? |
| 10:36:11 | 21 | A.  Around '92. |
| 10:36:16 | 22 | Q.  Any other promotions? |
| 10:36:18 | 23 | A.  Then I went to captain. |
| 10:36:27 | 24 | Q.  What year? |
| 10:36:28 | 25 | A.  I would say '95. |

10:36:35  1     Q.  Were you promoted again after captain?

10:36:38  2     A.  I was demoted.

10:36:45  3     Q.  Okay.  And you were demoted to what?

10:36:48  4     A.  Sir?

10:36:48  5     Q.  You were demoted to what?

10:36:51  6     A.  Patrol.

10:36:51  7     Q.  And when?

10:36:53  8     A.  '98.

10:36:58  9     Q.  Do you remember the month?

10:37:03 10     A.  No, sir.

10:37:06 11     Q.  Okay.  And after you were demoted to patrol,

10:37:12 12  was there a change in your work status, either demotion

10:37:18 13  or promotion?

10:37:18 14     A.  I was promoted back to sergeant.

10:37:21 15     Q.  When?

10:37:22 16     A.  That same year.

10:37:26 17     Q.  Okay.  And then?

10:37:28 18     A.  I was terminated.

10:37:38 19     Q.  During the time that you worked for the Port

10:37:40 20  Isabel Police Department, civil service was not in

10:37:42 21  place?

10:37:43 22     A.  No, sir.

10:37:44 23     Q.  So, for example, when you were promoted from

10:37:48 24  patrolman to corporal, was that the result of specific

10:37:55 25  recognition by your superiors, or was it simply a

| | |
|---|---|
| 10:38:00 | 1 | function of having been there "X" period of time? |
| 10:38:03 | 2 | A. No, sir, it was -- you took exams. |
| 10:38:05 | 3 | Q. Okay. So in order to be promoted to a |
| 10:38:07 | 4 | corporal, you took an examination singularly, or other |
| 10:38:14 | 5 | people took it as well? |
| 10:38:15 | 6 | A. Right. Whoever applied for the position. |
| 10:38:18 | 7 | Q. And you ranked or you scored the highest? |
| 10:38:20 | 8 | A. The highest to get it. |
| 10:38:22 | 9 | Q. So the promotion from patrolman to corporal was |
| 10:38:25 | 10 | an exam promotion? |
| 10:38:27 | 11 | A. Yes, sir. Only the first two. |
| 10:38:31 | 12 | Q. Okay. And then from corporal to sergeant was |
| 10:38:33 | 13 | also an exam promotion? |
| 10:38:37 | 14 | A. Yes, sir. |
| 10:38:37 | 15 | Q. I would anticipate that in addition to scoring |
| 10:38:42 | 16 | well on the exam, that you -- the positions also |
| 10:38:45 | 17 | required a certain level of experience? |
| 10:38:47 | 18 | A. Yes, sir. |
| 10:38:48 | 19 | Q. And you fulfilled those at the time? |
| 10:38:50 | 20 | A. Yes, sir. |
| 10:38:51 | 21 | Q. Okay. Now, from your promotion from sergeant |
| 10:38:55 | 22 | to first sergeant, was that a function of specific |
| 10:38:59 | 23 | recognition by your superiors, a function of an exam, |
| 10:39:03 | 24 | or just a function of time? |
| 10:39:05 | 25 | A. By the superior. |

10:39:07  1    Q.   Who was the superior who selected you for

10:39:11  2    promotion from sergeant to --

10:39:13  3    A.   Chief Rosales.

10:39:21  4    Q.   Okay.  And how about from the position of first

10:39:24  5    sergeant to investigator?  Was that also a function of

10:39:28  6    your superiors selecting you for that?

10:39:32  7    A.   Yes, sir.

10:39:32  8    Q.   And was it Chief Rosales, or was it somebody

10:39:36  9    else?

10:39:37 10    A.   Chief Loudrey.

10:39:37 11    Q.   Chief who?

10:39:37 12    A.   Loudrey.

10:39:40 13    Q.   Laundrey?  L-a-u --

10:39:42 14    A.   Chuck Loudrey, L-o-u-d-r-e-y.

10:40:03 15    Q.   Okay.  And then from your promotion -- for your

10:40:05 16    promotion from investigator to sergeant of

10:40:08 17    investigators, was that an exam promotion, a supervisor

10:40:17 18    selection promotion, or a timecard promotion?

10:40:22 19    A.   From the chief, the same.

10:40:25 20    Q.   And who was the chief?

10:40:26 21    A.   Same.  Chief Loudrey.

10:40:28 22    Q.   Loudrey.  All right.  And then you said you

10:40:33 23    were promoted to captain.

10:40:34 24    A.   Yes, sir.

10:40:35 25    Q.   Was that also because of recognition by your

| | |
|---|---|
| 10:40:38 | 1 |
| 10:40:38 | 2 |
| 10:40:39 | 3 |
| 10:40:46 | 4 |
| 10:40:53 | 5 |
| 10:40:58 | 6 |
| 10:41:04 | 7 |
| 10:41:17 | 8 |
| 10:41:17 | 9 |
| 10:41:20 | 10 |
| 10:41:23 | 11 |
| 10:41:25 | 12 |
| 10:41:28 | 13 |
| 10:41:29 | 14 |
| 10:41:31 | 15 |
| 10:41:34 | 16 |
| 10:41:34 | 17 |
| 10:41:38 | 18 |
| 10:41:42 | 19 |
| 10:41:42 | 20 |
| 10:41:46 | 21 |
| 10:41:51 | 22 |
| 10:41:54 | 23 |
| 10:41:56 | 24 |
| 10:41:58 | 25 |

superiors?

A.   Yes, sir.

Q.   And who was that?

A.   John K. Swan.

Q.   Now, in each of these instances where you were promoted because the chief of police at that time selected you for advancement, did the decision rest solely on the chief of police at that time, or did it have to be approved by either the city manager or the city council?

A.   I'm not aware of that, sir.

Q.   So you don't know what was required?

A.   Right.

Q.   You just know the chief was the person who seemed to have selected you for that promotion?

A.   Correct.

Q.   It may have been his sole decision, or he may have needed further approval.  You just don't know?

A.   Correct.

Q.   You mentioned that in 1998, you were demoted from the position of captain down to patrol officer --

A.   Correct.

Q.   -- which is the position you had started in 13 or 14 years earlier.

A.   Correct.

10:42:00 1        Q.  Okay.  Explain to me, in your own words, your
10:42:08 2    understanding of why you were demoted in 1998.
10:42:11 3        A.  In 1998 is the time that Chief John K. Swan
10:42:20 4    retired, and they made acting chief Pedro Collazo.  So
10:42:27 5    during the time when he was selected, the next day, he
10:42:32 6    met with the investigators, which I was in charge of, I
10:42:37 7    was the commander.  And during that time I explained to
10:42:39 8    him that during the ending part of when Chief Swan was
10:42:45 9    the chief, we had asked him about being compensated for
10:42:49 10   hours as far as when we were being called off duty and
10:42:53 11   were not being compensated.  So I approached him about
10:42:56 12   it and told him that we wanted to be paid or
10:43:00 13   compensated in some way for being called out or being
10:43:02 14   called at the residence from patrol division when there
10:43:06 15   was a crime scene.  So he did not agree with that, and
10:43:10 16   I was demoted the next day.
10:43:13 17       Q.  Uh-huh.
10:43:14 18       A.  But during that demotion, I was demoted without
10:43:18 19   rank.
10:43:19 20       Q.  What do you mean?
10:43:20 21       A.  I did not have any rank.  I did not have a
10:43:25 22   specific position.  I was assigned to come in from 8:00
10:43:29 23   to 5:00 into an office and stay in that office from
10:43:33 24   8:00 to 5:00.
10:43:33 25       Q.  As patrol?

10:43:36 1    A.   As anything, nothing, with no duties.

10:43:38 2    Q.   And this was an action taken by Acting Chief

10:43:42 3  Pedro Collazo?

10:43:44 4    A.   Yes, sir.

10:43:44 5    Q.   Now, you mentioned that you had explained to

10:43:46 6  the acting chief that you wanted to be

10:43:48 7  compensated -- you and other officers wanted to be

10:43:51 8  compensated for overtime hours?

10:43:54 9    A.   Myself and Danny Marchan.

10:43:57 10   Q.   During the Swan administration?

10:43:59 11   A.   Yes, sir.

10:43:59 12   Q.   Had you spoken to Chief Swan about that?

10:44:01 13   A.   Yes, sir.

10:44:02 14   Q.   How many times had you spoken to Chief Swan

10:44:03 15  about being compensated for overtime?

10:44:09 16   A.   I believe twice.

10:44:09 17   Q.   Do you remember the dates?

10:44:09 18   A.   No, sir.

10:44:10 19   Q.   Approximately?

10:44:10 20   A.   But at the ending part -- at the ending part of

10:44:13 21  his administration, he had gone through a -- he had a

10:44:14 22  heart attack, so he was -- at the latter part, before

10:44:17 23  he retired, he wasn't in the office for the last couple

10:44:21 24  of months.  That's why it hadn't been addressed.

10:44:23 25   Q.   I'm sorry?

10:44:24 1     A.   It hadn't been addressed because he wasn't at

10:44:27 2   work.   He was going through home stay, I guess, because

10:44:29 3   of his heart attack, bypass surgery.

10:44:32 4     Q.   Okay.   But you're telling me that you spoke to

10:44:35 5   Chief Swan twice about being compensated for overtime?

10:44:40 6     A.   Yes, sir.

10:44:40 7     Q.   And this happened right at the time he had his

10:44:42 8   heart attack?

10:44:43 9     A.   Yes, sir.

10:44:48 10     Q.   We'll take a quick recess.

11          (Brief recess)

10:47:36 12     Q.   When you spoke to Chief Swan on those two

10:47:39 13   occasions about being compensated for overtime, what is

10:47:45 14   it that you said to him, to the best that you can

10:47:47 15   remember right now?

10:47:48 16     A.   I remember just asking did we have some kind

10:47:51 17   of -- being compensated for being called out and

10:47:54 18   working or answering the phone during different parts

10:48:00 19   of the night.

10:48:10 20     Q.   Did Chief Swan ever give you a response in

10:48:13 21   terms of, "Yes, we'll compensate you," or, "No, we

10:48:17 22   can't compensate you," or anything like that?

10:48:19 23     A.   No, sir.   It was pending because of his

10:48:21 24   illness.

10:48:21 25     Q.   Aside from speaking with him, did you present

10:48:25  1    to him anything in writing regarding your request for

10:48:28  2    compensation?

10:48:29  3        A.  No, sir.

10:48:30  4        Q.  Did you present anything in writing to anyone

10:48:33  5    else with the city, the city manager, city secretary,

10:48:38  6    or any other representative of the city, at least as

10:48:42  7    you saw it?

10:48:43  8        A.  Verbal, with the city manager.

10:48:45  9        Q.  Was this at the same time?

10:48:47 10        A.  Yes, sir.

10:48:48 11        Q.  Okay.

10:48:49 12        A.  During the same time.

10:48:51 13        Q.  So with whom did you speak?

10:48:53 14        A.  Manuel Hinojosa.

10:48:59 15        Q.  And what did you say to Mr. Hinojosa?  What did

10:49:05 16    you say to Mr. Hinojosa?

10:49:07 17        A.  As far as -- I talked to him about just trying

10:49:09 18    to be -- the same thing that I asked for, that we

10:49:12 19    wanted to be compensated for working when we were

10:49:14 20    called out or called at the residence.

10:49:17 21        Q.  When you spoke to the chief, Chief Swan, and

10:49:20 22    then to City Manager Hinojosa, did you ask that you be

10:49:24 23    compensated for time that you had spent in the past, or

10:49:29 24    was it a request that, "Hey, from here on forward, we

10:49:32 25    would like to be compensated when we are called out to

10:49:35  1   do these types of things"?

10:49:38  2       A.  Correct.  It was more like we wanted to be paid

10:49:39  3   from -- it was really not looking to the back.  It was

10:49:48  4   just, you know, "We want to be compensated."

10:49:48  5       Q.  So you were requesting, in essence, a policy

10:49:48  6   change, or a change in attitude at least, with respect

10:49:51  7   to, "When I or these officers are called out to do this

10:49:56  8   type of work, then we would like to be compensated for

10:50:00  9   that," correct?

10:50:00 10       A.  Correct.  Be paid.

10:50:01 11       Q.  Correct?

10:50:01 12       A.  Uh-huh.

10:50:02 13       Q.  Okay.  It was not a request for hours worked in

10:50:07 14   the past?

10:50:08 15       A.  Correct.

10:50:14 16       Q.  How many times did you speak to City Manager

10:50:17 17   Hinojosa about trying to effect this policy change?

10:50:21 18       A.  Once.

10:50:22 19       Q.  Do you remember when?

10:50:24 20       A.  No, sir.

10:50:24 21       Q.  Do you remember what his response was?

10:50:28 22       A.  It's something you would have to go back and

10:50:30 23   talk to Chief Swan about.

10:50:41 24       Q.  Now, Chief Swan retired?

10:50:46 25       A.  Yes, sir.

| | |
|---|---|
| 10:50:47 1 | Q. And then Pedro Collazo became the acting chief? |
| 10:50:52 2 | A. Correct. |
| 10:50:53 3 | Q. Who made the decision to place Pedro Collazo as |
| 10:50:59 4 | acting chief? |
| 10:51:00 5 | A. The commission. |
| 10:51:01 6 | Q. This was by a vote in an open meeting? |
| 10:51:08 7 | A. I don't know. |
| 10:51:10 8 | Q. Okay. Who told you that the commission made |
| 10:51:12 9 | that decision? |
| 10:51:13 10 | A. It was announced -- I received a phone call |
| 10:51:17 11 | from the dispatcher as far as who was selected, but I |
| 10:51:22 12 | believe this was done behind closed doors in executive |
| 10:51:25 13 | session. I don't think it was done in an open forum. |
| 10:51:28 14 | Q. Were you present at the meeting where the |
| 10:51:28 15 | action was taken? |
| 10:51:30 16 | A. No, sir. |
| 10:51:30 17 | Q. Do you have any knowledge how the action was |
| 10:51:34 18 | taken? |
| 10:51:34 19 | A. No, sir. |
| 10:51:35 20 | Q. Has anyone told you that this was done in |
| 10:51:37 21 | executive session and was never approved in open |
| 10:51:41 22 | session? |
| 10:51:41 23 | A. No, sir. |
| 10:51:42 24 | Q. How long was Pedro Collazo the acting chief? |
| 10:51:50 25 | A. I'm not sure, sir, but I'd say three months. |

| | |
|---|---|
| 10:52:13 | 1 |
| 10:52:20 | 2 |
| 10:52:24 | 3 |
| 10:52:25 | 4 |
| 10:52:27 | 5 |
| 10:52:31 | 6 |
| 10:52:33 | 7 |
| 10:52:38 | 8 |
| 10:52:40 | 9 |
| 10:52:41 | 10 |
| 10:52:45 | 11 |
| 10:52:49 | 12 |
| 10:52:50 | 13 |
| 10:52:51 | 14 |
| 10:52:58 | 15 |
| 10:53:02 | 16 |
| 10:53:05 | 17 |
| 10:53:09 | 18 |
| 10:53:10 | 19 |
| 10:53:11 | 20 |
| 10:53:12 | 21 |
| 10:53:13 | 22 |
| 10:53:15 | 23 |
| 10:53:19 | 24 |
| 10:53:21 | 25 |

Q.  Now, as acting chief, did Pedro Collazo have the authority to discipline you and any other officer of the police department?

A.  I went to the city manager after he had demoted me to question the same thing you just said.

Q.  So, to your knowledge, as acting chief, did Pedro Collazo have the authority to discipline you or any other officer in the police department?

A.  Yes, yes.

Q.  Did Pedro Collazo explain to you why he was demoting you from captain to patrol?

A.  No.

Q.  He didn't say anything?

A.  No, sir.

Q.  Did Acting Chief Collazo, then, come in one day and communicate with you, either in writing or in person, "Listen, you're no longer captain.  I'm putting you in patrol"?

A.  Verbally.

Q.  Okay.  So he did it verbally?

A.  Uh-huh.

Q.  Is that what he said?

A.  Yes, sir.  Yes, sir.

Q.  Okay.  Did you ask him why?

A.  I went to the city manager.  I didn't ask him.

10:53:24  1    I went to the city manager, Manuel Hinojosa.

10:53:30  2        Q.  Why didn't you ask the chief, "Chief, why are

10:53:33  3    you doing this?  Why am I being demoted?"

10:53:35  4        A.  Because, you know, I believed it all stemmed

10:53:37  5    from that same conversation where we were talking about

10:53:39  6    being paid and he didn't agree with it.  And then he

10:53:42  7    actually told us that we were still going to be called

10:53:45  8    out and still performing the same way, and I disagreed

10:53:48  9    with it.

10:53:49 10        Q.  So what you're telling me is that you never had

10:53:52 11    any discussion whatsoever with Acting Chief Collazo

10:53:57 12    regarding his reasons for demoting you from captain to

10:54:00 13    patrol, correct?

10:54:02 14        A.  Well, not patrol, just no -- no rank.

10:54:05 15        Q.  Okay.  Well, you had mentioned patrol earlier.

10:54:08 16    Was it another --

10:54:10 17        A.  Well, that's the lowest other than -- that's

10:54:11 18    the lowest, as far as you can go, patrol.  That's why I

10:54:14 19    go down to patrol.  But, no -- no conversation with him

10:54:18 20    about it.

10:54:21 21        Q.  Let me -- I'm not sure this is clear for the

10:54:24 22    record, and I want to make it absolutely clear.

10:54:26 23        A.  Okay.

10:54:26 24        Q.  Is it true that you had no conversation or

10:54:30 25    discussion with Pedro Collazo, whatsoever, about the

10:54:36 1 reasons he had for demoting you from captain to
10:54:40 2 whatever position he assigned for you in 1998?
10:54:49 3     A.  Other than -- the only conversation was that I
10:54:52 4 was no longer the commander in charge of -- captain of
10:54:57 5 investigations, that I had been demoted.  That's the
10:55:00 6 only conversation.
10:55:02 7     Q.  Okay.  And you did not ask him, "Why am I being
10:55:07 8 demoted," correct?
10:55:08 9     A.  Yes, sir.  Correct.
10:55:09 10     Q.  Okay.  You went to the city manager?
10:55:11 11     A.  Yes, sir.
10:55:12 12     Q.  Did you ask the city manager why you were being
10:55:16 13 demoted?
10:55:16 14     A.  Yes.
10:55:17 15     Q.  Okay.  Did the city manager have a reason?
10:55:19 16     A.  The only thing the city manager -- and I asked
10:55:21 17 him the same question.  The only thing the city manager
10:55:24 18 told me was, "Go ahead and take the demotion," because
10:55:27 19 there were a lot of problems going on within the
10:55:30 20 department.
10:55:40 21     Q.  Okay.  So City Manager Manuel Hinojosa tells
10:55:44 22 you, in response to your question regarding the reasons
10:55:46 23 for your demotion, "Go ahead and take the demotion,
10:55:50 24 because we have a lot of problems in the police
10:55:52 25 department"?

10:55:52 1      A.   I told him that the reason that I was being

10:55:54 2   demoted was because I was asking that I be compensated

10:55:58 3   for my time, and that had never been answered.  So I

10:56:01 4   told him that I was going to be going to the Work Force

10:56:09 5   Commission to file a complaint as far as not being

10:56:09 6   compensated for my time.

10:56:10 7      Q.   Okay.

10:56:11 8      A.   And he told me then, he told me, "You know

10:56:13 9   what, go ahead and just take the demotion."

10:56:16 10      Q.   Okay.  Well, it is, or at least was, your

10:56:20 11   belief that your demotion at the hands of Acting Chief

10:56:25 12   Collazo was because you had requested a policy change

10:56:29 13   for compensation for certain time?

10:56:32 14      A.   Yes.

10:56:33 15      Q.   Okay.  But, in truth, Acting Chief Collazo

10:56:36 16   never told you that, correct?

10:56:38 17      A.   Correct.

10:56:38 18      Q.   And, in truth, City Manager Hinojosa never told

10:56:43 19   you that?

10:56:45 20      A.   No.

10:56:46 21      Q.   Correct?

10:56:47 22      A.   Correct.

10:56:48 23      Q.   Okay.  Did anyone else acting on behalf of the

10:56:54 24   City of Port Isabel, at least as you understood it,

10:56:58 25   ever tell you that the reason that you were demoted in

10:57:02 1    1998 from the position of captain was because you had

10:57:06 2    requested a policy change to be compensated for the

10:57:09 3    time that you mentioned?

10:57:10 4        A.  The only time was the one when we

10:57:13 5    discussed -- we had a meeting with Pete Collazo and we

10:57:17 6    told him about it, and he said that he would not -- he

10:57:19 7    would not change what was going on.

10:57:20 8        Q.  Okay.  But that was before your demotion,

10:57:22 9    wasn't it?

10:57:23 10       A.  That was the same time he came back and said

10:57:26 11   that I was demoted.

10:57:27 12       Q.  The same day?

10:57:29 13       A.  Let me see.  Yes, sir, the same day.

10:57:37 14       Q.  Okay.  What time of day was it that you had the

10:57:39 15   conversation with Acting Chief Collazo about being

10:57:42 16   compensated?

10:57:44 17       A.  In the morning when he came in.

10:57:45 18       Q.  And what time of day was it that you were

10:57:47 19   demoted?

10:57:49 20       A.  By the afternoon.

10:58:09 21       Q.  Do you remember the day?

10:58:11 22       A.  No, sir.  I remember it was the first day that

10:58:20 23   he was appointed as acting chief.

10:58:37 24       Q.  All right, Mr. Alaniz.  So your discussion with

10:58:42 25   Acting Chief Collazo about changing the policy

10:58:47 1    regarding compensation for this overtime occurred in

10:58:52 2    the morning and your demotion occurred that afternoon?

10:59:00 3        A.   As far as I can remember.

10:59:01 4        Q.   Okay.

10:59:02 5        A.   It was quick.

10:59:02 6        Q.   Okay.  When you had your conversation with

10:59:05 7    Chief Collazo in the morning, did he give you any

10:59:09 8    indication that he was planning to discipline you or

10:59:11 9    anybody else?

10:59:12 10       A.   No.

10:59:13 11       Q.   Okay.  And aside from the fact that it is your

10:59:24 12   belief that you were demoted that afternoon because of

10:59:27 13   the issue you had raised that morning, do you have any

10:59:37 14   evidence to support that belief?

10:59:47 15       A.   No, just myself and Danny Marchan were there.

10:59:53 16       Q.   Did Mr. Marchan present the same request or

11:00:00 17   complaint that you did to Acting Chief Collazo about

11:00:10 18   the change in policy regarding overtime?

11:00:10 19       A.   I was the only one talking.  He was present,

11:00:12 20   but I'm the one that -- since I was the commander, I'm

11:00:15 21   the one that was making the --

11:00:17 22       Q.   Was he there in support of your request?

11:00:20 23       A.   Yes, sir.

11:00:21 24       Q.   Were you and he working together to push this

11:00:23 25   matter or this issue forward?

11:00:25 1        A.  Yes.

11:00:25 2        Q.  You and Danny Marchan?

11:00:28 3        A.  Yes.

11:00:28 4        Q.  Was Danny Marchan subjected to any type of

11:00:33 5    disciplinary action by Acting Chief Collazo?

11:00:37 6        A.  No.

11:01:01 7        Q.  Were you aware of any complaints about you or

11:01:08 8    your performance as a law enforcement officer that

11:01:12 9    could have formed the basis for Chief Collazo's

11:01:16 10   decision to remove you as captain?

11:01:19 11       A.  No, sir.

11:01:21 12       Q.  Have you asked anyone whether or not there were

11:01:25 13   any complaints existing at that time that could have

11:01:30 14   formed the basis of Chief Collazo's decision?

11:01:33 15       A.  No, sir.

11:01:33 16       Q.  You haven't asked?

11:01:34 17       A.  No.

11:01:46 18       Q.  Now, sometime after this demotion, you were

11:01:53 19   repromoted or reinstated back to sergeant?

11:01:59 20       A.  Yes, sir.

11:02:03 21       Q.  How long after you were demoted?

11:02:06 22       A.  Whenever they selected the new chief.

11:02:12 23       Q.  Being who?

11:02:13 24       A.  Joel Ochoa.

11:02:15 25       Q.  Okay.  Did it occur the same day?

11:02:17  1      A.   That first day, I was advised that I was

11:02:20  2     still -- I was going to be a patrolman.   And then I

11:02:23  3     asked if I was going to be placed back to my rank.   And

11:02:26  4     then when they came back, they came back that I was

11:02:29  5     going to be a sergeant.

11:02:31  6      Q.   Was it the same day?

11:02:32  7      A.   The same day.

11:02:33  8      Q.   Okay.   So the first day that Joel Ochoa becomes

11:02:37  9     the chief of police, then Pedro Collazo is removed as

11:02:42 10     acting chief?

11:02:44 11      A.   Yes, sir.

11:02:44 12      Q.   And that same day, you are reinstated from

11:02:48 13     patrolman to sergeant?

11:02:51 14      A.   No, sir.   I was reinstated from not having a

11:02:54 15     position to patrolman, and then in the afternoon I was

11:02:57 16     advised that I was a sergeant.

11:03:03 17      Q.   And this was all at the hands of Chief Joel

11:03:06 18     Ochoa?

11:03:07 19      A.   It was not through him.   He was going through

11:03:09 20     Pete Collazo, who was the acting chief.   I did

11:03:14 21     not -- Joel did not tell me.   It came from Pete

11:03:17 22     Collazo.

11:03:20 23      Q.   But Joel Ochoa was already the chief of police?

11:03:23 24      A.   Correct.

11:03:24 25      Q.   So Pedro Collazo was no longer acting chief,

11:03:27 1    was he?

11:03:27 2         A.  But the chief was going through him to me.

11:03:31 3         Q.  I understand that.

11:03:31 4         A.  Yes, sir.

11:03:31 5         Q.  But let's make this clear.  At the time that

11:03:33 6    Joel Ochoa became chief of police, Pedro Collazo ceased

11:03:44 7    being chief of police.

11:03:44 8         A.  Correct.

11:03:44 9         Q.  He was something else within the department?

11:03:44 10        A.  Sergeant.

11:03:44 11        Q.  Okay.  So Chief Joel Ochoa, speaking through

11:03:47 12   his sergeant, Pedro Collazo, had you eventually

11:03:52 13   reinstated to the position of sergeant on the very

11:03:56 14   first day that he became chief of police?

11:03:59 15        A.  Yes.

11:04:23 16        Q.  Now, did -- and you don't remember what date

11:04:27 17   that was?

11:04:28 18        A.  No, sir.

11:04:29 19        Q.  Do you remember -- it was still 1998?

11:04:31 20        A.  Yes, sir.

11:04:44 21        Q.  Now, did you speak at all with Chief Ochoa that

11:04:48 22   first day of his tenure as chief of police?

11:04:52 23        A.  I had spoken with Joel prior to him being

11:04:55 24   selected as chief of police.

11:04:57 25        Q.  When you say "Joel," you're speaking of Chief

11:05:02  1   Ochoa?

11:05:02  2       A.  Yes.

11:05:02  3       Q.  You had spoken to him before he became the

11:05:05  4   chief?

11:05:05  5       A.  Yes, sir.

11:05:05  6       Q.  You spoke with him privately as one person to

11:05:08  7   another, or you spoke to him professionally as one

11:05:12  8   officer to another, or what --

11:05:13  9       A.  No, privately.  One on one.

11:05:15 10       Q.  How many times did you speak with him before he

11:05:18 11   became chief?

11:05:20 12       A.  Once.

11:05:21 13       Q.  Where?

11:05:21 14       A.  It was at the Island, at Jake's Restaurant.

11:05:24 15       Q.  Okay.  How long before he became the chief of

11:05:26 16   police did you have this meeting with him?

11:05:29 17       A.  Maybe a week or two prior to him being

11:05:32 18   selected.

11:05:33 19       Q.  And was this a chance meeting where you just

11:05:36 20   ran into him, or was this a meeting that was set up

11:05:41 21   between the two of you to get together and discuss

11:05:44 22   things?

11:05:45 23       A.  No, it was a chance meeting.  The chief was

11:05:47 24   with Martin Cantu, who was a commissioner, and they

11:05:51 25   drove by the department, and I met with them, and we

11:05:54 1    decided to go have a cup of coffee.

11:05:56 2        Q.  Okay.  They drove by the Port Isabel

11:05:59 3    department?

11:05:59 4        A.  Yes, sir, and I was outside.

11:06:01 5        Q.  And you were invited to join them at Jake's

11:06:04 6    Restaurant?

11:06:05 7        A.  Yes.

11:06:05 8        Q.  And what did you and Chief -- and Joel

11:06:07 9    Ochoa -- he was not chief at the time, obviously.  What

11:06:09 10   did you and Joel Ochoa discuss at Jake's Restaurant?

11:06:11 11       A.  I explained to him the situation I was in and

11:06:14 12   what had happened as far as my having no title, being

11:06:18 13   there at the department, that I wished to go back to

11:06:21 14   being an investigator.

11:06:22 15       Q.  Uh-huh.

11:06:23 16       A.  And that was my intention, if he was selected,

11:06:26 17   for me to go back to doing what I was doing prior.

11:06:28 18       Q.  So was this a request that you were making?

11:06:31 19       A.  Not a request.  Just --

11:06:33 20       Q.  What would you characterize it as?

11:06:36 21       A.  Just making him aware of what was going on and

11:06:39 22   my situation only.

11:06:40 23       Q.  Did he respond to your comments where you made

11:06:42 24   him aware of your perspective on these things?

11:06:46 25       A.  He said he would look into it, if he was

11:06:51 1    selected, and make his decision from there.

11:06:51 2        Q.  Okay.  Do you remember anything else about your

11:06:52 3    conversation with Joel Ochoa at Jake's Restaurant?

11:06:56 4        A.  No.

11:06:56 5        Q.  Did you speak with Commissioner Martin Cantu at

11:06:59 6    all about your future with the City?

11:07:03 7        A.  He was there.  He heard the conversation.

11:07:05 8        Q.  Did you speak with him about your future with

11:07:07 9    the City?

11:07:08 10       A.  Yes.

11:07:09 11       Q.  What did he say?

11:07:10 12       A.  That he would -- if Joel was selected, that

11:07:13 13   they would look into it.

11:07:15 14       Q.  Was that all he said?

11:07:16 15       A.  That's it.

11:07:19 16       Q.  Okay.  Was that the only meeting you had with

11:07:20 17   Joel Ochoa before he became chief of police?

11:07:25 18       A.  Yes.

11:07:25 19       Q.  All right.  Now, when he became chief of police

11:07:27 20   and you were reinstated that very first day, did you

11:07:30 21   have any conversations with Joel Ochoa now as chief of

11:07:35 22   police?

11:07:35 23       A.  That day, no.

11:07:35 24       Q.  Okay.  The following day?

11:07:40 25       A.  No.

11:07:40 1      Q.  Okay.  Did you ever have any meetings with

11:07:42 2  Chief Ochoa wherein you and he discussed what was

11:07:50 3  expected of you in your role as a member of the

11:07:54 4  department, you know, how the chief planned to run the

11:07:58 5  department, what role you might play, that type of

11:08:01 6  thing?

11:08:02 7      A.  He had a meeting with me and he asked me to

11:08:04 8  help him out, since I was one of the senior officers,

11:08:07 9  to help him out with the department.

11:08:10 10      Q.  And how long was it after he became chief of

11:08:12 11  police that you had that meeting?

11:08:15 12      A.  I'm not sure, sir.

11:08:17 13      Q.  Within a week, within two weeks?

11:08:20 14      A.  I would say within two weeks.

11:08:31 15      Q.  And what did he say to you at that meeting?

11:08:36 16      A.  That he would like for me to assist him with

11:08:40 17  the department's overall operations, since I had been

11:08:43 18  there for several years.

11:08:58 19      Q.  Did he speak more specifically than that, other

11:09:01 20  than, "I want your help in the department"?  Did he say

11:09:04 21  how?

11:09:05 22      A.  No.  But I remember during some of those

11:09:08 23  meetings -- I don't remember if it was the first,

11:09:13 24  second, the chief started telling me that Commissioner

11:09:18 25  Moore didn't want me on the department.  And, you know,

11:09:21 1   he made several comments about, you know, that he

11:09:24 2   wanted me out of the department.

11:09:25 3       Q.   Who wanted you out?

11:09:27 4       A.   The commissioner.

11:09:29 5       Q.   Okay.  Let's go back, though, to this meeting

11:09:39 6   that you mentioned that occurred within the first two

11:09:41 7   weeks where Chief Ochoa told you that he wanted you to

11:09:46 8   help him in the department.  Aside from making that

11:09:54 9   statement or that request of you, did Chief Ochoa give

11:09:58 10  you any specific instructions regarding how he would

11:10:04 11  like you to help him?

11:10:06 12      A.   No.

11:10:09 13      Q.   How long was this meeting with him?

11:10:10 14      A.   Short.

11:10:11 15      Q.   How short?

11:10:18 16      A.   I'd say ten minutes.

11:10:18 17      Q.   What else did you discuss for the other nine

11:10:21 18  minutes or so?

11:10:22 19      A.   Basically, I was just sitting there talking to

11:10:23 20  him.  Of what, I don't remember.

11:10:26 21      Q.   Okay.  Now, up until that time, you had never

11:10:31 22  taken the opportunity to speak to Chief Ochoa and

11:10:44 23  either ask him about your reinstatement as sergeant or

11:10:48 24  express some gratitude about your reinstatement as

11:10:52 25  sergeant?

11:10:53  1      A.  No.

11:10:55  2      Q.  Now, you said that during the context of those

11:10:59  3   meetings -- and I think this was what you said -- that

11:11:02  4   during the context of those meetings, that Chief Ochoa

11:11:05  5   told you that Commissioner Moore wanted you out.  What

11:11:08  6   meetings are you talking about?

11:11:10  7      A.  Sometimes when -- well, it's not meetings.

11:11:11  8   Sometimes when you'd pass by, the chief's door was

11:11:15  9   open.  He always had an open-door policy, and you could

11:11:18 10   go in there and sit down.  And I would sit down with

11:11:22 11   him and start talking.

11:11:23 12      Q.  When was the first time that Chief Ochoa told

11:11:25 13   you that Commissioner Moore wanted you out?

11:11:29 14      A.  I don't recall, sir.

11:11:30 15      Q.  How many times did he tell you that?

11:11:31 16      A.  I would say maybe four, five times.

11:11:36 17      Q.  Okay.  Now, aside from making the

11:11:57 18   representation that Commissioner Moore wanted you out

11:12:01 19   of the department, did Chief Ochoa ever elaborate

11:12:06 20   further, give any reasons for Commissioner Moore's

11:12:13 21   request or intention?

11:12:15 22      A.  No, other than just saying he just didn't want

11:12:19 23   me in the department.

11:12:29 24      Q.  Nothing further, no further reason?

11:12:32 25      A.  No, sir.  He had made a request to me, asking

11:12:36 1   me if I could go talk to the commissioner to see if I

11:12:39 2   could straighten out -- or try to find out what was

11:12:42 3   going on between the commissioner and myself.

11:12:44 4      Q.  Chief Ochoa suggested that you speak to the

11:12:46 5   commissioner?

11:12:47 6      A.  Yes.

11:12:48 7      Q.  Did you?

11:12:48 8      A.  No.

11:12:54 9      Q.  Now, did Chief Ochoa give you any indication

11:12:58 10   about whether he was inclined to acquiesce to

11:13:05 11   Commissioner Moore's request or not?

11:13:10 12      A.  No.

11:13:11 13      Q.  Didn't say either way?

11:13:14 14      A.  I believe he made a comment that -- he said

11:13:15 15   that if they were trying to fire me, that they would

11:13:20 16   have to fire him first.  I believe that's what he said.

11:13:24 17      Q.  Okay.  So the chief tells you during one of

11:13:40 18   these discussions that if the City wants to fire you,

11:13:47 19   they're going to have to fire him first?

11:13:50 20      A.  No, sir.  That Moore wanted me out, not the

11:13:57 21   City.

11:13:57 22      Q.  Okay.  So the chief tells you, then, that if

11:14:00 23   Moore fires you, he has to fire the chief first?

11:14:04 24      A.  Wants me out, right.  He would have to go

11:14:10 25   through him first.

| | | |
|---|---|---|
| 11:14:25 | 1 | Q. Did you accept this comment as a show of |
| 11:14:29 | 2 | support for you? |
| 11:14:30 | 3 | A. No. |
| 11:14:32 | 4 | Q. Why not? |
| 11:14:33 | 5 | A. I didn't really think he meant it. |
| 11:14:37 | 6 | Q. Okay. And why did you think that? |
| 11:14:39 | 7 | A. Just the way he presented himself about it. |
| 11:14:43 | 8 | Q. What, specifically? |
| 11:14:46 | 9 | A. I guess because, you know, Mr. Moore visited |
| 11:14:49 | 10 | him several times, I mean, almost on a daily basis. |
| 11:14:53 | 11 | Q. Uh-huh. |
| 11:14:57 | 12 | A. And I truly believed that they had a close |
| 11:15:00 | 13 | relationship. |
| 11:15:05 | 14 | Q. Okay. You say Moore would visit with the chief |
| 11:15:12 | 15 | daily? |
| 11:15:12 | 16 | A. Almost on a daily basis. |
| 11:15:32 | 17 | Q. Were you ever present during these meetings |
| 11:15:34 | 18 | with Commissioner Moore and Chief Ochoa? |
| 11:15:38 | 19 | A. No. |
| 11:15:39 | 20 | Q. Did you ever overhear their conversations? |
| 11:15:43 | 21 | A. No. |
| 11:15:44 | 22 | Q. Do you have any knowledge about what they |
| 11:15:46 | 23 | discussed during any of these meetings? |
| 11:15:48 | 24 | A. No. |
| 11:15:48 | 25 | Q. Okay. Any other reason why you didn't think |

| | |
|---|---|
| 11:15:53 1 | that the chief meant what he said when he said that |
| 11:15:57 2 | they would have to fire him before they fired you? |
| 11:16:00 3 | A.  No. |
| 11:16:16 4 | Q.  Let's take a quick recess. |
| 5 | (Brief recess) |
| 11:27:25 6 | Q.  Mr. Alaniz, before the break we were talking |
| 11:27:30 7 | about some conversations you had with Chief Ochoa and |
| 11:27:38 8 | your reasons for not believing that he meant what he |
| 11:27:43 9 | said when he told you that if Commissioner Moore wanted |
| 11:27:47 10 | to fire you, that he would have to fire him first. |
| 11:27:53 11 | Aside from the fact that you saw Commissioner Moore |
| 11:27:57 12 | visit with the chief on almost a daily basis, is there |
| 11:28:01 13 | any other reason that you have for believing that? |
| 11:28:04 14 | A.  No. |
| 11:28:07 15 | Q.  Now, how long did you hold the position of |
| 11:28:25 16 | sergeant in 1998 before you were ultimately terminated? |
| 11:28:31 17 | A.  Until the day I was terminated. |
| 11:28:34 18 | Q.  Well, I know that.  I mean, what period of time |
| 11:28:36 19 | was that, a month, two months, a matter of weeks, a |
| 11:28:39 20 | matter of days? |
| 11:28:39 21 | A.  No, it was months. |
| 11:28:41 22 | Q.  Months? |
| 11:28:42 23 | A.  Yes, sir. |
| 11:28:43 24 | Q.  Okay.  During that period of months, were you |
| 11:28:46 25 | aware of any complaints about your performance as a law |

11:28:51  1    enforcement officer?

11:28:53  2        A.  No, sir.

11:28:54  3        Q.  No one ever brought to your attention any

11:28:55  4    complaints about your actions as a law enforcement

11:29:00  5    officer during that period of time?

11:29:02  6        A.  No, sir.

11:29:03  7        Q.  During that period of months, however long it

11:29:07  8    was, did you have any problems or troublesome issues

11:29:18  9    that developed between you and Chief Ochoa?

11:29:23 10        A.  No.

11:29:25 11        Q.  Okay.  So as far as you could tell, things were

11:29:28 12    running smoothly?

11:29:30 13        A.  Yes.

11:29:32 14        Q.  Okay.  Now, you were terminated in September of

11:29:39 15    1998?

11:29:39 16        A.  Yes, sir.

11:29:39 17        Q.  By Chief Ochoa?

11:29:39 18        A.  Yes, sir.

11:29:39 19        Q.  Okay.  You were given a letter of termination?

11:29:41 20        A.  Eventually, yes.

11:29:43 21        Q.  Okay.  Tell me what happened on the day you

11:29:51 22    first learned that you were fired.

11:29:55 23        A.  The first day I was fired, sir, or the first

11:29:58 24    day that I was told to go home?

11:30:01 25        Q.  Well --

11:30:01  1     A.   Because --

11:30:02  2     Q.   When --

11:30:03  3     A.   -- it's two different --

11:30:04  4     Q.   Okay.  When did you first learn that you no

11:30:10  5  longer had a job at the Port Isabel Police Department?

11:30:18  6     A.   I was under investigation maybe three weeks.

11:30:25  7  Within that time, Danny Marchan came to my house and

11:30:29  8  dropped off an envelope, and within that envelope it

11:30:34  9  said that I had already been terminated.

       10     Q.   Okay.

11:30:40 11     A.   It was a letter that was sent to my house.

11:30:41 12     Q.   Okay.  So you learned of your firing or your

11:30:44 13  termination from that letter?

11:30:46 14     A.   Correct.

11:30:46 15     Q.   That was delivered by --

11:30:48 16     A.   Danny Marchan.

11:30:50 17     Q.   Danny Marchan.  And you stated that you were

11:31:08 18  under investigation?

11:31:15 19     A.   Yes, sir.

11:31:15 20     Q.   Under investigation by whom?  Who was

11:31:18 21  investigating you?

11:31:18 22     A.   Pete Collazo.

11:31:20 23     Q.   And you had been under investigation for about

11:31:23 24  three weeks?

11:31:23 25     A.   About three weeks.

| | | |
|---|---|---|
| 11:31:41 | 1 | Q.  Okay.  When did you first learn that you were |
| 11:31:44 | 2 | the subject of an investigation? |
| 11:31:47 | 3 | A.  Chief Ochoa had come in around 6:00 a.m. when I |
| 11:31:53 | 4 | was working the late shift and asked to speak to me in |
| 11:31:57 | 5 | his office. |
| 11:31:57 | 6 | Q.  Okay.  Do you remember the date? |
| 11:31:58 | 7 | A.  No, sir, I don't remember the date. |
| 11:31:59 | 8 | Q.  This would have been three weeks before your |
| 11:32:01 | 9 | termination, more or less? |
| 11:32:04 | 10 | A.  Correct. |
| 11:32:04 | 11 | Q.  Okay.  And what happened? |
| 11:32:05 | 12 | A.  He told me that he had received a complaint |
| 11:32:07 | 13 | from an officer. |
| 11:32:15 | 14 | Q.  Did he identify the officer? |
| 11:32:17 | 15 | A.  Yes.  Let me see if I can remember his name. |
| 11:32:32 | 16 | Tommy Salazar. |
| 11:32:36 | 17 | Q.  Okay.  Tell me everything that you remember |
| 11:32:38 | 18 | Chief Ochoa telling you during this meeting early that |
| 11:32:42 | 19 | morning. |
| 11:32:43 | 20 | A.  He had told me that he received a complaint in |
| 11:32:47 | 21 | reference to -- or from Tommy Salazar in reference to |
| 11:32:51 | 22 | him doing a search on a vehicle, and which I had |
| 11:32:55 | 23 | stopped the search, and he was placing me on suspension |
| 11:33:01 | 24 | for -- pending further investigation.  So at that time |
| 11:33:05 | 25 | I talked to him about it and explained what had |

11:33:07 1    happened.  And he then turned around and said for me

11:33:12 2    not to worry about it, that he was just going to talk

11:33:16 3    to the officer, and that he wasn't going to do the

11:33:17 4    investigation at that time.  And then I walked out from

11:33:22 5    his office and went to the sergeant's office.  And

11:33:25 6    maybe 15 minutes later he came back and said that he

11:33:30 7    was still going to place me on suspension pending an

11:33:37 8    investigation of what happened.

11:33:37 9        Q.  Okay.  So he changed his mind within a

11:33:38 10   15-minute time frame?

11:33:40 11       A.  Right.  And he came back and told me that he

11:33:42 12   was still going to suspend me.

11:33:44 13       Q.  Was this a suspension with or without pay?

11:33:46 14       A.  With pay.

11:33:51 15       Q.  And as far as you knew, the investigation

11:33:53 16   centered around Officer Salazar's complaints about you?

11:34:00 17       A.  Yes.

11:34:00 18       Q.  Anything else that you were aware was the area

11:34:02 19   of investigation?

11:34:03 20       A.  No, sir, other than me filing a complaint with

11:34:06 21   the chief as far as who was doing the investigation.

11:34:11 22       Q.  Well, that was later, wasn't it?

11:34:16 23       A.  When I found out who was investigating, I

11:34:19 24   called the chief and told him.

11:34:22 25       Q.  When did you find out who would be handling the

11:34:25 1    investigation?

11:34:25 2         A.   I'm not too sure, sir.   Within the same week,

11:34:28 3    but exactly when, I don't know -- but within the

11:34:31 4    same --

11:34:31 5         Q.   And you found out that it was Pete Collazo?

11:34:35 6         A.   Yes, sir.

11:34:35 7         Q.   And you complained?

11:34:37 8         A.   Yes, sir.

11:34:38 9         Q.   Why?

11:34:38 10        A.   I felt that my investigation wouldn't be a fair

11:34:41 11   investigation because myself and Pete Collazo already

11:34:44 12   had a conflict between us.   And I explained -- I

11:34:47 13   explained it to the chief, that I thought that it

11:34:49 14   wouldn't be a fair investigation for him to be doing

11:34:52 15   it.

11:34:56 16        Q.   And what did the chief say in response to your

11:34:59 17   comments about Mr. Collazo's objectivity?

11:35:03 18        A.   That he would look into it.

11:35:06 19        Q.   Is that it?

11:35:07 20        A.   That's it.   After that, the chief ignored my

11:35:19 21   phone calls for the next, what, two weeks.

11:35:22 22        Q.   How many times did you try to call?

11:35:27 23        A.   Maybe six, eight times.   I even called him at

11:35:31 24   his residence.

11:35:41 25        Q.   Okay.   During the context of this investigation

| | |
|---|---|
| 11:35:44 1 | by Officer Collazo, were you contacted by Officer |
| 11:35:52 2 | Collazo? |
| 11:35:54 3 | A.  No, sir. |
| 11:35:56 4 | Q.  Do you know who was? |
| 11:35:56 5 | A.  No, sir. |
| 11:35:56 6 | Q.  Do you know how Officer Collazo handled the |
| 11:36:01 7 | investigation? |
| 11:36:01 8 | A.  No, sir. |
| 11:36:02 9 | Q.  Do you know with whom he spoke? |
| 11:36:04 10 | A.  Right now, or at that time? |
| 11:36:05 11 | Q.  Right now.  Do you know with whom he spoke? |
| 11:36:09 12 | A.  Yes, sir. |
| 11:36:10 13 | Q.  Okay.  With whom did he speak? |
| 11:36:11 14 | A.  There were several -- several.  Let me see if I |
| 11:36:15 15 | can remember the names.  I know there was Nadine, there |
| 11:36:22 16 | was Tommy Salazar, David Gorham, Isaac Juarez, Mike |
| 11:36:39 17 | Hatley, Homer Salazar -- Homer Reyna, Homer Reyna, and |
| 11:36:56 18 | Rodney Moore.  Those are the ones I can remember. |
| 11:37:02 19 | Q.  At the time -- this would have been in late |
| 11:37:05 20 | 1998, was Pete Collazo next in command after Chief |
| 11:37:13 21 | Ochoa? |
| 11:37:13 22 | A.  No, sir. |
| 11:37:17 23 | Q.  Who was? |
| 11:37:17 24 | A.  I don't believe he had anybody next in command. |
| 11:37:18 25 | Q.  Well, Chief Ochoa was obviously at the top of |

11:37:25  1   the hierarchy in the police department.

11:37:27  2       A.   Correct.

11:37:28  3       Q.   Who would be in the next tier?

11:37:31  4       A.   There was no chain of command established that

11:37:34  5   I'm aware of.

11:37:35  6       Q.   Okay.  Well, in his absence, who would make any

11:37:38  7   decisions on behalf of the department as they may need

11:37:41  8   to have been made?

11:37:44  9       A.   I'm not aware of that, sir.

11:37:46 10       Q.   Aside from the fact that you felt that you had

11:37:48 11   a personal problem or animosity with Pete Collazo, was

11:37:56 12   there any other reason why you felt he was an

11:37:58 13   inappropriate choice for conducting this investigation?

11:38:01 14       A.   He had no background in investigations.  The

11:38:04 15   only background he had was in patrol.  There were

11:38:08 16   several other investigators that did have -- or who had

11:38:10 17   already gone through investigations.

11:38:12 18       Q.   This wasn't a criminal investigation, was it?

11:38:15 19       A.   No, sir.

11:38:16 20       Q.   Okay.  Any other reason why you felt he was

11:38:18 21   inappropriate for this job?

11:38:21 22       A.   No, sir.

11:38:24 23       Q.   Now, you mentioned that Officer Collazo spoke

11:38:26 24   with a handful of people, Officer Salazar, Gorham,

11:38:30 25   Juarez, Nadine -- McDonald?

11:38:35 1      A.  McDowell, I think.

11:38:36 2      Q.  McDowell, Hatley, and Reyna, and Moore.  Was

11:38:43 3  there anything inappropriate about Officer Collazo

11:38:48 4  speaking with these individuals?

11:38:50 5      A.  As far as?

11:38:52 6      Q.  As far as conducting an investigation.

11:38:54 7      A.  My understanding is that I received the

11:38:57 8  complaint, or that the chief received the complaint

11:38:59 9  against me from an officer named Tomas Salazar about a

11:39:06 10  certain situation.  That's the only thing I was told.

11:39:08 11  At the end, I found out it became an open-ended

11:39:11 12  investigation during the whole one-year period, going

11:39:14 13  back and trying to see what was going on within one

11:39:15 14  year.  That's what I thought was inappropriate, that it

11:39:19 15  became an open-ended investigation, not just the

11:39:20 16  complaint that the officer sent and it was addressed.

11:39:22 17  It wasn't -- that's not the only thing that was being

11:39:26 18  addressed.  As far as I knew, it was an open-ended

11:39:26 19  investigation, who had something.  So they went to

11:39:28 20  everybody.

11:39:28 21      Q.  So your criticism of Officer Collazo having

11:39:33 22  spoken to all these people is not that he did it, but

11:39:37 23  that the scope of the investigation went beyond the one

11:39:41 24  incident involving Officer Salazar?

11:39:43 25      A.  Correct.  Plus, I wasn't notified of what the

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366  (956) 428-0755  (956) 542-1020

11:39:46  1    complaints were.   And when I was trying to make contact

11:39:48  2    with the chief to find out during that time what was

11:39:51  3    going on, none of my calls were being returned.   So I

11:39:54  4    wasn't aware of anything that was going on.

11:39:56  5        Q.  Was there something, either in the departmental

11:39:58  6    policies or in the city policies, that required the

11:40:03  7    chief or anyone else to notify you of the scope of the

11:40:07  8    investigation being conducted?

11:40:08  9        A.  I'm not too sure where it's at, but I know that

11:40:14 10    there's -- it's within there, where it says if there is

11:40:14 11    a complaint, you need to be notified of what the

11:40:17 12    complaint is.   Whether it has to be in writing or not,

11:40:20 13    I'm not too sure.

11:40:22 14        Q.  Okay.  Well, those are two different things.

11:40:23 15        A.  Sure.

11:40:24 16        Q.  You were obviously notified of the Salazar

11:40:26 17    complaint.

11:40:27 18        A.  Verbally, correct.

11:40:28 19        Q.  Well, but you were aware that it was existent?

11:40:32 20        A.  Yes, yes.

11:40:32 21        Q.  All right.  Is it your position that if that

11:40:36 22    investigation spawned other investigations, that you

11:40:43 23    should have been informed of any other incidents that

11:40:48 24    were being investigated?

11:40:49 25        A.  Yes.

11:40:49  1        Q.   And that's based on your interpretation of some

11:40:51  2   policy?

11:40:52  3        A.   Sure.  Yes.

11:40:52  4        Q.   What policy?

11:40:53  5        A.   I'm not aware, like I said.  I don't know

11:40:56  6   word-by-word where it's at, but I'm pretty sure that in

11:41:00  7   the policy, there's somewhere where it says.

11:41:01  8        Q.   When you say that you're "pretty sure that in

11:41:02  9   the policy," what policy are you talking about?

11:41:04 10        A.   It should be in the police -- or in the

11:41:06 11   department policy.

11:41:06 12        Q.   Okay.  Have you ever seen the department policy

11:41:09 13   that you think required notification to you of

11:41:14 14   additional areas of investigation?

11:41:17 15        A.   I can't answer that.  Like I said -- I would

11:41:20 16   have to go back to the department policy manual.

11:41:23 17        Q.   What you're telling me is you don't remember

11:41:26 18   right now whether or not you've ever seen that policy,

11:41:29 19   correct?

11:41:29 20        A.   Right.  Yes, sir.

11:41:32 21        Q.   But if it exists, you believe it exists within

11:41:35 22   the Port Isabel Police Department policies?

11:41:38 23        A.   Manual.

11:41:45 24        Q.   And if it doesn't exist there, then you're

11:41:48 25   wrong, it doesn't exist, correct?

| | |
|---|---|
| 11:41:50 | 1 |

    A.   Correct.  There is a policy -- there is a

11:42:03  2    department policy, and there is a city manual.

11:42:05  3        Q.   Which one is the one that you think applies?

11:42:08  4        A.   It could be in both, because I know the city

11:42:11  5    manual also has policy on the complaints.

11:42:14  6        Q.   You haven't taken the time to read through

11:42:17  7    either of these manuals and identify the policy that

11:42:19  8    you think was violated?

11:42:22  9        A.   No, sir.  No, sir.

11:42:22  10       Q.   Even though it's been more than two years since

11:42:24  11    this happened?

11:42:25  12       A.   Yes, sir.

11:42:40  13       Q.   All right.  Other than the fact that you

11:42:42  14    believe you should have been notified that you were

11:42:44  15    being investigated about other incidents, do you have

11:42:47  16    any other criticisms of the way Officer Collazo

11:42:52  17    conducted the investigation?

11:42:53  18       A.   Yes, sir.

11:42:53  19       Q.   What are the other criticisms?

11:42:55  20       A.   My criticism is that I was never interviewed.

11:42:58  21       Q.   Okay.

11:42:58  22       A.   I was never given a chance to reply, to answer

11:42:58  23    any of his questions.

11:43:23  24       Q.   Any other criticisms?

11:43:23  25       A.   Just the fact that I was never notified of what

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

11:43:23  1   was going on during that time.

11:43:23  2       Q.  Okay.  Well, we've already talked about that,

11:43:25  3   right?

11:43:25  4       A.  That's it.

11:43:25  5       Q.  We've talked about the fact that you weren't

11:43:26  6   notified about the scope of the investigation, and

11:43:31  7   we've talked about the fact that you were never

11:43:31  8   interviewed.

11:43:33  9       A.  And kept abreast, during the whole three weeks,

11:43:35 10   of my situation.

11:43:36 11       Q.  Was there something in the policy manual that

11:43:39 12   required you to be notified of what was being

11:43:41 13   discovered as a result of the investigation?

11:43:44 14       A.  No.

11:43:44 15       Q.  Okay.  Then on what authority do you base your

11:43:52 16   criticism that you weren't kept abreast of what was

11:43:57 17   happening during that three-week period?

11:44:00 18       A.  Not authority.  Just courtesy, I believe, would

11:44:03 19   be what I want to say.

11:44:03 20       Q.  It would have been nice, but, to your

11:44:05 21   knowledge, it wasn't legally required?

11:44:08 22       A.  Yes, correct.

11:44:11 23       Q.  Okay.  In the letter that was delivered to you

11:44:28 24   by Officer Marchan advising you of your termination,

11:44:34 25   there was some detail about the results of the

11:44:38  1    investigation conducted on you?

11:44:41  2        A.  Yes, sir.

11:44:41  3        Q.  Correct?  And, in fact, that letter identified

11:44:45  4    various incidents of wrongdoing, at least in the eyes

11:44:54  5    of the police department?

11:44:55  6        A.  Yes, sir.

11:44:55  7        Q.  Okay.  Before you received that letter, had you

11:45:02  8    been told by anyone that you were suspected of or

11:45:08  9    accused of committing some of these wrongs?

11:45:12 10        A.  No, sir.

11:45:13 11        Q.  So the first you hear of it is the letter?

11:45:15 12        A.  The letter.

11:45:16 13        Q.  Okay.  And the letter that we're discussing is

11:45:44 14    this one that I'll label Alaniz Exhibit No. 1, correct?

11:46:10 15        A.  Yes.

11:46:13 16        Q.  Okay.  Now, that, obviously, is a copy that was

11:46:15 17    faxed to my office.  So aside from the fax information

11:46:19 18    located at the very top, in all other respects is it a

11:46:25 19    true and correct copy of the letter you received back

11:46:28 20    in September of 1998?

11:46:30 21        A.  Yes.

11:46:30 22        Q.  Okay.  Now, after you received Exhibit No. 1,

11:46:38 23    did you respond to it?

11:46:41 24        A.  Yes.

11:46:41 25        Q.  What did you do?

BRYANT & STINGLEY, INC.
    McAllen          Harlingen         Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

11:46:43 1      A.   I made out a response to every one of the

11:46:47 2   accusations.

11:46:49 3      Q.   Did you do so yourself or through an attorney?

11:46:52 4      A.   No, through myself.

11:46:57 5      Q.   And did you make this response in writing?

11:46:59 6      A.   Yes.

11:47:02 7      Q.   Do you still have that?

11:47:03 8      A.   Sir?

11:47:04 9      Q.   Do you still have that?

11:47:05 10     A.   Yes.

11:47:09 11     Q.   To whom did you submit the response?

11:47:14 12     A.   I'm trying to remember if I gave it to -- I

11:47:24 13  don't remember who I gave it to.

11:47:26 14     Q.   Did you give it to the chief, Chief Ochoa?

11:47:38 15     A.   I don't remember at this time, sir, to be

11:47:41 16  honest.  I don't remember.

11:47:43 17     Q.   Okay.  Did you submit the response by a way of

11:47:47 18  an appeal of the decision to terminate you, or was it

11:47:51 19  just, "You guys are wrong, and here is why"?

11:47:57 20     A.   I believe so.  It was --

11:47:58 21     Q.   You believe what?

11:48:00 22     A.   That they were wrong, and that what I was being

11:48:05 23  accused of wasn't right.  Like I said, I was never

11:48:07 24  given a chance to respond to it, so that's why I wrote

11:48:11 25  up my response to every accusation that was on there.

11:48:15 1    Q.  You were not afforded the opportunity to
11:48:16 2    respond to it before you were terminated, but once you
11:48:19 3    received the letter of termination, you had every
11:48:21 4    opportunity to respond, didn't you?
11:48:24 5    A.  Yes, sir.
11:48:24 6    Q.  And you did.
11:48:24 7    A.  I did.
11:48:25 8    Q.  And at this point you can't recall to whom you
11:48:28 9    made the response?
11:48:29 10   A.  No.  I know that after -- a couple of days
11:48:31 11   after I received it, I did go to Mr. Hoffman and ask
11:48:38 12   that he assist me with this to find out what my next
11:48:43 13   step of action would be.
11:48:44 14   Q.  Mr. Hoffman, the attorney?
11:48:46 15   A.  Yes.
11:48:47 16   Q.  Okay.
11:48:50 17   A.  He used to be the city attorney.
11:48:52 18   Q.  Did you submit your response before you spoke
11:48:55 19   to Rick Hoffman?
11:49:08 20   A.  I know that I already had typed it out.  So I
11:49:12 21   don't know if I had already submitted it.  But I know I
11:49:14 22   had it typed out before I talked to Rick, because I
11:49:18 23   believe I showed it to him so that he could see it.
11:49:21 24   Q.  I certainly do not want to get into your
11:49:24 25   discussions with Mr. Hoffman, since he was at that

11:49:27 1    point acting ostensively as your attorney.

11:49:30 2        A.  Yes.

11:49:30 3        Q.  Was he city attorney at the time?

11:49:31 4        A.  No.

11:49:33 5        Q.  He was not?

11:49:33 6        A.  That's how I knew him.  He used to be a city

11:49:36 7    attorney.

11:49:36 8        Q.  Okay.  So, again, when I ask you these

11:49:39 9    questions, I'm not interested in what you and

11:49:42 10   Mr. Hoffman discussed.

11:49:43 11       A.  Sure.

11:49:44 12       Q.  I'm only interested in your actions, what steps

11:49:48 13   you took, and so forth and so on.  Do you understand

11:49:50 14   that?

11:49:51 15       A.  Yes.

11:49:51 16       Q.  Okay.  Now, at some point in time after

11:49:58 17   receiving Exhibit No. 1, did you challenge or appeal

11:50:06 18   Chief Ochoa's decision to terminate you?

11:50:10 19       A.  Yes.

11:50:10 20       Q.  To whom did you present the challenge or

11:50:13 21   appeal?

11:50:13 22       A.  To the city manager.

11:50:15 23       Q.  Who was who?

11:50:18 24       A.  Sharon Claghorn.

11:50:22 25       Q.  And did you present this challenge or appeal in

| | | |
|---|---|---|
| 11:50:26 | 1 | writing? |
| 11:50:27 | 2 | A.  Yes. |
| 11:50:27 | 3 | Q.  Was that before or after you had submitted your |
| 11:50:30 | 4 | response? |
| 11:50:38 | 5 | A.  After. |
| 11:50:48 | 6 | Q.  Now, Ms. Claghorn was the city manager? |
| 11:50:53 | 7 | A.  Yes. |
| 11:50:56 | 8 | Q.  And did the City have some kind of procedure in |
| 11:51:00 | 9 | place for handling an appeal of a decision to |
| 11:51:05 | 10 | terminate? |
| 11:51:05 | 11 | A.  Yes. |
| 11:51:05 | 12 | Q.  And was that the procedure that you were |
| 11:51:08 | 13 | following? |
| 11:51:08 | 14 | A.  Yes. |
| 11:51:19 | 15 | Q.  After you received Exhibit No. 1, did you ever |
| 11:51:22 | 16 | speak with Chief Ochoa about, "Why are you firing me?" |
| 11:51:26 | 17 | A.  No.  He wouldn't return my phone calls. |
| 11:51:31 | 18 | Q.  Okay.  Did you speak with the city manager |
| 11:51:37 | 19 | about why Chief Ochoa had fired you? |
| 11:51:44 | 20 | A.  No. |
| 11:51:44 | 21 | Q.  You just presented your appeal? |
| 11:51:44 | 22 | A.  Yes. |
| 11:51:47 | 23 | Q.  Now, Exhibit No. 1 indicates that the chief of |
| 11:51:51 | 24 | police has made a decision to terminate you, correct? |
| 11:51:59 | 25 | A.  Uh-huh.  Yes, sir. |

| | |
|---|---|
| 11:52:00 | 1 |
| 11:52:03 | 2 |
| 11:52:10 | 3 |
| 11:52:16 | 4 |
| 11:52:20 | 5 |
| 11:52:24 | 6 |
| 11:52:27 | 7 |
| 11:52:28 | 8 |
| 11:52:33 | 9 |
| 11:52:34 | 10 |
| 11:52:50 | 11 |
| 11:52:54 | 12 |
| 11:53:01 | 13 |
| 11:53:03 | 14 |
| 11:53:03 | 15 |
| 11:53:06 | 16 |
| 11:53:06 | 17 |
| 11:53:13 | 18 |
| 11:53:18 | 19 |
| 11:53:23 | 20 |
| 11:53:25 | 21 |
| 11:53:30 | 22 |
| 11:53:35 | 23 |
| 11:53:39 | 24 |
| 11:53:44 | 25 |

Q. Okay. Do you have any evidence to
support -- well, no, let me rephrase my question.

Do you have any reason to believe that the
decision to terminate you was made, not by Chief Ochoa,
but by somebody else?

A. No.

Q. Okay. So you accept as true that -- the
proposition that Chief Ochoa was the one who decided to
terminate you?

A. Yes.

Q. Now, in Exhibit No. 1, Chief Ochoa details
various incidents and bases for his decision to
terminate you, correct?

A. Yes.

Q. Okay. You dispute some of these?

A. Yes.

Q. Okay. Aside from that, do you have any reason
to believe that Chief Ochoa's decision to terminate you
was based, not on the reasons detailed in Exhibit
No. 1, but on something else?

A. I had made contact with Commissioner Martin
Cantu, and during our conversation he had mentioned the
same thing about Mr. Moore, and that Mr. Moore was
upset about the Wage and Hour suit that had come
against the city.

1    Q.   Uh-huh.

11:53:44  2    A.   And that still, that it was -- he didn't

11:53:48  3   mention which commissioner, but that Mr. Moore and some

11:53:52  4   other commissioners wanted to terminate me.

11:53:55  5    Q.   Okay.  When did you speak with Martin Cantu and

11:53:58  6   discuss this matter?

11:54:00  7    A.   It was maybe the first week of my -- or when I

11:54:08  8   was suspended, during the time that I was suspended,

11:54:11  9   that I had talked to him about it.

11:54:13 10    Q.   But during your suspension, Mr. Cantu told you

11:54:16 11   that Commissioner Moore and some other commissioners

11:54:19 12   wanted to terminate you?

11:54:23 13    A.   Were still upset about the Wage and Hour

11:54:27 14   lawsuit.

11:54:30 15    Q.   Had you submitted a Wage and Hour lawsuit?

11:54:31 16    A.   I'm the one who did the complaint.

11:54:33 17    Q.   You're not the attorney or the claimant, are

11:54:33 18   you?

11:54:34 19    A.   No, sir.  But I'm the one that filed the

11:54:36 20   complaint.

11:54:36 21    Q.   Okay.

11:54:36 22    A.   By initiating the --

11:54:37 23    Q.   Were you joined by anybody else?

11:54:37 24    A.   No, sir.

11:54:37 25    Q.   So you filed it singularly?

11:54:37 1     A.   Yes, sir.

11:54:40 2     Q.   By one person?

11:54:42 3     A.   It had to be done in person.  Myself and Danny

11:54:43 4 Marchan were going to be going, but since it had to be

11:54:46 5 done in person, there was only one of us that could

11:54:48 6 leave the office.  So he stayed behind, and I did

11:54:52 7 the --

11:54:55 8     Q.   How many meetings did you have with Martin

11:54:58 9 Cantu where you discussed either Commissioner Moore or

11:55:03 10 any other commissioner wanting to terminate you?

11:55:05 11     A.   That's the only time.

11:55:07 12     Q.   Just once?

11:55:10 13     A.   Yes, and then I met with the mayor himself, Pat

11:55:17 14 Marchan.

11:55:19 15     Q.   Was he mayor at the time?

11:55:23 16     A.   Yes, sir.

11:55:25 17     Q.   When did you meet with Mayor Pat Marchan?

11:55:28 18     A.   After I had received this.

11:55:31 19     Q.   After you had received Exhibit 1?

11:55:33 20     A.   Yes, sir.

11:55:33 21     Q.   How long after?

11:55:37 22     A.   I would say a week after, when I was

11:55:43 23 trying -- or going for the appeal.

11:55:45 24     Q.   Uh-huh.  And what did you and Mayor Marchan

11:55:55 25 discuss?

| | |
|---|---|
| 11:55:56 1 | A. Discussed what was going on as far as the |
| 11:55:59 2 | accusations that were being made against me.  And I |
| 11:56:00 3 | also voiced my opinion as far as how the investigation |
| 11:56:05 4 | was being done, as far as the chief appointing Pete |
| 11:56:09 5 | Collazo, and my disagreements with Pete Collazo as far |
| 11:56:14 6 | as what was going on. |
| 11:56:16 7 | Q. What was your reason for meeting with Mayor |
| 11:56:19 8 | Marchan? |
| 11:56:19 9 | A. Just to voice -- that's the only one that I |
| 11:56:22 10 | could really make contact -- as I said, I tried to make |
| 11:56:25 11 | contact with the chief, and he wouldn't return my |
| 11:56:27 12 | calls.  So I figured he would be the next -- and I |
| 11:56:28 13 | already knew Pat Marchan. |
| 11:56:31 14 | Q. Okay.  Did Mayor Marchan respond to your |
| 11:56:35 15 | comments? |
| 11:56:35 16 | A. The only thing he told me in his response was |
| 11:56:37 17 | that he didn't feel it was right, and for me to go |
| 11:56:40 18 | ahead and get an attorney and sue the City. |
| 11:56:43 19 | Q. Did he give you any information that he had |
| 11:56:48 20 | regarding the actions that Chief Ochoa or -- |
| 11:56:52 21 | A. No. |
| 11:56:53 22 | Q. Or the investigation? |
| 11:56:54 23 | A. No.  He tried to make contact with the chief. |
| 11:56:57 24 | He called him on the phone, but the chief didn't return |
| 11:57:00 25 | his call at that time while I was there. |

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

11:57:34 1     Q.  Have you ever spoken with Chief Ochoa about why

11:57:37 2  you were fired in September of '98?

11:57:40 3     A.  Never have.  This is the first time I've seen

11:57:43 4  him since this incident happened.

11:57:45 5     Q.  Okay.  Has anyone ever told you that the

11:58:05 6  reasons underlying Chief Ochoa's decision to fire you

11:58:13 7  were something other than what is contained in Exhibit

11:58:18 8  No. 1?

11:58:19 9     A.  No.

11:58:25 10     Q.  You mentioned that you initiated a wage

11:58:29 11  complaint?

11:58:31 12     A.  Yes, sir.

11:58:32 13     Q.  When did you do that?

11:58:37 14     A.  Within that week that I made the complaint to

11:58:41 15  Pete Collazo and the city manager.

11:58:55 16     Q.  I'm sorry.  I don't understand you.  Within

11:58:58 17  what?

11:58:58 18     A.  Within the time that Pete Collazo had talked to

11:59:01 19  me, where I had confronted him about being paid and he

11:59:05 20  told me that we were still not going to be paid and I

11:59:10 21  went to the city manager.  The city manager said to go

11:59:13 22  ahead and take the demotion, and I told the city

11:59:16 23  manager I was going to go to Wage and Hour to file a

11:59:19 24  complaint.  So I did.  I made the phone call, set up an

11:59:20 25  appointment, and then went up there and made the

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956)618-2366  (956)428-0755  (956)542-1020

11:59:22  1    complaint.

11:59:22  2        Q.  Okay.  This was before Joel Ochoa became chief

11:59:26  3    of police?

11:59:30  4        A.  Yes, sir.

11:59:30  5        Q.  And you told Pete Collazo that you were going

11:59:30  6    to go to Wage and Hour and file a complaint?

11:59:33  7        A.  Right.

11:59:36  8        Q.  And what did you request of the Wage and Hour

11:59:38  9    Department?

11:59:40 10        A.  I filed a complaint as far as not being paid to

11:59:45 11    go out and investigate crime scenes and being called at

11:59:50 12    different parts of the night and answering questions

11:59:53 13    about certain violations.

12:00:02 14        Q.  So your complaint with Wage and Hour was not,

12:00:07 15    "I want to be paid for time I've worked in the past,"

12:00:10 16    but, rather, it was, "We're being asked to do this, and

12:00:16 17    I feel that we should be paid for this"?

12:00:18 18        A.  Yes, sir, it was a whole conversation.  It

12:00:20 19    started off as why I'm there.  "Because I went to the

12:00:22 20    chief of police and I went to the city manager and I

12:00:25 21    requested this."  And then they asked me what was the

12:00:28 22    background, "How long has this been going on?"  And

12:00:33 23    that's when it started going back.

12:00:34 24        Q.  But, again, when you filed your complaint, you

12:00:36 25    weren't asking to be compensated for time in the past.

12:00:39 1    What you were asking Wage and Hour to do was to step in

12:00:42 2    and force a change of policy such that, from here on

12:00:46 3    forward, whenever you're asked to come in, you get paid

12:00:49 4    for it?

12:00:50 5        A.  Well, it started from saying that, but it went

12:00:53 6    back to saying that we needed to be compensated for the

12:00:56 7    time that we weren't being paid.

12:00:59 8        Q.  Okay.  Do you have -- well, was this complaint

12:01:04 9    made in writing?

12:01:05 10       A.  Yes.

12:01:05 11       Q.  Do you have that complaint?

12:01:07 12       A.  No, sir.

12:01:08 13       Q.  You didn't keep a copy of it?

12:01:11 14       A.  No, sir.  It was kept by Wage and Hour.

12:01:15 15       Q.  So when you walked out of Wage and Hour, you

12:01:18 16   did not take with you a copy of that?

12:01:23 17       A.  No, sir.  I just signed it.

12:01:27 18       Q.  Now, do you know whether or not Wage and Hour

12:01:28 19   ever notified the City of Port Isabel or any of its

12:01:34 20   agents --

12:01:34 21       A.  Yes.

12:01:34 22       Q.  -- that the complaint had been made?

12:01:37 23       A.  Yes, sir.

12:01:37 24       Q.  Okay.  Who was notified?

12:01:40 25       A.  I believe the city manager was notified, and

| 12:01:43 | 1 | then I -- and then I don't know how it got -- but I |
| 12:01:48 | 2 | know Pete Collazo, the acting chief, got notified. |
| 12:01:54 | 3 | Q.  And how do you know that? |
| 12:01:55 | 4 | A.  They started, you know, asking around.  Pete |
| 12:01:57 | 5 | Collazo started asking different officers and myself |
| 12:02:01 | 6 | about the complaint that was being made, that Wage and |
| 12:02:05 | 7 | Hour people were going to be coming in to ask |
| 12:02:08 | 8 | questions. |
| 12:02:10 | 9 | Q.  Okay.  Do you know whether Wage and Hour ever |
| 12:02:13 | 10 | identified who had presented the complaint? |
| 12:02:16 | 11 | A.  I received a phone call during that |
| 12:02:18 | 12 | investigation that Pete Collazo had made some |
| 12:02:24 | 13 | indications that he knew that it was me the one that |
| 12:02:28 | 14 | made the complaint.  And then I was also given a phone |
| 12:02:32 | 15 | call that the City, during their -- when it was |
| 12:02:32 | 16 | presented to the City, that Commissioner Moore did not |
| 12:02:36 | 17 | want to settle out because he wanted me excluded from |
| 12:02:40 | 18 | this -- from this lawsuit.  I received two phone calls. |
| 12:02:47 | 19 | Q.  Okay.  Let's talk about the first phone call. |
| 12:02:49 | 20 | You said you received a phone call that Pete Collazo |
| 12:02:55 | 21 | knew that it was you? |
| 12:02:56 | 22 | A.  He was asking -- that he was asking the |
| 12:02:57 | 23 | investigator from Wage and Hour -- |
| 12:02:59 | 24 | Q.  If it was you? |
| 12:02:59 | 25 | A.  Right. |

12:03:01 1     Q.   Okay.   So Pete Collazo was asking?

12:03:04 2     A.   Yes, sir.

12:03:05 3     Q.   Now, who called you?

12:03:06 4     A.   I can't remember the name of the investigator.

12:03:07 5   It was from Wage and Hour.  It was the one that was

12:03:10 6   handling the case.

12:03:11 7     Q.   Okay.  Did the officer who called you tell you

12:03:13 8   that he or anybody else at Wage and Hour had confirmed

12:03:18 9   that you were the complainant?

12:03:20 10     A.   No, he said that -- well, even when I talked to

12:03:22 11   him, their policy was not to divulge who was the actual

12:03:25 12   complainant.

12:03:27 13     Q.   So, to your knowledge, they didn't divulge who

12:03:31 14   the actual complainant was?

12:03:35 15     A.   No, sir.

12:03:46 16     Q.   Did Mr. Collazo ever ask you, "Hey, are you the

12:03:49 17   complainant?"

12:03:50 18     A.   We were really not on speaking terms at that

12:03:55 19   time.

12:03:55 20     Q.   So he never asked you?

12:03:55 21     A.   No.

12:03:56 22     Q.   Did anybody else on behalf of the City ever ask

12:03:58 23   you if you were the complainant?

12:04:00 24     A.   No.

12:04:01 25     Q.   Okay.  Then you said you received a second

12:04:02 1   phone call that Commissioner Moore wanted you excluded

12:04:10 2   from some settlement regarding Wage and Hour claims?

12:04:16 3      A.  Right.  They notified me that they couldn't do

12:04:26 4   that.  They wouldn't exclude me from the lawsuit, and

12:04:29 5   they would have to decline the offer the City made and

12:04:34 6   then go to court on it.

12:04:35 7      Q.  Okay.

12:04:39 8      A.  That they wouldn't drop me from the lawsuit.

12:04:42 9   But I was the only one that was being excluded.

12:04:46 10      Q.  Okay.  Was this a lawsuit being presented by

12:04:48 11   the Wage and Hour Department or by a private attorney?

12:04:52 12      A.  Yes, sir.  By Wage and Hour.

12:04:52 13      Q.  How many claimants were in that lawsuit?

12:05:00 14      A.  I can guess eight.

12:05:04 15      Q.  Including yourself?

12:05:07 16      A.  Nine, including myself, I would say.

12:05:19 17      Q.  Who were the other eight people or so?  Just

12:05:25 18   give me the names you remember.

12:05:28 19      A.  Michael Longoria, Adan Lopez, Pete Collazo,

12:05:36 20   Martin Salinas, Danny Marchan, Mike Hatley.

12:05:48 21      Q.  Michael Hatley?

12:05:51 22      A.  Hatley, David Strief.  That's the ones I can

12:05:58 23   remember.  I know there's some others.  I just can't

12:06:04 24   remember who they are.

12:06:04 25      Q.  Okay.

12:06:07 1        MR. MORADO:  I think there is somebody

12:06:08 2   here.  I'm going to send them away.

3        (Brief recess)

12:07:16 4   Q.  Now, these additional officers, Longoria, Lopez

12:07:21 5   Collazo, Salinas, Marchan, Hatley, and Strief, did they

12:07:26 6   also go to Wage and Hour and make complaints?

12:07:29 7   A.  No, sir.

12:07:30 8   Q.  Okay.  How did they become claimants in this

12:07:33 9   proceeding?

12:07:34 10  A.  When the Wage and Hour came in to investigate,

12:07:35 11  they talked to each one of these officers or the

12:07:39 12  personnel, everybody.  And I guess that's how they

12:07:42 13  ended coming up with that.

12:07:45 14  Q.  Do you know whether or not they were asked to

12:07:47 15  join?

12:07:47 16  A.  Yes, because I know that Pete Collazo had

12:07:50 17  refused to join in.  He didn't want to answer any

12:07:53 18  questions.  And, finally, they did talk to him.  So I

12:07:56 19  know they were asking, because he was refusing to --

12:08:00 20  Q.  But eventually he did join?

12:08:03 21  A.  He eventually came in, my understanding.

12:08:05 22  Q.  Okay.  All right.  And were all of their claims

12:08:07 23  eventually resolved?

12:08:08 24  A.  Yes.

12:08:08 25  Q.  Okay.  And, to your knowledge, was any

12:08:14 1    retaliatory action taken against any of these other

12:08:19 2    officers, Longoria, Lopez, Collazo, Salinas, Marchan,

12:08:24 3    Hatley, and Strief?

12:08:24 4         A.  No.

12:08:34 5         Q.  Has anyone ever told you that you were

12:08:40 6    responsible for the accumulation of unpaid overtime

12:08:45 7    hours on the part of these officers?

12:08:47 8         A.  No.

12:08:47 9         Q.  No one has ever said that to you?

12:08:50 10        A.  That I was responsible?

12:08:52 11        Q.  Yes.

12:08:52 12        A.  No.

12:08:53 13        Q.  Has anyone ever told you or suggested to you

12:08:56 14   that it was because of your policies or your actions

12:09:01 15   that these officers were not appropriately compensated

12:09:08 16   at the time that the work was done?

12:09:10 17        A.  I didn't have that authority.

12:09:12 18        Q.  No one has ever told you or suggested that to

12:09:14 19   you?

12:09:15 20        A.  No.

12:09:15 21        Q.  Okay.  Was your claim settled as part of the

12:09:21 22   settlement of this?

12:09:23 23        A.  Yes.

12:09:23 24        Q.  And you were paid your overtime?

12:09:25 25        A.  Yes.

12:09:26 1    Q.  Was this before or after you were terminated?

12:09:28 2    A.  Before.

12:09:29 3    Q.  How long before?

12:09:34 4    A.  Before I was terminated?

12:09:36 5    Q.  Uh-huh.

12:09:44 6    A.  What was it, six months or -- the time

12:09:47 7    period -- the settlement was reached prior to the

12:09:51 8    selection of the chief of police.

12:09:53 9    Q.  Shortly before, within a month or two?

12:09:56 10   A.  A month prior to him being selected, I believe.

12:09:59 11   Somewhere in that time.

12:10:00 12   Q.  Okay.  Now, this complaint that you filed with

12:10:17 13   the U.S. Department of Labor was filed in July of 1997,

12:10:22 14   correct?

12:10:24 15   A.  I'm not too good with the dates.

12:10:27 16   Q.  Okay.  Well, let me show you responses to

12:10:30 17   defendant's first set of interrogatories, which were

12:10:34 18   served on me on the 1st of February of this year by

12:10:40 19   your attorney.  And I'll show you my copy.  Take a look

12:10:43 20   at that.

12:10:44 21   A.  Uh-huh.

12:10:45 22   Q.  Okay.  And then I'll ask you to look at the

12:10:50 23   verification page.  Is that your signature?

12:10:54 24   A.  Yes.

12:10:56 25   Q.  Attesting that the responses are true and

12:10:57 1    correct?

12:10:58 2        A.  Yes, sir.

12:10:58 3        Q.  Okay.  And if you'll look at your answer to

12:11:01 4    interrogatory No. 2, you state that a complaint was

12:11:05 5    filed on July of 1997 with the U.S. -- United States

12:11:08 6    Department of Labor.

12:11:10 7        A.  Okay.

12:11:10 8        Q.  Correct?

12:11:11 9        A.  Uh-huh.

12:11:12 10       Q.  Now, is that a true response to this

12:11:14 11   interrogatory?

12:11:19 12       A.  Yes.  But, like I said, I'm not too good on the

12:11:23 13   date.  But I'm pretty sure that was July 1997.

12:11:26 14       Q.  Well, you wouldn't swear that this were true by

12:11:29 15   signing the affidavit unless it were, would you?

12:11:33 16       A.  Correct.  So that's true.

12:11:34 17       Q.  Okay.  Now, has anyone with the United States

12:11:54 18   Department of Labor ever told you that the identity of

12:12:00 19   the complainant, the person who initiated the complaint

12:12:05 20   with them, was ever revealed to anyone at the City of

12:12:09 21   Port Isabel?

12:12:10 22       A.  No.

12:12:13 23       Q.  Has anyone at the City of Port Isabel ever told

12:12:16 24   you that the U.S. Department of Labor confirmed that

12:12:22 25   you were the original complainant that started this

12:12:25 1    thing?

12:12:25 2        A.   No.

12:12:29 3        Q.   Have you ever confirmed to the City of Port

12:12:31 4    Isabel, aside from this deposition, that you were the

12:12:37 5    original complainant?

12:12:38 6        A.   Other than Pete Collazo and the city manager

12:12:43 7    when I -- before I went to file it.  They were the only

12:12:46 8    ones that knew I was planning to do it, and Danny

12:12:49 9    Marchan.

12:13:09 10       Q.   Now, you told the city manager and Officer

12:13:14 11   Collazo that you were planning to go to Wage and Hour.

12:13:18 12   Did you ever tell him that you actually did it?

12:13:21 13       A.   No.

12:13:47 14       Q.   Let's go back to a different issue.  You

12:13:49 15   mentioned earlier that you filed or presented an appeal

12:13:53 16   of Chief Ochoa's decision to terminate you from the

12:13:58 17   police department?

12:13:58 18       A.   Yes, sir.

12:13:58 19       Q.   And you did that following the City's appeal or

12:14:02 20   grievance procedure?

12:14:03 21       A.   Yes, sir.

12:14:04 22       Q.   Which went to the city manager?

12:14:07 23       A.   Yes, sir.

12:14:07 24       Q.   Okay.  And was there a hearing of the appeal?

12:14:14 25       A.   I delivered one to the city manager and one to

12:14:16  1    the mayor.

12:14:17  2        Q.  Okay.  Was there a hearing of your appeal?

12:14:22  3        A.  Yes.

12:14:22  4        Q.  Was that done in the context of a city

12:14:23  5    commission meeting?

12:14:24  6        A.  No.

12:14:25  7        Q.  Who heard your appeal?

12:14:27  8        A.  The city manager, myself, and Ivan.

12:14:29  9        Q.  And was that in accordance with the policies

12:14:32 10    and procedures of the City of Port Isabel?

12:14:37 11        A.  I believe so.

12:14:37 12        Q.  Okay.  And at this hearing, who was present

12:14:40 13    aside from you and your attorney?

12:14:42 14        A.  The chairman, the city manager, Sharon

12:14:50 15    Claghorn.

12:14:50 16        Q.  Okay.  Anybody else?

12:14:50 17        A.  No, sir.

12:14:50 18        Q.  Okay.  At this hearing were you afforded the

12:14:52 19    opportunity to explain your appeal or your response to

12:14:55 20    your termination?

12:14:56 21        A.  Yes, sir.

12:14:56 22        Q.  Was your attorney afforded the opportunity to

12:14:59 23    make whatever comments he thought appropriate?

12:15:02 24        A.  Yes, sir.

12:15:02 25        Q.  Okay.  Did the city manager make a decision on

12:15:09 1   your appeal?

12:15:11 2       A.   She heard what I had to say and she -- it was

12:15:15 3   pending her decision, but according to what she had

12:15:19 4   told me and my attorney at that time, that she would

12:15:22 5   take care of the situation as far as trying to

12:15:25 6   reinstate me back.

12:15:27 7       Q.   Okay.  Did she ever make a decision regarding

12:15:29 8   your appeal?

12:15:30 9       A.   She was terminated.

12:15:31 10      Q.   Okay.  After she was terminated, was there a

12:15:34 11  new city manager --

12:15:35 12      A.   No.

12:15:38 13      Q.   -- installed or selected?

12:15:41 14      A.   No.

12:15:42 15      Q.   There still is no city manager?

12:15:46 16      A.   It was the mayor.

12:15:47 17      Q.   The mayor is acting as city manager at this

12:15:52 18  time?

12:15:53 19      A.   Yes.

12:15:53 20      Q.   Do you know a gentleman by the name of Roberto

12:15:56 21  Garcia?

12:15:57 22      A.   No.

12:15:57 23      Q.   Okay.  Do you know what position he holds with

12:16:00 24  the City of Port Isabel?

12:16:03 25      A.   No.

12:16:03 1       Q.  Okay.  It's your testimony that today,

12:16:07 2   March the 1st, 2001, Pat Marchan is acting city manager

12:16:13 3   for the City of Port Isabel?

12:16:14 4       A.  During that time, yes, sir.

12:16:15 5       Q.  No, right now.

12:16:18 6       A.  Oh, no, sir.  They have a city manager, but I

12:16:19 7   don't know who he is.

12:16:20 8       Q.  Okay.  When did the City of Port Isabel select

12:16:26 9   a city manager after Ms. Claghorn's departure?

12:16:32 10      A.  I don't know, sir.  I can't answer that.

12:16:34 11      Q.  After her departure, did Mayor Pat Marchan

12:16:37 12  become the acting city manager?

12:16:39 13      A.  Yes, sir.

12:16:40 14      Q.  Okay.  Mayor Marchan was the same one that,

12:16:43 15  according to you, had told you to get an attorney.

12:16:45 16      A.  Yes, sir.

12:16:46 17      Q.  Did he ever make a decision on your appeal?

12:16:49 18      A.  Yes, sir.

12:16:49 19      Q.  And what did he decide?

12:16:51 20      A.  He upheld my termination.

12:16:53 21      Q.  Did you ever ask him why?

12:16:55 22      A.  No, sir.

12:16:57 23      Q.  When you spoke to Mayor Marchan earlier and he

12:17:00 24  had suggested you get an attorney, did you consider him

12:17:03 25  your friend?

12:17:08  1      A.  An acquaintance.  I mean, I don't know about

12:17:11  2  friendship.  We didn't -- I mean, I knew him.  An

12:17:13  3  acquaintance.

12:17:15  4      Q.  You thought enough of him to speak with him,

12:17:17  5  though?

12:17:17  6      A.  He was the next person that I knew to talk to.

12:17:21  7      Q.  And he told you that at that point he didn't

12:17:27  8  feel that what had happened was right?

12:17:27  9      A.  Correct.

12:17:27 10      Q.  Okay.  And, yet, upon considering your appeal,

12:17:32 11  he decided that he would uphold the decision to

12:17:36 12  terminate you?

12:17:38 13      A.  Correct.

12:17:38 14      Q.  Okay.  Has he ever told you why he made that

12:17:41 15  decision?

12:17:43 16      A.  No, sir.

12:17:43 17      Q.  Do you know why he made that decision?

12:17:44 18      A.  No, sir.

12:17:45 19      Q.  Okay.

12:17:50 20      A.  I know that at the end of our meeting that we

12:17:54 21  had, Chief Ochoa told him that he didn't want me to

12:17:58 22  come back.  So he made that final at the end, saying

12:18:00 23  he didn't want me back, that it would cause problems.

12:18:04 24  I don't know if that had anything to do with it.

12:18:07 25      Q.  Aside from the fact that you may disagree with

Case 1:00-cv-00136   Document 9   Filed in TXSD on 06/15/2001   Page 102 of 129

12:18:12 1    Chief Ochoa's assessment of your contribution to the

12:18:18 2    police department, you don't question his authority in

12:18:21 3    making a recommendation to the city manager or the

12:18:24 4    acting city manager that he does not want a particular

12:18:26 5    officer working within the department, do you?

12:18:29 6        A.  No.

12:18:51 7        Q.  When you made your appeal and presented your

12:18:58 8    position to Ms. Claghorn, was a tape recording made of

12:19:08 9    the proceedings?

12:19:12 10       A.  I don't recall.  I'd say no, but I don't

12:19:16 11   recall.  I'm not too sure, but I'd say no.

12:19:18 12       Q.  Have you ever heard a recording of those

12:19:21 13   proceedings?

12:19:21 14       A.  No.

12:19:22 15       Q.  Have you ever seen a transcript of those

12:19:23 16   proceedings?

12:19:23 17       A.  No.

12:19:24 18       Q.  Was there a court reporter present like what we

12:19:27 19   have today?

12:19:27 20       A.  No.

12:19:28 21       Q.  Did you submit to Ms. Claghorn any documentary

12:19:34 22   proof for your position?

12:19:39 23       A.  Yes, my response to these allegations.

12:19:42 24       Q.  Okay.  Do you still have a complete copy of

12:19:44 25   that response?

12:19:45  1        A.   Yes.

12:19:47  2        Q.   Aside from your -- well, did your response

12:19:52  3   include supporting documents, or was it just your

12:19:56  4   letter or your memo saying, "No, this is what happened,

12:20:00  5   that's what happened," so forth?

12:20:02  6        A.   Correct.  "This is what happened.  There is no

12:20:04  7   documents.  This is all just -- I'm being accused of

12:20:08  8   certain behavior."

12:20:09  9        Q.   Okay.  So, basically, your response was your

12:20:11 10   own handwritten recitation of what you believed the

12:20:19 11   facts to be?

12:20:21 12        A.   Yes.

12:20:25 13        Q.   You offered no independent witnesses to confirm

12:20:30 14   or corroborate what you were saying, correct?

12:20:36 15        A.   I wasn't given an opportunity to present

12:20:38 16   witnesses.  But in my statement, no, there was

12:20:41 17   no other than the people involved.

12:20:42 18        Q.   Did you invite any witnesses to step forward on

12:20:46 19   your behalf when you presented your appeal?

12:20:50 20        A.   No, it was just myself and the attorney and the

12:20:53 21   city manager.

12:20:54 22        Q.   Was there a reason why you didn't invite any

12:21:01 23   witnesses to step forward?

12:21:01 24        A.   I think -- my opinion on the appeal process,

12:21:01 25   it's just me going before the city manager and

12:21:03 1   explaining what had happened.  That's what I think.  I

12:21:07 2   don't know about any witnesses.  It's just one on one

12:21:09 3   on what happened.

12:21:10 4        Q.  Did you ever talk to anyone, fellow officers or

12:21:15 5   third parties, about the possibility of them coming

12:21:18 6   forward and testifying or giving a written statement on

12:21:23 7   your behalf to defend you against this termination?

12:21:27 8        A.  Yes.

12:21:28 9        Q.  Who did you talk to?

12:21:29 10       A.  I talked to Homer Reyna.  I talked to Ronnie

12:21:32 11  Moore, Danny Marchan.  I can't remember his first name.

12:21:43 12  Can I look in here?

12:21:45 13       Q.  Sure.

12:22:05 14       A.  Manuel, Juan Manuel Ayala.  That's it.

12:22:12 15       Q.  When did you speak with these gentlemen about

12:22:15 16  giving some testimony on your behalf?

12:22:18 17       A.  After -- after I had gone to the meeting -- or

12:22:23 18  terminated.

12:22:24 19       Q.  After you had been terminated?

12:22:25 20       A.  Yes, sir.

12:22:26 21       Q.  But before your appeal?

12:22:29 22       A.  No, I didn't talk to anybody before my appeal.

12:22:30 23       Q.  Was it after your appeal had been heard that

12:22:33 24  you spoke with these folks?

12:22:35 25       A.  Yes, sir.

12:22:35 1    Q.   Did any of them agree to testify on your

12:22:38 2    behalf?

12:22:39 3    A.   Yes, sir.

12:22:39 4    Q.   Who?

12:22:40 5    A.   Ayala, Ronnie Moore, Danny Marchan.   That's it.

12:22:52 6    Q.   Okay.   What would -- to your knowledge, what

12:22:58 7    would you expect Officer Ayala to say on your behalf in

12:23:05 8    defense of your position that you were wrongfully

12:23:09 9    terminated?

12:23:10 10   A.   That the complaint that's indicated on this

12:23:13 11   report is not true.

12:23:18 12   Q.   Okay.   How about Danny Marchan?   To your

12:23:21 13   knowledge, what would he say to support your position?

12:23:23 14   A.   The same thing.   That it's not true, what's

12:23:26 15   being indicated in this report.

12:23:27 16   Q.   Okay.   And Officer Moore?

12:23:29 17   A.   The same thing, sir.   That it's not true.

12:23:31 18   Q.   All right.   You're currently earning $34,575 a

12:24:27 19   year?

12:24:27 20   A.   I just received another raise.

12:24:29 21   Q.   What are you making now?

12:24:34 22   A.   36,8.

12:24:37 23   Q.   When you started working for the Department of

12:24:40 24   Transportation in July of '99, was your salary about

12:24:45 25   34,000 a year?

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

12:24:46  1      A.  Yes, sir.

12:24:48  2      Q.  What were you earning at the Port Isabel Police

12:24:53  3  Department as sergeant before your termination?

12:25:00  4      A.  I would have to guess approximately, maybe, 24.

12:25:04  5      Q.  So is it fair to say that your position with

12:25:07  6  the Federal government pays you substantially more than

12:25:11  7  what you were earning at the City of Port Isabel?

12:25:15  8      A.  Yes.

12:25:15  9      Q.  What was the highest pay you ever received

12:25:18 10  while working for the City of Port Isabel?

12:25:24 11      A.  That was the highest, at the end.

12:25:24 12      Q.  About 24,000?

12:25:24 13      A.  Uh-huh.  Yes, sir.

12:25:44 14      Q.  You were unemployed for about nine months

12:25:51 15  between your termination from the City of Port Isabel

12:25:53 16  and your employment with the Federal government?

12:25:56 17      A.  Yes, sir.

12:25:57 18      Q.  Did you apply anywhere for employment during

12:25:59 19  that period of time?

12:26:00 20      A.  Yes, sir.

12:26:00 21      Q.  Where did you apply?

12:26:02 22      A.  Rancho Viejo Police Department and the Cameron

12:26:07 23  County sheriff's office.

12:26:16 24      Q.  How soon after your termination from the City

12:26:19 25  of Port Isabel did you apply at either of those places?

12:26:28 1      A.   I would say maybe a couple of months.

12:26:33 2      Q.   Why did you wait that long?

12:26:35 3      A.   Because we went through the process of doing

12:26:37 4  the appeals for the unemployment, and then I started

12:26:40 5  looking for different -- and then that opening came up

12:26:43 6  in Rancho Viejo, and the opening came up in the

12:26:47 7  sheriff's office.

12:26:49 8      Q.   Did you receive unemployment benefits for any

12:26:52 9  period of time?

12:26:52 10     A.   Yes, sir.

12:26:52 11     Q.   For how long?

12:26:53 12     A.   Six months.

12:26:54 13     Q.   And how much were you receiving in unemployment

12:26:56 14 benefits?

12:27:01 15     A.   I don't recall, sir, what the actual amount

12:27:05 16 was.

12:27:09 17     Q.   Was it more than 1,000 a month?

12:27:11 18     A.   No.  It was somewhere in that area.

12:27:29 19     Q.   Are you currently enjoying your job with the

12:27:33 20 Department of Transportation?

12:27:34 21     A.   Yes, sir.

12:27:43 22     Q.   Do you work out of Brownsville?

12:27:44 23     A.   Yes, sir.  I was just promoted two months ago,

12:27:49 24 so I'm going to be working out of the home, home office

12:27:52 25 now.

12:27:53 1    Q.   Your home?

12:27:53 2    A.   Uh-huh.  I was promoted, yes, sir.  I was

12:27:56 3  promoted to a safety investigator.

12:28:02 4    Q.   Now, in your responses to interrogatories, you

12:28:06 5  indicate that at your hearing regarding your

12:28:12 6  termination, not only were you and your attorney

12:28:15 7  present, but Tomas Salazar, David Gorham, Homer Reyna,

12:28:24 8  Ronald Moore, Lee Hatley and Juan Ayala; is that true?

12:28:26 9    A.   No, they weren't there.

12:28:27 10    Q.   Let me show you -- let me show you the fourth

12:28:34 11  page to your responses to interrogatories.

12:28:38 12    A.   Oh, if this is the one -- if this is the one

12:28:39 13  where we went to appeal with Pat Marchan, they were

12:28:42 14  there.

12:28:44 15    Q.   Well, was there another appeal besides the one

12:28:49 16  you presented to the City?

12:28:52 17    A.   It was the first one -- there was the appeal

12:28:53 18  with Sharon Claghorn, and then the one with Pat

12:28:58 19  Marchan.

12:28:59 20    Q.   Which was just a continuation of the same

12:29:02 21  proceeding, wasn't it?  In other words, Pat Marchan

12:29:04 22  picked up where Ms. Claghorn left off?

12:29:08 23    A.   Yes.  And they were there.  They were present

12:29:10 24  there.

12:29:10 25    Q.   Okay.  Did they testify on your behalf?

12:29:15 1    A.  No.

12:29:15 2    Q.  Did they say anything in the context of that

12:29:15 3  hearing?

12:29:18 4    A.  I don't recall.  I know they were asked

12:29:21 5  questions, but I don't recall what was asked or what

12:29:24 6  was responded during that time.  But they were asked.

12:29:25 7    Q.  They were asked questions?

12:29:26 8    A.  Yes, sir.

12:29:26 9    Q.  And they did respond?

12:29:27 10    A.  Yes, sir.

12:29:28 11    Q.  Who asked them questions?

12:29:31 12    A.  The city attorney.  The city attorney asked

12:29:36 13  questions.

12:29:36 14    Q.  John Haywood?

12:29:38 15    A.  Yeah, that's what I was trying to remember.

12:29:42 16    Q.  Okay.  Now, after the city manager made the

12:30:02 17  decision to deny your appeal -- and at this point the

12:30:06 18  city manager is Pat Marchan?

12:30:08 19    A.  Uh-huh.  Yes, sir.

12:30:10 20    Q.  Did the policy provide for you to carry that

12:30:12 21  appeal forward to the city commission?

12:30:19 22    A.  I don't know.

12:30:20 23    Q.  Okay.  Did you attempt to address the city

12:30:26 24  commission on the matter?

12:30:28 25    A.  No.

12:30:34  1     Q.  Do you have any information that leads you to
12:30:37  2  believe that the city commission of the City of Port
12:30:44  3  Isabel took any action to approve Chief Ochoa's
12:30:54  4  decision to terminate you?
12:30:55  5     A.  No.
12:31:53  6     Q.  If you had still been working for the City of
12:31:57  7  Port Isabel in June of 1999 and at that time you had
12:32:16  8  been offered a position with the United States
12:32:18  9  Department of Transportation at a salary of $34,000,
12:32:23 10  would you have taken it?
12:32:24 11     A.  Yes.
12:32:26 12     Q.  Because the economics of the situation is such
12:32:30 13  that it's a much better paying job?
12:32:33 14     A.  Yes.
12:32:34 15     Q.  Correct?
12:32:34 16     A.  Yes.
12:32:44 17     Q.  How did you learn of the position within DOT?
12:32:49 18     A.  There is a motorcycle group that belongs to law
12:32:52 19  enforcement called the Blue Knights, and there is
12:32:55 20  a -- the team supervisor for DOT is a Blue Knight, and
12:33:00 21  I ride with them.  So he told me about the opening, and
12:33:05 22  that's how I ended up.
12:33:07 23     Q.  So you learned about it through an
12:33:08 24  acquaintance?
12:33:09 25     A.  Yes.

12:33:10 1    Q.  Did you have to test for the position, in the

12:33:12 2  sense of, you know, receiving the highest score in a

12:33:16 3  particular exam in order to qualify for this position?

12:33:20 4    A.  You had to meet the SKSs, which is the skills,

12:33:24 5  in order to make it through the first cut, and then you

12:33:27 6  get selected.  And then you have to pass your academy

12:33:31 7  in order to continue.  That's the only -- but there was

12:33:33 8  not -- no preemployment test or none of that.

12:33:39 9    Q.  Uh-huh.  Do you know who made the decision to

12:33:41 10  select you for this particular position at DOT?

12:33:44 11    A.  It came from Washington.  So exactly who, I

12:33:47 12  don't know.

12:33:47 13    Q.  Okay.  Let me take a quick break and meet with

12:33:54 14  my client.

15              (Brief recess)

12:40:53 16    Q.  Before Joel Ochoa became chief of police of

12:40:59 17  Port Isabel, did you know him?

12:41:04 18    A.  Yes.

12:41:04 19    Q.  In what capacity?

12:41:04 20    A.  He was a trooper.

12:41:04 21    Q.  With the Department of Public Safety?

12:41:05 22    A.  Yes, sir.

12:41:05 23    Q.  Aside from the fact that he was a fellow law

12:41:08 24  enforcement officer, did you know him?

12:41:11 25    A.  Personally?

| | | |
|---|---|---|
| 12:41:11 | 1 | Q. Uh-huh. |
| 12:41:12 | 2 | A. No. I knew his brothers. |
| 12:41:14 | 3 | Q. Okay. Did you have a social relationship with |
| 12:41:17 | 4 | any of his brothers? Were you friends with any of |
| 12:41:20 | 5 | them? |
| 12:41:20 | 6 | A. Yes. |
| 12:41:21 | 7 | Q. Who? |
| 12:41:21 | 8 | A. With Froy and Ted. |
| 12:41:23 | 9 | Q. Okay. Froy, F-r-o-y? |
| 12:41:26 | 10 | A. Yeah, F-r-o-y. |
| 12:41:30 | 11 | Q. And Ted? |
| 12:41:31 | 12 | A. Ted Ochoa, Teodoro. |
| 12:41:34 | 13 | Q. Okay. Anybody else? |
| 12:41:34 | 14 | A. That's it. |
| 12:41:34 | 15 | Q. Are you still friends with them? |
| 12:41:37 | 16 | A. Ted died a couple of years ago, and Froy, he |
| 12:41:39 | 17 | moved. I don't know where he's at. |
| 12:41:41 | 18 | Q. But are you still friends with him? |
| 12:41:45 | 19 | A. One passed away, and the other one, I haven't |
| 12:41:49 | 20 | seen him for a while. |
| 12:41:50 | 21 | Q. How long? |
| 12:41:51 | 22 | A. Froy, for a long time. I haven't seen Froy, |
| 12:41:53 | 23 | but Ted passed away, I don't know, five years, six |
| 12:41:57 | 24 | years ago, somewhere in there. |
| 12:42:00 | 25 | MR. OCHOA: '96. |

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

12:42:04  1    Q.  At -- obviously, given the fact that one of

12:42:07  2    these gentlemen died and the other gentleman moved

12:42:14  3    away, you ceased your relationship with them because of

12:42:16  4    the circumstances.  At the time that that relationship

12:42:20  5    stopped, whether because of death or absence, were you

12:42:25  6    still friends with both of those gentlemen?

12:42:28  7    A.  Yes.

12:42:41  8    Q.  When Chief Ochoa took over as the chief of

12:42:47  9    police for Port Isabel, did he ever have a one-to-one

12:42:53  10   conversation with you where he asked you for your help

12:43:01  11   in making this a better police department?

12:43:05  12   A.  Yes.

12:43:10  13   Q.  During the time that you were working under

12:43:14  14   Chief Ochoa's supervision with him as chief of police,

12:43:22  15   was there ever an occasion in which you disobeyed or

12:43:27  16   contravened any of his orders?

12:43:30  17   A.  No.

12:43:32  18   Q.  None at all?

12:43:32  19   A.  I was accused of it.  No, I didn't.  During

12:44:11  20   that time, I followed his orders and tried to help him

12:44:15  21   out with problem officers.

12:44:33  22   Q.  When you applied with the Cameron County

12:44:37  23   sheriff's office and with the Rancho Viejo Police

12:44:41  24   Department, did you ever receive any response from

12:44:45  25   them?

| | |
|---|---|
| 12:44:45 1 | A. On the one from Rancho Viejo, I went to the |
| 12:44:48 2 | oral interview with the mayor and commissioner and the |
| 12:44:52 3 | chief of police, and they had contacted someone from |
| 12:44:58 4 | the City of Port Isabel in which I received a bad |
| 12:45:01 5 | recommendation and wasn't hired at all because of the |
| 12:45:04 6 | recommendation. And with the Cameron County sheriff's |
| 12:45:09 7 | office, I ranked No. 3 in their testing, and then I |
| 12:45:16 8 | went to the obstacle course and I couldn't jump the |
| 12:45:16 9 | six-foot fence, so I was eliminated. |
| 12:45:18 10 | Q. Did any representatives of the City of Rancho |
| 12:45:21 11 | Viejo, the town of Rancho Viejo tell you with whom they |
| 12:45:26 12 | had spoken at the City of Port Isabel? |
| 12:45:28 13 | A. No, sir. |
| 12:45:29 14 | Q. Do you know with whom they spoke? |
| 12:45:31 15 | A. No, sir. |
| 12:45:32 16 | Q. Do you know what was said to the |
| 12:45:33 17 | representatives of Rancho Viejo? |
| 12:45:36 18 | A. No, sir, just to the point that they wouldn't |
| 12:45:38 19 | hire me. |
| 12:45:40 20 | Q. Who told you that? |
| 12:45:40 21 | A. The mayor from Rancho Viejo. |
| 12:45:45 22 | Q. And who was that? |
| 12:45:45 23 | A. I don't recall his name, sir. I know the chief |
| 12:45:47 24 | was there also. |
| 12:45:49 25 | Q. All right. |

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755    (956) 542-1020

12:45:51   1              MR. MORADO:  That's all the questions I

12:45:52   2    have.  I pass the witness.

12:45:54   3              MR. ANDARZA:  We'll reserve our questions

12:45:55   4    for trial.  Thank you.

           5              (Deposition concluded)

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

April 16, 2001

TN-501

BRYANT & STINGLEY, INC.
RECEIVED

4-6-01
DATE

```
1              ERRATA SHEET/SIGNATURE PAGE

2    PAGE LINE   CHANGE                        REASON

3          none
   _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____

14      I, JORGE GARCIA ALANIZ, have read the foregoing
   transcript and hereby affix my signature that same is
15 true and correct, except as noted above.

16
          JORGE GARCIA ALANIZ
17

18 THE STATE OF TEXAS

19 COUNTY OF CAMERON

20      SUBSCRIBED AND SWORN TO BEFORE ME, the

21 undersigned authority on this the ____2nd____ day of

22  April                        2001.

23

24
          Notary Public in and for
25        The State of Texas
```

(Notary seal: J.C. VASQUEZ, NOTARY PUBLIC, STATE OF TEXAS, EXPIRES 01-05-2005)

**ORIGINAL**      BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JORGE G. ALANIZ,            ) (
        Plaintiff          ) (
                           ) (
VS.                        ) (   CIVIL ACTION B-00-136
                           ) (
CITY OF PORT ISABEL, TEXAS, ) (
        Defendant          ) (

REPORTER'S CERTIFICATION
DEPOSITION OF JORGE GARCIA ALANIZ
MARCH 1, 2001

     I, CORINNA N. GARCIA, Certified Court Reporter
in and for the State of Texas, hereby certify that the
witness, JORGE GARCIA ALANIZ, was duly sworn by me, and
that the transcript of the oral deposition is a true
and correct record of the testimony given by the
witness; that the deposition was reported by me in
stenograph and was subsequently transcribed under my
supervision.

     I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially or otherwise interested in the
outcome of the action.

     WITNESS MY HAND on this _14th_ day of
_March_____, 2001.


                    CORINNA N. GARCIA, Texas CSR 5210
                    Expiration Date: 12-31-01
                    Bryant & Stingley, Inc.
                    2010 East Harrison
                    Harlingen, Texas  78550


BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

# STIPULATIONS

Tracking No. _TN-501_

Deposition(s) of: _Jorge G Alaniz_

Cause No.: _B-00-136_          Style: _Jorge Alaniz_

Date: _3-1-01_   Trial Date: _____   vs. _City of Port Isabel_

1.  This deposition is taken pursuant to:
    - _√_ A. Notice
    - ___ B. Notice and Subpoena
    - ___ C. Agreement
    - ___ D. Court Order

2.  Objections:
    - _√_ A. Objections will be made pursuant to the ~~Texas~~/Federal Rules of Civil Procedure.
    - ___ B. All objections are reserved.
    - ___ C. All objections will be made at the time of taking the deposition.

3.  Signature and Delivery:
    - _√_ A. The original transcript will be sent to _____,
      the Custodial Attorney, and the original signature page, along with a copy of the
      transcript(s), will be submitted to _____ the witness or _√_ the witness'
      attorney, who will return the executed signature page, including any changes, to
      Bryant & Stingley, Inc., within _____.days of transmittal.

    - ___ B. Signature is waived and the reporter will deliver the original transcript and
      exhibits to the Custodial Attorney, _____.

_30 days_

I, the undersigned, do hereby agree to the stipulations as indicated above and request the
following:

1.  Copy of Transcript: Yes _____   No _√_   Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail   Yes _____   No _____   e-mail address _____

    Signature: _____   Representing: _Jorge Alaniz, Plaintiff_

2.  Copy of Transcript: Yes _√_  No _____   Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail   Yes _____   No _____   e-mail address _____

    Signature: _____   Representing: _City of Port Isabel_

3.  Copy of Transcript: Yes _____  No _____   Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail   Yes _____   No _____   e-mail address _____

    Signature: _____   Representing: _____

4.  Copy of Transcript: Yes _____  No _____   Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail   Yes _____   No _____   e-mail address _____

    Signature: _____   Representing: _____

CibiPDF – www.fastio.com



# PORT ISABEL POLICE DEPARTMENT

110 W. HICKMAN ST. • PHONE (210) 943-1242 • FAX (210) 943-1949
PORT ISABEL, TEXAS 78578



Alaniz

EXHIBIT NO. 1

CORRINA GARCIA

September 16, 1998

Jorge Alaniz
Sergeant
Police Department
Port Isabel, Texas 78578

Dear Sergeant Alaniz,

I have requested that an Internal Investigation be conducted in reference to allegations made against you by several officers that have served under your command. The officers allege that you have engaged in intimidating tactics that have created a hostile working environment. This situation has escalated to the point that it has effected morale and job performance. This investigation has been conducted in accordance with Chapter XIV, Section 14 01B of the Port Isabel Police Department Policy Manual.

On September 1, 1998, at approximately 12:15 PM., Officer Tomas Salazar came to my office and asked to have a conference with me, concerning a supervisory decision you had made during his 10:00PM to 6:00AM shift. At approximately 12:15AM, as he patrolled through the H.E.B. parking lot, he observed a female subject using a public telephone. Officer Salazar recognized this subject as Sonia Sanchez, who had an outstanding warrant from the South Padre Island Police Department. He then used a public telephone to contact Officer J. Puente of the S.P.I. P.D. to get confirmation on the warrant. At this point the subject had driven off and Officer Salazar followed while waiting for the confirmation. When he observed the subject commit a traffic violation, he proceeded to conduct a legal stop of the vehicle. He then had Dispatcher David Gorham reaffirm the outstanding warrant, and was advised that the S.P.I.P.D. had a unit enroute to serve the warrant #96-00-3051.3052.

At this point you requested via police radio what the traffic offense was in regard to Officer Salazar's traffic stop. Officer Salazar advised you that the subject had an outstanding warrant from South Padre Island P.D. for unpaid fines. You drove to the scene, and again asked Officer Salazar what the warrant was for, and "what the hell do you think you are doing?" He again repeated himself and advised you that he had obtained confirmation from Officer J. Puente of the S.P.I.P.D. of the warrant for Mrs. Sonia Sanchez. You then stated to Officer Salazar, "What does the City of Port Isabel have to gain by serving warrants out of other cities?" Officer Salazar stated that he was just trying to do his job as a Peace Officer, and maintaining good inter-agency relations. At this point you ordered Officer Salazar to release the subject, and resume patrol.

Case 1:00-cv-00136   Document 9   Filed in TXSD on 06/15/2001   Page 121 of 129

Officer Salazar attempted to advise you that an officer from the S.P.I.P.D. was enroute to serve the warrant, but you insisted by direct order that he release her and resume patrol.

A few minutes later at approximately 12:50AM, you called officer Salazar to meet with you at the Police Station. There, you again asked Officer Salazar, "What the hell do you think you were doing?" He had to repeat himself and told you that he was just trying to do his job as a Peace Officer. You went on to demand why he had detained Mrs. Sanchez without a warrant or warrant number in hand. You further advised him that the violation he had stopped the subject for was a "chicken shit violation, and that he was going to be sued if he wasn't careful."

Officer Salazar further states that approximately 5:05AM, during the same shift you ordered him and officer Homer Reyna to meet with you at the police station. A check of the radio log reflects that you, unit 102 and Officer Salazar unit 106, went off duty (10-42) at 5:06AM. Officer Homer Reyna unit 117, went off duty (10-42) at 5:09AM. The radio log also reflects that the ending mileage for each patrol car used, was also recorded. The normal working hours required by this shift was 10:00PM to 6:00AM. The radio log reflects that the 10:00 PM to 6:00 AM shift, on Monday, August 31, 1998, was ordered by you, to go off duty approximately 51 minutes early. I find that there was no legitimate reason for you to have the officers go off duty, and leave the city without any police patrol for almost an hour.'

In regard to Officer Tomas Salazar's allegations against you I find that you violated Port Isabel Police Department Policy Manual, Chapter 5 section 5.23 Unbecoming Conduct: It includes unjustified behavior which brings the Department into disrepute, discredits a member of the Department or impairs the operation of the Department, when you ordered him to release a subject he had legally detained for another agency on an outstanding arrest warrant. I found nothing improper or illegal in his traffic stop. You as an experience police officer and in a supervisory position should have known that Officers Salazar's actions were proper and legal. Therefore, I find that you violated section 5.42 Unsatisfactory Performance: Officers shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions. Officers shall perform their duties in a manner that will maintain the highest standards of the Department. I find you to be in violation of section 5.58 (1)(3) Dereliction of Duty: On the part of the supervisor or other members of the Department, prejudicial to the proper performance of the functions of the Department. 1. Failure to observe and give effect to the policies of the Department. 3. Failure to make proper report of offenses investigated, observed, or reported. Your dereliction of duty was demonstrated when you prevented a Peace Officer from carrying out his duties You violated Chapter 22.01(A)(B)(C) Supervisory Reprimands: when you believed that Officer Tomas Salazar's actions were illegal and improper to the degree that you had to order him to release the subject. But yet you failed to explain the reprimand in a written report promptly and forward it to the Chief of Police, as required. You failed to advise Officer Salazar that he had a right to have his reprimand reviewed, if he desired to do so within five days of receiving the reprimand. I also found that you violated section 5.02 Insubordination: when you ordered Officers Salazar, and Reyna to go off duty 51 minutes before the completion of their tour of duty at 6:00AM, when you knew or should have known that I had issued a directive on August 20, 1998, concerning unreasonable long periods of time spend on breaks. I consider this a willful act of defiance on your part of my directive of August 20, 1998.

2

Chapter VII-Conduct of the City of Port Isabel Policy Manual: Attendance: Rest Periods: Employees may take one morning and one afternoon rest period (or coffee break) at the time designated by the supervisor, each full work day. You violated T.P.C. 38.15 (a)(1)(b) Interference with Public Duties when you ordered Officer Salazar to release a subject he had legally detained, and was carrying out his duties as a Peace Officer. (a) A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with; (1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law. An offense under this section is a Class "B" misdemeanor. I find that you violated T.P.C.38.05 (a)(2); Hindering apprehension or prosecution: A person commits an offense if, with intent to hinder the arrest, prosecution, conviction, or punishment of another for an offense; (2) provides or aids in providing the other with any means of avoiding arrest or effecting escape; An offense under this section is a Class "A" misdemeanor.

Officer Homer Reyna states that on Friday, May 22, 1998, he was working the 2:00 PM to 10:00 PM shift under you command. On this date Officer Reyna stated that the patrol car he was driving appeared to be having transmission problems. It was after 5:00 PM and all the repair shops were closed. I requested that he park it for the weekend and not let anyone else drive it. I made this request as a cost and maintenance preventive measure, and for the safety of the officer and motoring public. However, Officer Reyna states that you overruled my order and ordered him to drive the patrol car. You further stated to Officer Reyna, "I don't care what the Chief told you, I am your supervisor. I'm telling you to take 95-3, if it breaks down it breaks. We can not do anything about it."

Officer Reyna states that between the hours of 2:00PM, the beginning of his shift and 5:00PM he had been asked by the Department to run some documents to City Hall, and to go by the bank and make a deposit. He further states that you were upset at him because he was performing these duties. Later on in the shift, Dispatcher Arnulfo Martinez, asked Officer Reyna to get him something to eat, which is a common practice by all our officers. At this point the dispatcher advised that there was someone at the station to get someone out of jail. Since, Officer Reyna was already enroute to the station to deliver the meal, he requested permission to process the prisoner. You refused to grant the permission and ordered him to stay on the road. At approximately 6:00PM you requested that Officer Reyna meet with you at the Port Bowl parking lot. You then ordered him to go to the Housing Authority and do foot patrol, and told him not to leave the area until you said so. Officer Reyna followed your orders and proceeded to the Housing Authority to perform his foot patrol. You then called the dispatcher on your radio and advised him of your decision in a manner that all officers could monitor.

Officer Reyna feels that he had not done anything wrong for you to punish him in this manner. He feels that the actions you took were only to embarrass him and humiliate him. In his mind he questions your actions and professionalism. At approximately 7:55 AM you requested that Officer Reyna meet you at the police station, where you ordered him to go home two hours before the completion of his shift He asked if he was to claim only 6 hours instead of 8 on his time sheet, but you advised him not to worry that you would take care of it. Again, he followed your order and went home.

3

On August 31, 1998, Officer Reyna stopped to assist Officer Salazar on a traffic stop. Officer Salazar requested that Officer Reyna assist him in searching a vehicle for weapons or contraband. Officer Salazar had obtained consent from the driver to search the vehicle. While Officer Reyna was conducting the search, you arrived at the scene and asked him "what the hell are you doing?" Upon giving you his explanation, you ordered him to stop right then and there and resume patrol. You sarcastically added that he was getting like Officer Juan Ayala, wanting to search every vehicle that he stops. Officer Reyna obeyed your order, advised Officer Salazar of said order, and left him to handle to traffic stop by himself.

In regard to Officer Homer Reyna's allegations. I find that you were in violation of Police Department Policy Manual Chapter 5, section 5.06 Insubordination: You arrogantly and defiantly disobeyed my instructions. You ordered Officer Reyna to drive a patrol car that he had reported as having a defective transmission, when I had ordered him to park it. You violated section 5.23 Unbecoming Conduct: You demonstrated your arrogance and lack of professionalism when you ordered Officer Reyna to do foot patrol at the Housing Authority as a punishment. Officer Reyna had not violated any Department policies, rules, or regulations. Your actions only served to demean, embarrass, and humiliate Officer Reyna. Your arrogance was demonstrated when you told Officer Reyna, that you did not care what the Chief had said.This action clearly demonstrates the disrespect you have for your superiors and subordinates. I find that you violated section 5.42 Unsatisfactory Performance: You made the decision to punish or reprimand an officer without just cause. Again, you interfered with an officer's duties when you ordered Officer Reyna to stop the search of a vehicle, when he had obtained consent to search. The consent was obtained incidentally to a legal traffic stop. Your actions, again only served to demean, and embarrass an officer who was just doing his job. You violated section 5.58 Dereliction of Duty: 1. Failure to observe and give effect to the policies of the Department. (1) You prevented the officers from carrying out their duties as Peace Officers.(2) You failed to follow procedures when you reprimanded Officer Reyna. 2. Failure to obey orders, when you ordered Officer Reyna to drive a car against the Chief of Police orders.
I further find that you violated Chapter XI-Safety of the City of Port Isabel Policy Manual, Section 1101: Purpose and Basis; (2) Insuring that all municipal motor vehicles are operated in a safe manner and are in a safe operating condition. You ordered an officer to drive a vehicle that had been reported to have a transmission defect. Your actions put the safety of the officer and motoring public at risk. You also ran the risk of creating a high cost in repairs, to the city and the Department. Section 1104: Accident Prevention Procedure; (2) require full compliance from each supervisory and non-supervisory subordinate with all applicable written and oral standards of safety, including, but not limited to Safety Review Board policies, City administrative and departmental policies. Section 1109: (4); Vehicle and Equipment Operation; (4) any City employee who abuses or negligently uses City owned motor vehicles or motorized equipment or who violates the traffic ordinances of the City or vehicle and traffic laws of the State of Texas in the course and scope of his/her employment shall be subject to disciplinary action in accordance with the personnel rules. Section 1111: Fleet Safety Policy Statement-Operating Procedures; (7) Vehicles will be operated only when they are in safe operating condition. Continuous awareness of your vehicle's condition should be accomplished and operating defect reported to management or corrected prior to operation. Section 1114: (2) A system of reporting and

4

correcting defects should be established. Drivers should be instructed to observe their vehicles on a continuous basis and report defects for correction.

During the month of July 1998, Officer Moore was working the 10:00 PM to 6.00 AM shift, under your command. He does not remember the exact night or time but remembers that on one occasion during this month he discovered loud music coming from within the High School complex. He advised dispatcher Nadine McDowell of the situation and asked for assistance. Officer Moore advised that he had not found a door opened but wanted back up to be enroute in case he found someone inside the building. Dispatcher McDowell proceeded to dispatch Officer Javier Gutierrez who advised he was enroute. You then, upon finding out what was going on assumed that the music was coming from the weight room, and canceled the assistance. Officer Moore advised that while he was checking the situation out the assistance never arrived. He further stated that a unit did not even conduct a roll by which is common practice by our officers for their safety.

In regard to Officer Ronald Moore's allegations, I find you violated Chapter XI-Safety (3) of the City of Port Isabel Policy Manual. (3) Verifying that all municipal services are performed in a safe manner and are in a safe operating condition. You called off Officer Moore's assistance assuming that his safety was not in jeopardy. You were not at the scene, therefore you could not have known the facts to evaluate the situation, much less make that determination.
Section 5.58 Dereliction of Duty (1): Of the Port Isabel Police Department Policy Manual. (1) Failure to observe and give effect to the policies of the department. I find your actions to be prejudicial to the proper performance of the functions of the Department. Section 2.05 Organizational Relationships: The administration desires that personnel in the various organizational positions perform and interact in a way that best contributes to the goals of the Port Isabel Police Department.

Officer Juan Manuel Ayala states that on August 22, 1998, while working the 10:00AM to 6:00AM at approximately 2:45AM traveling west approaching the Travel Trailer passed by him he smelled an odor of burnt marijuana. After the car had passed he no longer detected the odor of burnt marijuana. He pursued the vehicle and observed an occupant in the vehicle throw an object out the window. He then noticed a defective license plate light and obvious violation of the law. He then conducted a traffic stop for the violation. Officer Ayala then noticed that there were about 8 subjects in the vehicle and requested assistance from Officer Tomas Salazar. A driver's license check revealed that the driver did not have a valid Texas driver's license. Another violation he noticed, was that several small children in the vehicle were not restrained as required by State law.
You then arrived at the scene and asked "what was going on?" Officer Ayala advised you of what he had. You then took over the traffic stop and advised the driver that he could go. You advised that you did not smell any odor of marijuana but you disregarded the other violations. Officer Ayala had made a legal traffic stop and discovered other violations incidental to the traffic stop.

On August 28, 1998, Sergeant Pedro Collazo requested that Officer Ayala stay about 30 minutes passed his shift to assist in processing a prisoner. The morning shift officer had been dispatched

5

CIMPDF - www.fenio.com

to a call of a vehicle traveling on the wrong side of the causeway. The next day on August 29, 1998, again Sgt. Collazo requested that Officer Ayala stay to process all the prisoners. He again took 30 minutes to process the prisoners and correct some mistakes on the finger print cards. Officer Ayala then filled out the required comp-time forms to claim his time as required by city policy and FLSA section 560 Compensatory Time law. On September 1, 1998, when he returned from his two days off you questioned why he was claiming the comp-time. You advised Officer Ayala that it was going to look bad at City Hall if they were to look at his activity log. You discouraged Officer Ayala from submitting comp-time forms for time worked and earned. Officer Ayala disposed of the forms, but re-submitted them when Sgt. Collazo advised him to do so. In view of the recent problems the City of Port Isabel had with the Labor Department, I find your behavior inexcusable. The City of Port Isabel had to pay $55,737.00 for violations under the Fair Labor Standards Act, that were committed by the Police Department, while you were second in command. In your capacity as a Police Department supervisor should know not to allow a violation like this occur.

In regard to Officer Juan Manuel Ayala's allegations, you violated Chapter 5; section 5.23: Unbecoming Conduct. You again interfered with a police officer's duty and impaired the operation of the Department. Section 5.42 Unsatisfactory Performance: Officers shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions. Your unsatisfactory performance was demonstrated when you failed to take action or prevented another officer to take enforcement action on a law violation. I find that you again violated T.P.C. 38.15 (a)(1)(b), Interference with Public Duties.


The operator of this vehicle did not possess a valid driver's license, and there were children in the vehicle that were not restrained I find that you violated Transportation code 521.458(b) Permitting an unauthorized person to drive. (A Class "C" misdemeanor)
Upon instructing Officer Ayala not to submit his comp-time forms, you violated Chapter VI Compensation and Benefits of the City of Port Isabel Policy Manual. You also violated FLSA section 560-Compensatory Time law, which requires the submission of these form to claim time earned.


Officer Delvin Lee Hatley Jr. submitted a statement in which he states that on several occasions he has personally heard you make derogatory remarks toward other fellow officers and Department employees. Examples are: "where's that fat little rollie pollie fuck?" or " where is the pinche marana?" referring to Sergeant Pedro Collazo. He further states that you have made similar remarks about Communications Officer Nadine McDowell. You asked Officer Hatley, "tell me the truth, have you ever wondered how Nadine wipes her ass?" These statements were made loud enough to where the people you were talking about could have heard you.

In regard to the statement that was submitted by Officer Hatley, I find that again you were insubordinate toward the Chief of Police. You demonstrate a willful act of defiance to my directive of June 6, 1998. In the directive I specifically request that indecent and vulgar language not be used in the Police Department.

6

Sergeant Alaniz, your style of supervising your subordinates is contrary to the basic skills of supervision. It is not consistent with skills that are based on job knowledge, human relations, conceptual skills to eliminate errors and imrove proficiency, and affective skills to create an environment based on fairness and equality. A supervisor should place emphasis on the development of the skills of their subordinates, rather than restricting them from doing their job, and humiliating them without just cause.

I believe your style of supervising prevents your subordinates from maximizing their talents. You restrict them from achieving individual needs, in order to obtain job satisfaction. You limit their opportunity for satisfying professional goals. It is your duty as a supervisor to create a pleasant or at least a civil working environment in which officers want to work, and not be afraid of coming to work. It is also your duty as a supervisor to make yourself available to help or guide your subordinates in solving problems as they occur.

I have reviewed your evaluation of July 9, 1998, and have concluded that you have not made any effort to meet any of the expectations in this evaluation. Among these were a need on your part, (1). to make an effort toward leading and motivating your subordinates to improving job performance. (2). To work toward the common goal of providing efficient, quality,and professional service to our citizens. (3). Improve traffic enforcement on your shift. It seems that you attempt to do the opposite I see no effort on your part to motivate your subordinates to improving their job performance. Traffic enforcement has not improved, and you have not demonstrated any willingness to provide efficient, quality, and professional service to our citizens. This would be in working toward one of the goals of the Port Isabel Police Department.

The evidence obtained in this investigation of your conduct, reflects that you have failed to meet these standards expected of you as a supervisor. You have repeatedly abuse your position of authority and have engaged in conduct that is unacceptable as a Sergeant or member of the Port Isabel Police Department. You have committed serious violations of policy and law, and to that extent, you have become a liability to the City and the Department. I feel that you can no longer be effective as a supervisor or member of the Port Isabel Police Department. Therefore I am terminating your position as a member of this Department effective September 16, 1998, at 5:00 PM. You must turn in all property entrusted to you and belonging to the City of Port Isabel, before you receive your pay check.

You have the right to appeal this action with the City Manager, as provided by policy within ten days after receiving this letter.

Respectfully,

Joel Ochoa
Chief of Police

cc:     City Manager
        Personnel File
        File

7

# Affidavit of Nancy Davalos

CVisPDF – www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JORGE G. ALANIZ                            :
                                           :
VS.                                        :          CIVIL ACTION B-00-136
                                           :
CITY OF PORT ISABEL, TEXAS                 :

## AFFIDAVIT

BEFORE ME, the undersigned authority, on this day personally appeared **Nancy**

**Davalos**, and after being duly sworn, deposes and says:

1.  My name is Nancy Davalos; I am over eighteen years old, have never been convicted of a crime, and am fully competent to make this affidavit.

2.  I am the City Secretary of the City of Port Isabel , and as such, I am the official custodian of records for the City.

3.  I have reviewed the official personnel file of Mr. Jorge Alaniz, the Plaintiff in this action.

4.  Mr. Alaniz was first employed by the City of Port Isabel about March 1983 as a patrolman.

5.  Mr. Alaniz was terminated as an employee of the City of Port Isabel by the Chief of Police, Joel Ochoa, by letter dated September 16, 1998.

6.  Mr. Alaniz had no written contract of employment at the time of his termination.

7.  The statements contained in this letter are true and correct and based upon my review of the official personnel file of Mr. Jorge Alaniz kept by the City of Port Isabel.

8.  The records contained within the official personnel file of Mr. Jorge Alaniz were made at or near the time of the events described therein by a person with knowledge of time facts and were kept by the City in the regular course of business.

NANCY DAVALOS

SUBSCRIBED AND SWORN TO BEFORE ME by the said NANCY DAVALOS, affiant,

to which witness my hand and seal of office on this the ___13ᵗʰ___ day of June, 2001.

_P.M. Palacios_
Notary Public, State of Texas