*13*

United States District Court
Southern District of Texas
FILED

JUL 2 0 2001

Michael N. Milby
Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

JORGE G. ALANIZ        §
       **Plaintiff,**        §
       §
**vs.**        §      **CIVIL ACTION B-00-136**
       §           **JURY**
**CITY OF PORT ISABLE, TEXAS**        §
       **Defendant**        §

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

       **JORGE G. ALANIZ ("ALANIZ")**, Plaintiff in the above-numbered and styled cause, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, hereby files his response to CITY OF PORT ISABEL, TEXAS ("PORT ISABEL") Defendants' Motion for Summary Judgment, and request that Court deny Defendant's motion since genuine issues of material fact exist that necessitate a trial by Jury.

     1.      This Response to Defendants' Motion for Summary Judgment is based upon the pleadings on file and summary judgment evidence attached hereto, all of which establishes that Port Isabel is not entitled to summary judgment.

     2.      The specific evidence supporting this response is found in excerpts and exhibits from Plaintiff's Deposition (Exhibit "A"), the affidavit of Jorge G. Alaniz (Exhibit "B"), and the affidavit of Nancy Davalos (Exhibit "C") all of which are incorporated herein in full.

## Factual Background

3.     Alaniz was employed by the City of Port Isabel as a patrolman on or about March 1983. (see Affidavit of Nancy Davalos).  During Mr. Alaniz's 15-year service with the city of Port Isabel, he quickly rose through the ranks.  Mr. Alaniz' promotions are as follows: from Patrolman to Corporal, to Sergeant, to First Sergeant, to Investigator, to Sergeant of Investigators, and finally to Captain. (Plaintiff's depo. at 19-20).

4.     In 1997, then Captain Alaniz complained to then Chief of Police for the City of Port Isabel, Chief Swan, and city manager Manuel Hinojosa about not being compensated for overtime hours.  (see Affidavit of Jorge G. Alaniz and Plaintiff's depo. at 26-29).   Chief Swan retired after a heart attack, shortly after Alaniz' complaint about compensation for overtime. (Plaintiff's depo. at 26-29).   Chief Swan was replaced by acting Chief of Police Pedro Collazo. (Plaintiff's depo. at 30).

5.     Alaniz renewed his complaint about not being compensated for overtime with the newly appointed acting Chief of Police Pedro Collazo. (Plaintiff's depo. at 35).   Acting Chief Collazo informed Alaniz that he would continue the policy of calling out officers with no compensation for overtime.  (Plaintiff's depo. at 32 and 35).   The same afternoon of Mr. Alaniz complaint, suddenly and without warning, Mr. Alaniz was told by acting chief Collazo that he was no longer Captain and was being demoted to a position that carried no rank. (Plaintiff's depo. at 32).   Mr. Alaniz went to the city manager Manuel Hinojosa to inform him of his demotion and of his intent to file a complaint

with the Work Force Commission for not being compensated for overtime. (Plaintiff's depo. at 33-35).

6.     Mr. Alaniz filed a complaint with Wage and Hour Department. (Plaintiff's depo. at 71). Wage and Hour immediately started an investigation asking questions of the different officers in the police department. (Plaintiff's depo. at 73). City of Port Isabel Commissioner Moore refused to settle the Wage and Hour claim unless Alaniz was excluded from the settlement. (see Plaintiff Depo. at 75). Finally, the claim for compensation was settled with Wage and Hour after the City agreed to include Mr. Alaniz in the settlement. (Plaintiff's depo. at 77).

7.     About a month after the settlement with Wage and Hour, Port Isabel selected Joel Ochoa as the new Chief of Police. (Plaintiff's depo. at 38 and 78). Although Chief Ochoa returned Alaniz to a rank, he did not return him the rank of Captain, but instead gave him the rank of Sergeant. (Plaintiff's depo. at 38). Then on September 1998, months after being reinstated as sergeant, Mr. Alaniz was suddenly fired from the City of Port Isabel.

### Plaintiff's Objections to Summary Judgment Evidence of Defendant

8.     Plaintiff objects to Exhibit 1 of Plaintiff's Deposition "The Letter of Termination" in that it constitutes inadmissible hearsay.

### Response to Port Isabel's Grounds for Summary Judgment

9.     Port Isabel alleges in its Motion for Summary Judgment that there is no genuine issue of material fact regarding two elements of Alaniz's claim. In order to establish a *prima facia* case of retaliation for filing a complaint in

violation of 29 U.S.C. §215(a)(3), Plaintiff must establish the following elements:

(a) The plaintiff engaged in activity protected by Title VII;

(b) An adverse employment action followed; and

(c) There was some casual connection between the activity and the adverse action. Collins v. Baptist Memorial Geriatic Center, 937 F.2d 109, 193 (5th Cir. 1991).

10.    Specifically, Port Isabel alleges that Alaniz was an employee-at-will and that there is no "but for" causal connection between Plaintiff's termination and his wage and hour complaint. (Defendants' Motion for Summary Judgment at ¶ II). Port Isabel is incorrect.

11.    In determining whether or not Plaintiff can show a "but for" casual connection between his termination and his wage and hour complaint, the Court must accept the evidence of the nonmoving party and draw all justifiable inferences in his favor. Andarson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

12.    Alaniz's testimony in his deposition shows that after he complaint to acting chief of Police Pedro Collaso about not being compensated for overtime, Alaniz was instantly demoted without explanation. (Plaintiff's Depo at page 32). The evidence also shows that Port Isabel Commissioner Moore refused to settle the Wage and Hour complaint unless Alaniz was excluded from the settlement. Shortly after the settlement of the Wage and Hour claim, Alaniz was fired from the Police Department. The timing of Plaintiff's demotion after complaining of not being compensated for overtime, coupled with the

CIMPDF - www.faxiss.com

fact that the city at some point refused to settle the Wage and Hour claim if it included Alaniz, are ample evidence that allow the Court to draw justifiable inferences that Defendant Port Isabel was motivated in its retaliatory actions by Alaniz's claim for unemployment benefits.   It is also justifiable for the Court to infer that the firing of Alaniz, months after Port Isabel entered into a settlement with Wage and Hour that included Alaniz's claim, was a direct result of Mr. Alaniz having initiated the Wage and Hour investigation. Alaniz had served the Port Isabel Police department for over 15 years advancing steadily in rank. (Plaintiff's Depo at 19-20)  It is clear that Alaniz's problems with the city began the moment he started complaining about not being compensated for overtime.   But for Alaniz's actions of engaging in the protected activity of complaining for not being compensated for overtime, it is reasonable to infer that Mr. Alaniz would not be subject to being demoted and later fired.

13.   Port Isabel's Motion for Summary Judgment relies heavily on Hashop v. Rockwell Space Operations Co., 867 F. Supp 1287 (S.D. Tex. 1994).  The Hashop case is easily distinguished from the present case.  In Hoshop the employer rebutted the employees claim by showing evidence of a non-discriminately reason for the termination of employment and the employee failed to show any evidence to the contrary.  Hoshop at 1301.  In the present case we contend that Movant failed to raise a non-discriminatory reason for discharging Alaniz and in the alternative, if Movant did raise a non-discriminatory reason, Alaniz raises fact issues as to the validity those

reasons. Movant points to the letter attached as exhibit "1" of the deposition of Alaniz as the reasons for the firing of Alaniz. The letter attached as exhibit "1" of the deposition of Alaniz cannot be considered by the Court because it is inadmissible hearsay. Even if the Court admits exhibit "1" of the deposition of Alaniz as proper summary judgment evidence, unlike the employee in Hoshop, Alaniz does raise fact issues as to every claim raised in exhibit "1" of the deposition of Alaniz. (see affidavit of Alaniz).

### Attorney fees

14.    Movant argues Attorney's fees are not proper in the absence of any meritorious claim. (see paragraph 2 of Defendants' Motion for Summary Judgment). Since Alaniz has raised meritorious claim above, Movants argument is moot.

WHEREFORE PREMISES CONSIDERED, Plaintiff Jorge G. Alaniz requests that this Honorable Court deny Defendant's Motion for Summary Judgment.

Ivan A. Andarza
**ANDARZA & DE COSS, P.C.**
State Bar No. 00798031
1718 Boca Chica Blvd.
Brownsville, Texas 78520
(956) 550-8330
(956) 982-1909 fax

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's Response to Defendant's Motion for Summary Judgment was served on the parties listed below by regular mail, on this the _____ day of July, 2001.

Ricardo Morado
Roerig, Oliveira & Fisher, L.L.P.
855 West Price Road-Suite 9
Brownsville, TX 78520

Ivan A. Andarza

---

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **JORGE G. ALANIZ** | § | |
| **Plaintiff,** | § | |
| | § | |
| **Vs.** | § | **CIVIL ACTION NO. B-00-136** |
| | § | **(JURY)** |
| **CITY OF PORT ISABEL, TEXAS** | § | |
| **Defendants,** | § | |

## AFFIDAVIT OF IVAN A. ANDARZA

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

Before me the undersigned authority, on this day personally appeared IVAN A. ANDARZA, proved to me on oath through Texas driver's license to be the person whose name is subscribed to the following instrument and acknowledged to me that he executed the same for the purposes therein expressed, and having been by me duly sworn, upon his oath, deposed and states the following:

1.  My name is Ivan A. Andarza.  I am over the age of 18 years of age and am fully competent to make this affidavit.  I have personal knowledge of all the facts stated herein.

2.  I am the attorney of record for Jorge G. Alaniz and make this affidavit in connection with Plaintiff's Response to Defendant's Motion for Summary Judgment in the above styled and numbered cause.

3.  I was present at the deposition of Jorge G. Alaniz.  Attached hereto and made part hereof for all purposes is a true and correct copy of the



referenced pages and exhibits of said deposition for the Court's

consideration as summary judgment evidence.

FURTHER AFFIANT SAYETH NOT.

IVAN A. ANDÁRZA

**SUBSCRIBED AND SWORN TO BEFORE ME** on this _20th_ day of July, 2001,
A.D., to certify which witness my Hand and seal of office:

Notary Public, State of Texas

J. C. VASQUEZ
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
01-05-2005

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JORGE G. ALANIZ,              )(
      Plaintiff             )(
                         )(
VS.                           )(    CIVIL ACTION B-00-136
                         )(
CITY OF PORT ISABEL, TEXAS,   )(
      Defendant             )(

---

ORAL DEPOSITION OF
JORGE GARCIA ALANIZ
MARCH 1, 2001

---

        ORAL DEPOSITION OF JORGE GARCIA ALANIZ,
produced as a witness at the instance of the DEFENDANT,
taken in the above styled and numbered cause on
MARCH 1, 2001, reported by CORINNA N. GARCIA, Certified
Court Reporter No. 5210, in and for the State of Texas,
at the offices of Roerig, Oliveira & Fisher, L.L.P.,
855 West Price Road, Brownsville, Texas, pursuant to
the Federal Rules of Civil Procedure.

**ORIGINAL**

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956)618-2366  (956)428-0755  (956)542-1020

## APPEARANCES

COUNSEL FOR PLAINTIFF:

      IVAN ANDARZA
      ANDARZA & DE COSS, P.C.
      815 Ridgewood
      Brownsville, Texas  78520

COUNSEL FOR DEFENDANT:

      RICARDO MORADO
      ROERIG, OLIVEIRA & FISHER, L.L.P.
      855 West Price Road, Suite 9
      Brownsville, Texas  78520

ALSO PRESENT:

      Joel Ochoa

## INDEX

| | PAGE |
|---|---|
| Appearances ................................... | 2 |

JORGE GARCIA ALANIZ

| | |
|---|---|
| Examination by Mr. Morado ..................... | 3 |
| Errata Sheet/Signature Page ................... | 99 |
| Reporter's Certificate ........................ | 100 |

Attached to the end of the transcript:  Stipulations

## EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 1 | Letter Dated 09-16-98 ................. | 61 |

3

| | |
|---|---|
| 1 | JORGE GARCIA ALANIZ, |
| 2 | having been duly sworn, testified as follows: |
| 3 | EXAMINATION |
| 4 | BY MR. MORADO: |
| 10:13:19 5 | Q. State your full name, please. |
| 10:13:22 6 | A. Jorge Garcia Alaniz. |
| 10:13:24 7 | Q. Mr. Alaniz, my name is Ricardo Morado, and I'm |
| 10:13:28 8 | an attorney. I represent the City of Port Isabel in |
| 10:13:31 9 | connection with a lawsuit that you have filed in |
| 10:13:32 10 | Federal court, being Civil Action No. B-00-136. Do you |
| 10:13:38 11 | understand that? |
| 10:13:39 12 | A. Yes. |
| 10:13:40 13 | Q. We're here this morning in my offices for the |
| 10:13:42 14 | purposes of taking your deposition in connection with |
| 10:13:44 15 | that lawsuit. Do you understand that? |
| 10:13:46 16 | A. Yes. |
| 10:13:46 17 | Q. Have you ever been deposed in any proceeding, |
| 10:13:49 18 | any other lawsuit, prior to today? |
| 10:13:52 19 | A. Yes. |
| 10:13:52 20 | Q. How many times have you gone through |
| 10:13:54 21 | depositions? |
| 10:13:57 22 | A. Maybe a handful, five -- five times. |
| 10:14:02 23 | Q. Okay. Have you ever been a party to a lawsuit |
| 10:14:03 24 | other than this one? |
| 10:14:05 25 | A. Yes. |

| | |
|---|---|
| 10:14:05 1 | Q. How many times have you been a party to a |
| 10:14:08 2 | lawsuit? |
| 10:14:08 3 | A. Twice. |
| 10:14:08 4 | Q. Okay. In this lawsuit, you are the plaintiff, |
| 10:14:11 5 | the person bringing the lawsuit. Do you understand |
| 10:14:15 6 | that? |
| 10:14:16 7 | A. Yes. |
| 10:14:16 8 | Q. On these other two occasions that you've been |
| 10:14:19 9 | party to a lawsuit, have you been the plaintiff or the |
| 10:14:22 10 | defendant? |
| 10:14:22 11 | A. Once -- plaintiff, once. |
| 10:14:24 12 | Q. Okay. Tell me about the lawsuit -- the other |
| 10:14:28 13 | lawsuit in which you were a plaintiff. When was that |
| 10:14:32 14 | filed, more or less? |
| 10:14:34 15 | A. On a car accident? |
| 10:14:37 16 | Q. Whenever it was. |
| 10:14:38 17 | A. It was filed maybe two years ago. Exactly, I |
| 10:14:42 18 | don't know, but two years. |
| 10:14:43 19 | Q. So approximately 1998 or '99? |
| 10:14:46 20 | A. Sure. |
| 10:14:47 21 | Q. And was it in state court? |
| 10:14:49 22 | A. Yes. |
| 10:14:51 23 | Q. Okay. Do you remember whose court? |
| 10:14:52 24 | A. No, sir. |
| 10:14:54 25 | Q. Do you remember the name of the judge? |

|      |                                                                    |
|------|--------------------------------------------------------------------|
| 1    | JORGE GARCIA ALANIZ,                                               |
| 2    | having been duly sworn, testified as follows:                      |
| 3    | EXAMINATION                                                         |
| 4    | BY MR. MORADO:                                                      |

10:13:19  5    Q.  State your full name, please.

10:13:22  6    A.  Jorge Garcia Alaniz.

10:13:24  7    Q.  Mr. Alaniz, my name is Ricardo Morado, and I'm

10:13:28  8  an attorney.  I represent the City of Port Isabel in

10:13:31  9  connection with a lawsuit that you have filed in

10:13:32 10  Federal court, being Civil Action No. B-00-136.  Do you

10:13:38 11  understand that?

10:13:39 12    A.  Yes.

10:13:40 13    Q.  We're here this morning in my offices for the

10:13:42 14  purposes of taking your deposition in connection with

10:13:44 15  that lawsuit.  Do you understand that?

10:13:46 16    A.  Yes.

10:13:46 17    Q.  Have you ever been deposed in any proceeding,

10:13:49 18  any other lawsuit, prior to today?

10:13:52 19    A.  Yes.

10:13:52 20    Q.  How many times have you gone through

10:13:54 21  depositions?

10:13:57 22    A.  Maybe a handful, five -- five times.

10:14:02 23    Q.  Okay.  Have you ever been a party to a lawsuit

10:14:03 24  other than this one?

10:14:05 25    A.  Yes.

| | |
|---|---|
| 10:15:58 1 | Q.  When did the accident occur? |
| 10:16:01 2 | A.  I think it's November '98, I believe.  I'm not |
| 10:16:05 3 | too sure on the month, but somewhere in there. |
| 10:16:09 4 | Q.  And who was your attorney in connection with |
| 10:16:11 5 | this civil lawsuit? |
| 10:16:21 6 | A.  Let me see if I remember the name. |
| 10:16:26 7 | Q.  You're going to hurt his feelings if you don't. |
| 10:16:31 8 | A.  I can't remember his name, sir. |
| 10:16:33 9 | Q.  Okay.  I'm going to leave a blank here in your |
| 10:16:36 10 | deposition.  When you read the transcript of your |
| 10:16:40 11 | deposition, if you remember the name of the attorney |
| 10:16:41 12 | who represented you, go ahead and fill it in. |
| 10:16:46 13 | A.  Oh, I'll remember.  Okay. |
| 10:16:46 14 | Q.  Then the second time that you were involved in |
| 10:16:49 15 | a lawsuit was as a defendant, where somebody sued you, |
| 10:16:54 16 | correct? |
| 10:16:55 17 | A.  No, I'm sorry.  No.  I was never sued.  What I |
| 10:16:58 18 | meant to say was that once I was the one -- I was |
| 10:17:02 19 | involved in the accident, and the other one, my wife |
| 10:17:04 20 | was involved in an accident.  I wasn't -- |
| 10:17:06 21 | Q.  So in this second lawsuit prior to today, you |
| 10:17:10 22 | were the plaintiff? |
| 10:17:11 23 | A.  Right. |
| 10:17:13 24 | Q.  And when was that lawsuit filed, more or less? |
| 10:17:15 25 | A.  That lawsuit was filed in like '94. |

| | | |
|---|---|---|
| 10:14:55 | 1 | A.  No. |
| 10:14:56 | 2 | Q.  Did you ever -- did you have to try the case? |
| 10:14:59 | 3 | A.  No, it didn't go. |
| 10:15:00 | 4 | Q.  It settled? |
| 10:15:01 | 5 | A.  It was settled. |
| 10:15:02 | 6 | Q.  Do you remember against whom the case was |
| 10:15:04 | 7 | pending?  Who was the defendant? |
| 10:15:06 | 8 | A.  The company was A&A Waste Disposal out of |
| 10:15:15 | 9 | Mission. |
| 10:15:19 | 10 | Q.  And this accident was a result -- I'm sorry. |
| 10:15:23 | 11 | This lawsuit was a result of an automobile accident you |
| 10:15:26 | 12 | had with an A&A vehicle? |
| 10:15:28 | 13 | A.  Correct. |
| 10:15:30 | 14 | Q.  Okay.  Were you personally involved in that |
| 10:15:31 | 15 | accident? |
| 10:15:32 | 16 | A.  No. |
| 10:15:33 | 17 | Q.  Was someone in your family involved? |
| 10:15:35 | 18 | A.  My wife and my daughter. |
| 10:15:37 | 19 | Q.  What's your wife's name? |
| 10:15:39 | 20 | A.  Rosa. |
| 10:15:45 | 21 | Q.  And your daughter? |
| 10:15:47 | 22 | A.  Jessica. |
| 10:15:49 | 23 | Q.  So Rosa and Jessica were in a motor vehicle |
| 10:15:53 | 24 | which was involved in an accident with an A&A vehicle? |
| 10:15:57 | 25 | A.  Correct. |

10:17:24 1    Q.  And was it Jorge Alaniz versus somebody?

10:17:28 2    A.  Uh-huh.

10:17:29 3    Q.  You need to --

10:17:30 4    A.  Yes.  I'm sorry, yes.

10:17:33 5    Q.  Who was the defendant?

10:17:33 6    A.  I can't remember the defendant.  I know my

10:17:36 7    attorney on that one.

10:17:38 8    Q.  Who was your attorney?

10:17:40 9    A.  Mr. Marchan.

10:17:41 10   Q.  Ray Marchan?

10:17:43 11   A.  Yes, sir.

10:17:46 12   Q.  Did that case go to trial?

10:17:47 13   A.  No.

10:17:52 14   Q.  Were you the only plaintiff?

10:17:54 15   A.  Yes.

10:17:59 16   Q.  And that was as a result of an automobile

10:18:03 17   accident also?

10:18:04 18   A.  Yes, sir.  I remember the name of this

10:18:05 19   attorney, if you want, now.

10:18:07 20   Q.  Sure.

10:18:07 21   A.  Bruce Thorpe.

10:18:25 22   Q.  Okay.  All right.  Let me go over some ground

10:18:29 23   rules for deposition.  We got into the discussion

10:18:32 24   regarding the lawsuits a little bit ahead of ourselves.

10:18:36 25   Do you understand you've just taken an oath to tell the

| | |
|---|---|
| 10:18:39 | 1 | truth?
| 10:18:39 | 2 | A.  Yes, sir.
| 10:18:40 | 3 | Q.  Okay.  Because you've taken the oath to tell

the truth, the testimony that you give during the

course of the deposition in this informal setting has

the same practical effect as if we were sitting right

now in front of a judge and jury.  Do you understand

that?

A.  Yes, sir.

Q.  Because of that, Mr. Alaniz, it becomes very

important for you to answer truthfully, to the best of

your ability, every question that I pose to you, all

right?

A.  Yes, sir.

Q.  If I ask you a question that you do not

understand or which makes no sense to you or you didn't

hear it or anything like that, will you please ask me

to repeat it or rephrase it before you begin your

answer?

A.  Yes, sir.

Q.  Okay.  In other words, I want you to feel

comfortable that you have understood my question before

you begin responding, all right?

A.  Yes, sir.

Q.  Okay.  During the course of the deposition, if

| | | |
|---|---|---|
| 10:19:29 | 1 | you need to take a break to get something to drink, to |
| 10:19:31 | 2 | use the facilities, to stretch your legs, whatever, |
| 10:19:34 | 3 | will you please let me know that you need a break, and |
| 10:19:41 | 4 | I'll be more than happy to afford you some time to do |
| 10:19:41 | 5 | so. |
| 10:19:41 | 6 | A.  Yes. |
| 10:19:42 | 7 | Q.  With respect to any questions that I ask of you |
| 10:19:44 | 8 | during the deposition which can be answered "yes" or |
| 10:19:46 | 9 | "no," would you please answer them "yes" or "no," |
| 10:19:51 | 10 | rather than using "uh-huh, huh-uh," because the court |
| 10:19:56 | 11 | reporter can only accurately record what you say.  And |
| 10:19:59 | 12 | in order to get an accurate recording of your answer, |
| 10:20:04 | 13 | "yes" or "no" will work most effectively.  Will you do |
| 10:20:07 | 14 | that? |
| 10:20:08 | 15 | A.  Yes, sir. |
| 10:20:08 | 16 | Q.  Now, where do you live? |
| 10:20:10 | 17 | A.  Los Fresnos. |
| 10:20:11 | 18 | Q.  What's your address? |
| 10:20:12 | 19 | A.  32717 Melon Drive. |
| 10:20:19 | 20 | Q.  How long have you lived there? |
| 10:20:23 | 21 | A.  Nine years. |
| 10:20:27 | 22 | Q.  And you live there with your wife? |
| 10:20:30 | 23 | A.  Yes. |
| 10:20:30 | 24 | Q.  Who else lives with you? |
| 10:20:31 | 25 | A.  My daughter. |

| | | |
|---|---|---|
| 10:20:32 | 1 | Q.  Is it just the three of you? |
| 10:20:34 | 2 | A.  Yes, sir. |
| 10:20:35 | 3 | Q.  How old is your daughter? |
| 10:20:36 | 4 | A.  My daughter is eight. |
| 10:20:40 | 5 | Q.  Where did you live before you lived at -- on |
| 10:20:44 | 6 | Melon Drive in Los Fresnos? |
| 10:20:47 | 7 | A.  At the B&E Trailer Park in Port Isabel. |
| 10:20:52 | 8 | Q.  How long did you live there? |
| 10:20:53 | 9 | A.  Like nine years. |
| 10:20:55 | 10 | Q.  Okay.  Do you remember what your address was |
| 10:20:59 | 11 | there? |
| 10:20:59 | 12 | A.  No, they didn't have an address at first.  I |
| 10:21:03 | 13 | never used it for mailing. |
| 10:21:05 | 14 | Q.  What's your wife's maiden name? |
| 10:21:07 | 15 | A.  Rosales. |
| 10:21:10 | 16 | Q.  How long have you and she been married? |
| 10:21:11 | 17 | A.  Eight years. |
| 10:21:13 | 18 | Q.  Is this your only marriage? |
| 10:21:16 | 19 | A.  No. |
| 10:21:22 | 20 | Q.  Does she work? |
| 10:21:23 | 21 | A.  No. |
| 10:21:30 | 22 | Q.  You were previously married one other time? |
| 10:21:33 | 23 | A.  Yes. |
| 10:21:33 | 24 | Q.  Okay.  Did that marriage end in divorce? |
| 10:21:36 | 25 | A.  Yes. |

| Time | Line | |
|---|---|---|
| 10:21:36 | 1 | Q.  Who were you married to before you married Rosa |
| 10:21:39 | 2 | Rosales? |
| 10:21:40 | 3 | A.  Leticia. |
| 10:21:47 | 4 | Q.  Leticia whom? |
| 10:21:49 | 5 | A.  Flores. |
| 10:21:53 | 6 | Q.  And when were you married to Leticia Flores? |
| 10:22:12 | 7 | A.  I believe it was in -- I can't remember the |
| 10:22:22 | 8 | year. |
| 10:22:23 | 9 | Q.  When were you divorced from her? |
| 10:22:26 | 10 | A.  1998. |
| 10:22:36 | 11 | Q.  No, that can't be right. |
| 10:22:38 | 12 | A.  No.  1989. |
| 10:22:43 | 13 | Q.  Well, let's think about this, Mr. Alaniz.  You |
| 10:22:46 | 14 | told me that you've been married to Rosa Rosales for |
| 10:22:51 | 15 | eight years. |
| 10:22:52 | 16 | A.  Eight years. |
| 10:22:52 | 17 | Q.  I would assume that you were divorced from your |
| 10:22:54 | 18 | first wife before you married Ms. Rosales. |
| | 19 | A.  Yes. |
| 10:22:57 | 20 | Q.  If you've been married eight years to |
| 10:22:59 | 21 | Ms. Rosales, that means that you married Ms. Rosales |
| 10:23:05 | 22 | perhaps around 1993? |
| 10:23:06 | 23 | A.  '93.  I remember that. |
| 10:23:07 | 24 | Q.  So you were divorced from your first wife |
| 10:23:10 | 25 | sometime prior to the date of your marriage in 1993. |

| | | |
|---|---|---|
| 10:23:13 | 1 | A. '89. |
| 10:23:14 | 2 | Q. '89? |
| 10:23:15 | 3 | A. '89. |
| 10:23:17 | 4 | Q. How many years were you married to Leticia |
| 10:23:19 | 5 | Flores?  More than ten? |
| 10:23:27 | 6 | A. Ten. |
| 10:23:33 | 7 | Q. Did you and Leticia Flores have any children? |
| 10:23:36 | 8 | A. No. |
| 10:23:50 | 9 | Q. Where does Ms. Flores live now? |
| 10:23:53 | 10 | A. I don't know. |
| 10:23:59 | 11 | Q. Where did she last live, to your knowledge, the |
| 10:24:02 | 12 | last place you remember her living? |
| 10:24:05 | 13 | A. Chicago was the last. |
| 10:24:10 | 14 | Q. Where was she from originally when you -- |
| 10:24:12 | 15 | A. La Feria. |
| 10:24:22 | 16 | Q. Do you remember the names of her parents? |
| 10:24:26 | 17 | A. They were deceased. |
| 10:24:30 | 18 | Q. All right.  Tell me about your educational |
| 10:24:32 | 19 | background.  Did you graduate from high school? |
| 10:24:35 | 20 | A. Graduated from Santa Rosa High School. |
| 10:24:38 | 21 | Q. What year? |
| 10:24:41 | 22 | A. Graduated in 1980. |
| 10:24:44 | 23 | Q. Then after graduating from Santa Rosa High, did |
| 10:24:47 | 24 | you continue on with your education? |
| 10:24:49 | 25 | A. Pan American University. |

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

10:24:55 1       Q.  Did you complete a degree program?

10:24:57 2       A.  No.

10:24:58 3       Q.  How many years did you go to Pan Am?

10:24:59 4       A.  Two.

10:25:00 5       Q.  From 1980 to '82?

10:25:02 6       A.  Right.

10:25:05 7       Q.  And then did you drop out of the program?

10:25:08 8       A.  Yes.

10:25:10 9       Q.  So after dropping out of Pan Am, have you

10:25:13 10   continued your education any further?

10:25:16 11      A.  As far as college, no.

10:25:18 12      Q.  Okay.  I presume, at some point, you went to a

10:25:21 13   law enforcement academy?

10:25:24 14      A.  Academy.

10:25:25 15      Q.  Which academy did you attend?

10:25:27 16      A.  Rio Grande Valley Regional Academy.

10:25:38 17      Q.  Okay.  When?

10:25:40 18      A.  '82.

10:25:43 19      Q.  After Pan Am?

10:25:45 20      A.  Uh-huh.  Yes, sir.

10:25:50 21      Q.  And did you complete the academy successfully

10:25:53 22   during the first attempt?

10:25:54 23      A.  Yes, sir.

10:25:55 24      Q.  How long was that training program?

10:25:57 25      A.  I believe it was three months.

10:26:04  1      Q.  And after completing the academy in 1982, did
10:26:09  2  you have some type of diploma or certification from the
10:26:14  3  academy?
10:26:15  4      A.  Yes, sir.
10:26:15  5      Q.  What was that?
10:26:16  6      A.  The diploma for completion of the academy.
10:26:20  7      Q.  Is that also known as the basic peace officer
10:26:24  8  certification?
10:26:25  9      A.  Yes, sir.
10:26:36 10      Q.  Now, after receiving that certification, were
10:26:39 11  you licensed by the state at some point?
10:26:42 12      A.  Yes, sir.
10:26:42 13      Q.  When?
10:26:42 14      A.  That same time.
10:26:44 15      Q.  Same time?
10:26:45 16      A.  Yes, sir.
10:26:45 17      Q.  This would still be all in 1982?
10:26:49 18      A.  '82.
10:26:55 19      Q.  All right.  Since that time, since receiving
10:26:58 20  your basic peace officer's certification, have you had
10:27:03 21  any further formal education?
10:27:05 22      A.  I have my master's peace officer.
10:27:17 23      Q.  Is that a certification?
10:27:20 24      A.  Yes, sir.
10:27:20 25      Q.  When did you receive that?

| | |
|---|---|
| 10:27:24 1 | A.  Let me see -- '96. |
| 10:27:27 2 | Q.  Just five years ago? |
| 10:27:29 3 | A.  Uh-huh.  Yes, sir. |
| 10:27:31 4 | Q.  From whom, from where? |
| 10:27:33 5 | A.  State of Texas. |
| 10:27:37 6 | Q.  Did that require you to attend some classes -- |
| 10:27:41 7 | A.  Yes, sir. |
| 10:27:41 8 | Q.  -- or some program prior to receiving the |
| 10:27:45 9 | certification? |
| 10:27:46 10 | A.  It requires so many hours, plus years of |
| 10:27:53 11 | experience. |
| 10:27:53 12 | Q.  Okay.  When you say "so many hours," is this |
| 10:27:53 13 | part of a continuing program where, perhaps annually, |
| 10:27:56 14 | you would take a few classes or a few hours and |
| 10:28:01 15 | accumulate them over time until you had enough? |
| 10:28:05 16 | A.  Yes. |
| 10:28:05 17 | Q.  Okay.  So it was not a situation where you went |
| 10:28:09 18 | to a university or an academy for three or four months |
| 10:28:15 19 | at a time to complete your master's program and get |
| 10:28:18 20 | this master's certification? |
| 10:28:20 21 | A.  No. |
| 10:28:22 22 | Q.  Any further education after receiving your |
| 10:28:24 23 | master's peace officer's certification? |
| 10:28:29 24 | A.  In law enforcement? |
| 10:28:31 25 | Q.  Any formal education. |

10:28:33  1      A.   I've taken the one where I'm at right now, my

10:28:36  2   job, which is hazardous materials, or it's

10:28:39  3   inspector -- safety inspector certification.

10:28:47  4      Q.   And when did you receive the safety inspector

10:28:49  5   certification?

10:28:51  6      A.   I received it in 1999.

10:29:00  7      Q.   From whom?

10:29:01  8      A.   From the Federal government.

10:29:09  9      Q.   Did you have to go off to school somewhere to

10:29:11 10   be trained for this certification?

10:29:15 11      A.   Yes.

10:29:15 12      Q.   Where?

10:29:16 13      A.   El Paso.

10:29:17 14      Q.   What was the name of the facility or the

10:29:19 15   program?

10:29:19 16      A.   The program, North American -- North American

10:29:25 17   level 1 inspectors.

10:29:28 18      Q.   North American level 1 inspectors, and it was

10:29:32 19   sponsored by the United States Government?

10:29:34 20      A.   Right.

10:29:34 21      Q.   A particular branch of the government?

10:29:36 22      A.   United States Department of Transportation.

10:29:51 23      Q.   How long was this program?

10:29:54 24      A.   Five weeks.

10:29:58 25      Q.   Every day?

10:29:59 1    A.  Yes, sir, except for weekends.

10:30:03 2    Q.  And did you successfully complete the program

10:30:05 3  in your first attempt?

10:30:07 4    A.  Yes, sir.

10:30:08 5    Q.  Okay.  Any other formal education you've had

10:30:11 6  since?

10:30:12 7    A.  No, sir.

10:30:20 8    Q.  During the two years that you went to UT Pan

10:30:25 9  Am, did you study any particular field, or were you

10:30:27 10  just, as they say, taking basics?

10:30:30 11    A.  It was basics.  It was a minor in criminal

10:30:35 12  justice.

10:30:36 13    Q.  How many total hours did you accumulate?

10:30:43 14    A.  I believe it was 51.

10:30:46 15    Q.  Just shy of completing your sophomore year?

10:30:50 16    A.  Yes, sir.

10:30:58 17    Q.  What's your date of birth?

10:31:00 18    A.  August 13th, 1962.

10:31:17 19    Q.  You're currently working for the United States

10:31:29 20  Department of Transportation Federal Motor Carrier

10:31:34 21  Safety Division?

10:31:35 22    A.  Safety Administration, Safety Administration.

10:31:40 23    Q.  Safety Administration.  And you've been working

10:31:41 24  for that office since June of 1999?

10:31:45 25    A.  Correct.

10:31:45 1    Q.   So you're coming up on two years?

10:31:47 2    A.   Yes, sir.

10:31:48 3    Q.   All right.  Did you complete your North

10:31:56 4    American level 1 inspection -- inspector program prior

10:32:01 5    to June of 1999?

10:32:04 6    A.   During June.

10:32:05 7    Q.   Okay.  Before you began your employment with

10:32:23 8    the Federal government in June of 1999, where was the

10:32:30 9    last place you had worked?

10:32:30 10   A.   Port Isabel, the City of Port Isabel.

10:32:41 11   Q.   Do you recall the dates from which you worked

10:32:46 12   at the City of Port Isabel?

10:32:50 13   A.   Not offhand, sir.

10:32:54 14   Q.   Do you remember when you were terminated from

10:32:57 15   the City of Port Isabel?

10:32:59 16   A.   It's hard for me because I know that I received

10:33:01 17   a letter stating a certain date, but I know that when

10:33:06 18   we went to appeal for the unemployment, I was given

10:33:08 19   another date.  So there's two dates, in other --

10:33:10 20   Q.   What are the two dates?

10:33:12 21   A.   I can't remember the exact two dates.

10:33:15 22   Q.   Maybe approximate dates?

10:33:18 23   A.   September.

10:33:19 24   Q.   Of what year?

10:33:20 25   A.   Of '98.

10:33:38 1        Q.   Okay.   When did you start working for the City

10:33:40 2   of Port Isabel?

10:33:44 3        A.   I know it was March -- March of -- I don't want

10:33:56 4   to guess at it, but something like '83 or '84.

10:34:00 5        Q.   So in the early to mid '80s?

10:34:02 6        A.   Right.   Yes, sir.

10:34:06 7        Q.   To perhaps September of 1998?

10:34:09 8        A.   Yes, sir.

10:34:13 9        Q.   So you worked for the City of Port Isabel 14 or

10:34:16 10  15 years, more or less?

10:34:17 11       A.   Yes, sir, more or less.

10:34:25 12       Q.   During that 14 or 15-year period, did you work

10:34:29 13  anywhere else?

10:34:29 14       A.   No, sir.

10:34:33 15       Q.   What position did you hold when you first began

10:34:36 16  working for the City of Port Isabel?

10:34:38 17       A.   Patrolman.

10:34:48 18       Q.   And then, at some point, were you promoted?

10:34:51 19       A.   Yes, sir.

10:34:51 20       Q.   To what?

10:34:53 21       A.   Corporal.

10:34:54 22       Q.   When?   You can just give me the year, if you

10:35:00 23  remember.

10:35:00 24       A.   I would say around '86.

10:35:03 25       Q.   Uh-huh.   Then were you promoted again?

| | | |
|---|---|---|
| 10:35:07 | 1 | A.  Sergeant. |
| 10:35:13 | 2 | Q.  Roughly, when? |
| 10:35:15 | 3 | A.  '88. |
| 10:35:18 | 4 | Q.  Were you promoted again? |
| 10:35:20 | 5 | A.  First sergeant. |
| 10:35:23 | 6 | Q.  It's sergeant and then first sergeant? |
| 10:35:27 | 7 | A.  First sergeant. |
| 10:35:35 | 8 | Q.  When? |
| 10:35:36 | 9 | A.  The next year, '89. |
| 10:35:38 | 10 | Q.  Uh-huh.  Were you promoted again? |
| 10:35:43 | 11 | A.  Investigator. |
| 10:35:48 | 12 | Q.  And when? |
| 10:35:51 | 13 | A.  I would say a year later after that. |
| 10:35:53 | 14 | Q.  1990 or so? |
| 10:35:55 | 15 | A.  Yes, sir. |
| 10:35:55 | 16 | Q.  Any other promotions? |
| 10:36:02 | 17 | A.  Then I went to sergeant of investigators. |
| 10:36:06 | 18 | Q.  Sergeant of investigators? |
| 10:36:07 | 19 | A.  Yes. |
| 10:36:10 | 20 | Q.  What year? |
| 10:36:11 | 21 | A.  Around '92. |
| 10:36:16 | 22 | Q.  Any other promotions? |
| 10:36:18 | 23 | A.  Then I went to captain. |
| 10:36:27 | 24 | Q.  What year? |
| 10:36:28 | 25 | A.  I would say '95. |

| | | |
|---|---|---|
| 10:36:35 | 1 | Q. Were you promoted again after captain? |
| 10:36:38 | 2 | A. I was demoted. |
| 10:36:45 | 3 | Q. Okay. And you were demoted to what? |
| 10:36:48 | 4 | A. Sir? |
| 10:36:48 | 5 | Q. You were demoted to what? |
| 10:36:51 | 6 | A. Patrol. |
| 10:36:51 | 7 | Q. And when? |
| 10:36:53 | 8 | A. '98. |
| 10:36:58 | 9 | Q. Do you remember the month? |
| 10:37:03 | 10 | A. No, sir. |
| 10:37:06 | 11 | Q. Okay. And after you were demoted to patrol, |
| 10:37:12 | 12 | was there a change in your work status, either demotion |
| 10:37:18 | 13 | or promotion? |
| 10:37:18 | 14 | A. I was promoted back to sergeant. |
| 10:37:21 | 15 | Q. When? |
| 10:37:22 | 16 | A. That same year. |
| 10:37:26 | 17 | Q. Okay. And then? |
| 10:37:28 | 18 | A. I was terminated. |
| 10:37:38 | 19 | Q. During the time that you worked for the Port |
| 10:37:40 | 20 | Isabel Police Department, civil service was not in |
| 10:37:42 | 21 | place? |
| 10:37:43 | 22 | A. No, sir. |
| 10:37:44 | 23 | Q. So, for example, when you were promoted from |
| 10:37:48 | 24 | patrolman to corporal, was that the result of specific |
| 10:37:55 | 25 | recognition by your superiors, or was it simply a |

|  |  |
|---|---|
| 10:38:00 1 | function of having been there "X" period of time? |
| 10:38:03 2 | A.  No, sir, it was -- you took exams. |
| 10:38:05 3 | Q.  Okay.  So in order to be promoted to a |
| 10:38:07 4 | corporal, you took an examination singularly, or other |
| 10:38:14 5 | people took it as well? |
| 10:38:15 6 | A.  Right.  Whoever applied for the position. |
| 10:38:18 7 | Q.  And you ranked or you scored the highest? |
| 10:38:20 8 | A.  The highest to get it. |
| 10:38:22 9 | Q.  So the promotion from patrolman to corporal was |
| 10:38:25 10 | an exam promotion? |
| 10:38:27 11 | A.  Yes, sir.  Only the first two. |
| 10:38:31 12 | Q.  Okay.  And then from corporal to sergeant was |
| 10:38:33 13 | also an exam promotion? |
| 10:38:37 14 | A.  Yes, sir. |
| 10:38:37 15 | Q.  I would anticipate that in addition to scoring |
| 10:38:42 16 | well on the exam, that you -- the positions also |
| 10:38:45 17 | required a certain level of experience? |
| 10:38:47 18 | A.  Yes, sir. |
| 10:38:48 19 | Q.  And you fulfilled those at the time? |
| 10:38:50 20 | A.  Yes, sir. |
| 10:38:51 21 | Q.  Okay.  Now, from your promotion from sergeant |
| 10:38:55 22 | to first sergeant, was that a function of specific |
| 10:38:59 23 | recognition by your superiors, a function of an exam, |
| 10:39:03 24 | or just a function of time? |
| 10:39:05 25 | A.  By the superior. |

10:39:07 1       Q.  Who was the superior who selected you for

10:39:11 2   promotion from sergeant to --

10:39:13 3       A.  Chief Rosales.

10:39:21 4       Q.  Okay.  And how about from the position of first

10:39:24 5   sergeant to investigator?  Was that also a function of

10:39:28 6   your superiors selecting you for that?

10:39:32 7       A.  Yes, sir.

10:39:32 8       Q.  And was it Chief Rosales, or was it somebody

10:39:36 9   else?

10:39:37 10      A.  Chief Loudrey.

10:39:37 11      Q.  Chief who?

10:39:37 12      A.  Loudrey.

10:39:40 13      Q.  Laundrey?  L-a-u --

10:39:42 14      A.  Chuck Loudrey, L-o-u-d-r-e-y.

10:40:03 15      Q.  Okay.  And then from your promotion -- for your

10:40:05 16  promotion from investigator to sergeant of

10:40:08 17  investigators, was that an exam promotion, a supervisor

10:40:17 18  selection promotion, or a timecard promotion?

10:40:22 19      A.  From the chief, the same.

10:40:25 20      Q.  And who was the chief?

10:40:26 21      A.  Same.  Chief Loudrey.

10:40:28 22      Q.  Loudrey.  All right.  And then you said you

10:40:33 23  were promoted to captain.

10:40:34 24      A.  Yes, sir.

10:40:35 25      Q.  Was that also because of recognition by your

| 10:40:38 | 1 | superiors? |

A.   Yes, sir.

Q.   And who was that?

A.   John K. Swan.

Q.   Now, in each of these instances where you were promoted because the chief of police at that time selected you for advancement, did the decision rest solely on the chief of police at that time, or did it have to be approved by either the city manager or the city council?

A.   I'm not aware of that, sir.

Q.   So you don't know what was required?

A.   Right.

Q.   You just know the chief was the person who seemed to have selected you for that promotion?

A.   Correct.

Q.   It may have been his sole decision, or he may have needed further approval.  You just don't know?

A.   Correct.

Q.   You mentioned that in 1998, you were demoted from the position of captain down to patrol officer --

A.   Correct.

Q.   -- which is the position you had started in 13 or 14 years earlier.

A.   Correct.

| | |
|---|---|
| 10:42:00 1 | Q.  Okay.  Explain to me, in your own words, your |
| 10:42:08 2 | understanding of why you were demoted in 1998. |
| 10:42:11 3 | A.  In 1998 is the time that Chief John K. Swan |
| 10:42:20 4 | retired, and they made acting chief Pedro Collazo.  So |
| 10:42:27 5 | during the time when he was selected, the next day, he |
| 10:42:32 6 | met with the investigators, which I was in charge of, I |
| 10:42:37 7 | was the commander.  And during that time I explained to |
| 10:42:39 8 | him that during the ending part of when Chief Swan was |
| 10:42:45 9 | the chief, we had asked him about being compensated for |
| 10:42:49 10 | hours as far as when we were being called off duty and |
| 10:42:53 11 | were not being compensated.  So I approached him about |
| 10:42:56 12 | it and told him that we wanted to be paid or |
| 10:43:00 13 | compensated in some way for being called out or being |
| 10:43:02 14 | called at the residence from patrol division when there |
| 10:43:06 15 | was a crime scene.  So he did not agree with that, and |
| 10:43:10 16 | I was demoted the next day. |
| 10:43:13 17 | Q.  Uh-huh. |
| 10:43:14 18 | A.  But during that demotion, I was demoted without |
| 10:43:18 19 | rank. |
| 10:43:19 20 | Q.  What do you mean? |
| 10:43:20 21 | A.  I did not have any rank.  I did not have a |

10:43:36  1       A.  As anything, nothing, with no duties.

10:43:38  2       Q.  And this was an action taken by Acting Chief

10:43:42  3   Pedro Collazo?

10:43:44  4       A.  Yes, sir.

10:43:44  5       Q.  Now, you mentioned that you had explained to

10:43:46  6   the acting chief that you wanted to be

10:43:48  7   compensated -- you and other officers wanted to be

10:43:51  8   compensated for overtime hours?

10:43:54  9       A.  Myself and Danny Marchan.

10:43:57 10       Q.  During the Swan administration?

10:43:59 11       A.  Yes, sir.

10:43:59 12       Q.  Had you spoken to Chief Swan about that?

10:44:01 13       A.  Yes, sir.

10:44:02 14       Q.  How many times had you spoken to Chief Swan

10:44:03 15   about being compensated for overtime?

10:44:09 16       A.  I believe twice.

10:44:09 17       Q.  Do you remember the dates?

10:44:09 18       A.  No, sir.

10:44:10 19       Q.  Approximately?

10:44:10 20       A.  But at the ending part -- at the ending part of

10:44:13 21   his administration, he had gone through a -- he had a

10:44:14 22   heart attack, so he was -- at the latter part, before

10:44:17 23   he retired, he wasn't in the office for the last couple

10:44:21 24   of months.  That's why it hadn't been addressed.

10:44:23 25       Q.  I'm sorry?

10:44:24 1    A.  It hadn't been addressed because he wasn't at

10:44:27 2  work.  He was going through home stay, I guess, because

10:44:29 3  of his heart attack, bypass surgery.

10:44:32 4    Q.  Okay.  But you're telling me that you spoke to

10:44:35 5  Chief Swan twice about being compensated for overtime?

10:44:40 6    A.  Yes, sir.

10:44:40 7    Q.  And this happened right at the time he had his

10:44:42 8  heart attack?

10:44:43 9    A.  Yes, sir.

10:44:48 10    Q.  We'll take a quick recess.

11        (Brief recess)

10:47:36 12    Q.  When you spoke to Chief Swan on those two

10:47:39 13  occasions about being compensated for overtime, what is

10:47:45 14  it that you said to him, to the best that you can

10:47:47 15  remember right now?

10:47:48 16    A.  I remember just asking did we have some kind

10:47:51 17  of -- being compensated for being called out and

10:47:54 18  working or answering the phone during different parts

10:48:00 19  of the night.

10:48:10 20    Q.  Did Chief Swan ever give you a response in

10:48:13 21  terms of, "Yes, we'll compensate you," or, "No, we

10:48:17 22  can't compensate you," or anything like that?

10:48:19 23    A.  No, sir.  It was pending because of his

10:48:21 24  illness.

10:48:21 25    Q.  Aside from speaking with him, did you present

10:48:25 1     to him anything in writing regarding your request for

10:48:28 2     compensation?

10:48:29 3         A.  No, sir.

10:48:30 4         Q.  Did you present anything in writing to anyone

10:48:33 5     else with the city, the city manager, city secretary,

10:48:38 6     or any other representative of the city, at least as

10:48:42 7     you saw it?

10:48:43 8         A.  Verbal, with the city manager.

10:48:45 9         Q.  Was this at the same time?

10:48:47 10         A.  Yes, sir.

10:48:48 11         Q.  Okay.

10:48:49 12         A.  During the same time.

10:48:51 13         Q.  So with whom did you speak?

10:48:53 14         A.  Manuel Hinojosa.

10:48:59 15         Q.  And what did you say to Mr. Hinojosa?  What did

10:49:05 16     you say to Mr. Hinojosa?

10:49:07 17         A.  As far as -- I talked to him about just trying

10:49:09 18     to be -- the same thing that I asked for, that we

10:49:12 19     wanted to be compensated for working when we were

10:49:14 20     called out or called at the residence.

10:49:17 21         Q.  When you spoke to the chief, Chief Swan, and

10:49:20 22     then to City Manager Hinojosa, did you ask that you be

10:49:24 23     compensated for time that you had spent in the past, or

10:49:29 24     was it a request that, "Hey, from here on forward, we

10:49:32 25     would like to be compensated when we are called out to

10:49:35 1    do these types of things"?

10:49:38 2        A.  Correct.  It was more like we wanted to be paid

10:49:39 3    from -- it was really not looking to the back.  It was

10:49:48 4    just, you know, "We want to be compensated."

10:49:48 5        Q.  So you were requesting, in essence, a policy

10:49:48 6    change, or a change in attitude at least, with respect

10:49:51 7    to, "When I or these officers are called out to do this

10:49:56 8    type of work, then we would like to be compensated for

10:50:00 9    that," correct?

10:50:00 10       A.  Correct.  Be paid.

10:50:01 11       Q.  Correct?

10:50:01 12       A.  Uh-huh.

10:50:02 13       Q.  Okay.  It was not a request for hours worked in

10:50:07 14   the past?

10:50:08 15       A.  Correct.

10:50:14 16       Q.  How many times did you speak to City Manager

10:50:17 17   Hinojosa about trying to effect this policy change?

10:50:21 18       A.  Once.

10:50:22 19       Q.  Do you remember when?

10:50:24 20       A.  No, sir.

10:50:24 21       Q.  Do you remember what his response was?

10:50:28 22       A.  It's something you would have to go back and

10:50:30 23   talk to Chief Swan about.

10:50:41 24       Q.  Now, Chief Swan retired?

10:50:46 25       A.  Yes, sir.

| | |
|---|---|
| 10:50:47 1 | Q. And then Pedro Collazo became the acting chief? |
| 10:50:52 2 | A. Correct. |
| 10:50:53 3 | Q. Who made the decision to place Pedro Collazo as |
| 10:50:59 4 | acting chief? |
| 10:51:00 5 | A. The commission. |
| 10:51:01 6 | Q. This was by a vote in an open meeting? |
| 10:51:08 7 | A. I don't know. |
| 10:51:10 8 | Q. Okay. Who told you that the commission made |
| 10:51:12 9 | that decision? |
| 10:51:13 10 | A. It was announced -- I received a phone call |
| 10:51:17 11 | from the dispatcher as far as who was selected, but I |
| 10:51:22 12 | believe this was done behind closed doors in executive |
| 10:51:25 13 | session. I don't think it was done in an open forum. |
| 10:51:28 14 | Q. Were you present at the meeting where the |
| 10:51:28 15 | action was taken? |
| 10:51:30 16 | A. No, sir. |
| 10:51:30 17 | Q. Do you have any knowledge how the action was |
| 10:51:34 18 | taken? |
| 10:51:34 19 | A. No, sir. |
| 10:51:35 20 | Q. Has anyone told you that this was done in |
| 10:51:37 21 | executive session and was never approved in open |
| 10:51:41 22 | session? |
| 10:51:41 23 | A. No, sir. |
| 10:51:42 24 | Q. How long was Pedro Collazo the acting chief? |
| 10:51:50 25 | A. I'm not sure, sir, but I'd say three months. |

10:52:13  1     Q.  Now, as acting chief, did Pedro Collazo have

10:52:20  2  the authority to discipline you and any other officer

10:52:24  3  of the police department?

10:52:25  4     A.  I went to the city manager after he had demoted

10:52:27  5  me to question the same thing you just said.

10:52:31  6     Q.  So, to your knowledge, as acting chief, did

10:52:33  7  Pedro Collazo have the authority to discipline you or

10:52:38  8  any other officer in the police department?

10:52:40  9     A.  Yes, yes.

10:52:41 10     Q.  Did Pedro Collazo explain to you why he was

10:52:45 11  demoting you from captain to patrol?

10:52:49 12     A.  No.

10:52:50 13     Q.  He didn't say anything?

10:52:51 14     A.  No, sir.

10:52:58 15     Q.  Did Acting Chief Collazo, then, come in one day

10:53:02 16  and communicate with you, either in writing or in

10:53:05 17  person, "Listen, you're no longer captain.  I'm putting

10:53:09 18  you in patrol"?

10:53:10 19     A.  Verbally.

10:53:11 20     Q.  Okay.  So he did it verbally?

10:53:12 21     A.  Uh-huh.

10:53:13 22     Q.  Is that what he said?

10:53:15 23     A.  Yes, sir.  Yes, sir.

10:53:19 24     Q.  Okay.  Did you ask him why?

10:53:21 25     A.  I went to the city manager.  I didn't ask him.

32

10:53:24 1    I went to the city manager, Manuel Hinojosa.

10:53:30 2        Q.  Why didn't you ask the chief, "Chief, why are

10:53:33 3    you doing this?  Why am I being demoted?"

10:53:35 4        A.  Because, you know, I believed it all stemmed

10:53:37 5    from that same conversation where we were talking about

10:53:39 6    being paid and he didn't agree with it.  And then he

10:53:42 7    actually told us that we were still going to be called

10:53:45 8    out and still performing the same way, and I disagreed

10:53:48 9    with it.

10:53:49 10       Q.  So what you're telling me is that you never had

10:53:52 11   any discussion whatsoever with Acting Chief Collazo

10:53:57 12   regarding his reasons for demoting you from captain to

10:54:00 13   patrol, correct?

10:54:02 14       A.  Well, not patrol, just no -- no rank.

10:54:05 15       Q.  Okay.  Well, you had mentioned patrol earlier.

10:54:08 16   Was it another --

10:54:10 17       A.  Well, that's the lowest other than -- that's

10:54:11 18   the lowest, as far as you can go, patrol.  That's why I

10:54:14 19   go down to patrol.  But, no -- no conversation with him

10:54:18 20   about it.

10:54:21 21       Q.  Let me -- I'm not sure this is clear for the

10:54:24 22   record, and I want to make it absolutely clear.

10:54:26 23       A.  Okay.

10:54:26 24       Q.  Is it true that you had no conversation or

10:54:30 25   discussion with Pedro Collazo, whatsoever, about the

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

10:54:36 1    reasons he had for demoting you from captain to

10:54:40 2    whatever position he assigned for you in 1998?

10:54:49 3        A.   Other than -- the only conversation was that I

10:54:52 4    was no longer the commander in charge of -- captain of

10:54:57 5    investigations, that I had been demoted.  That's the

10:55:00 6    only conversation.

10:55:02 7        Q.   Okay.  And you did not ask him, "Why am I being

10:55:07 8    demoted," correct?

10:55:08 9        A.   Yes, sir.  Correct.

10:55:09 10       Q.   Okay.  You went to the city manager?

10:55:11 11       A.   Yes, sir.

10:55:12 12       Q.   Did you ask the city manager why you were being

10:55:16 13   demoted?

10:55:16 14       A.   Yes.

10:55:17 15       Q.   Okay.  Did the city manager have a reason?

10:55:19 16       A.   The only thing the city manager -- and I asked

10:55:21 17   him the same question.  The only thing the city manager

10:55:24 18   told me was, "Go ahead and take the demotion," because

10:55:27 19   there were a lot of problems going on within the

10:55:30 20   department.

10:55:40 21       Q.   Okay.  So City Manager Manuel Hinojosa tells

10:55:44 22   you, in response to your question regarding the reasons

10:55:46 23   for your demotion, "Go ahead and take the demotion,

10:55:50 24   because we have a lot of problems in the police

10:55:52 25   department"?

10:55:52  1      A.   I told him that the reason that I was being

10:55:54  2   demoted was because I was asking that I be compensated

10:55:58  3   for my time, and that had never been answered.  So I

10:56:01  4   told him that I was going to be going to the Work Force

10:56:09  5   Commission to file a complaint as far as not being

10:56:09  6   compensated for my time.

10:56:10  7      Q.   Okay.

10:56:11  8      A.   And he told me then, he told me, "You know

10:56:13  9   what, go ahead and just take the demotion."

10:56:16  10     Q.   Okay.  Well, it is, or at least was, your

10:56:20  11  belief that your demotion at the hands of Acting Chief

10:56:25  12  Collazo was because you had requested a policy change

10:56:29  13  for compensation for certain time?

10:56:32  14     A.   Yes.

10:56:33  15     Q.   Okay.  But, in truth, Acting Chief Collazo

10:56:36  16  never told you that, correct?

10:56:38  17     A.   Correct.

10:56:38  18     Q.   And, in truth, City Manager Hinojosa never told

10:56:43  19  you that?

10:56:45  20     A.   No.

10:56:46  21     Q.   Correct?

10:56:47  22     A.   Correct.

10:56:48  23     Q.   Okay.  Did anyone else acting on behalf of the

10:56:54  24  City of Port Isabel, at least as you understood it,

10:56:58  25  ever tell you that the reason that you were demoted in

10:57:02 1    1998 from the position of captain was because you had

10:57:06 2    requested a policy change to be compensated for the

10:57:09 3    time that you mentioned?

10:57:10 4        A.  The only time was the one when we

10:57:13 5    discussed -- we had a meeting with Pete Collazo and we

10:57:17 6    told him about it, and he said that he would not -- he

10:57:19 7    would not change what was going on.

10:57:20 8        Q.  Okay.  But that was before your demotion,

10:57:22 9    wasn't it?

10:57:23 10       A.  That was the same time he came back and said

10:57:26 11    that I was demoted.

10:57:27 12       Q.  The same day?

10:57:29 13       A.  Let me see.  Yes, sir, the same day.

10:57:37 14       Q.  Okay.  What time of day was it that you had the

10:57:39 15    conversation with Acting Chief Collazo about being

10:57:42 16    compensated?

10:57:44 17       A.  In the morning when he came in.

10:57:45 18       Q.  And what time of day was it that you were

10:57:47 19    demoted?

10:57:49 20       A.  By the afternoon.

10:58:09 21       Q.  Do you remember the day?

10:58:11 22       A.  No, sir.  I remember it was the first day that

10:58:20 23    he was appointed as acting chief.

10:58:37 24       Q.  All right, Mr. Alaniz.  So your discussion with

10:58:42 25    Acting Chief Collazo about changing the policy

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

| | | |
|---|---|---|
| 10:58:47 | 1 | regarding compensation for this overtime occurred in |
| 10:58:52 | 2 | the morning and your demotion occurred that afternoon? |
| 10:59:00 | 3 | A.   As far as I can remember. |
| 10:59:01 | 4 | Q.   Okay. |
| 10:59:02 | 5 | A.   It was quick. |
| 10:59:02 | 6 | Q.   Okay.  When you had your conversation with |
| 10:59:05 | 7 | Chief Collazo in the morning, did he give you any |
| 10:59:09 | 8 | indication that he was planning to discipline you or |
| 10:59:11 | 9 | anybody else? |
| 10:59:12 | 10 | A.   No. |
| 10:59:13 | 11 | Q.   Okay.  And aside from the fact that it is your |
| 10:59:24 | 12 | belief that you were demoted that afternoon because of |
| 10:59:27 | 13 | the issue you had raised that morning, do you have any |
| 10:59:37 | 14 | evidence to support that belief? |
| 10:59:47 | 15 | A.   No, just myself and Danny Marchan were there. |
| 10:59:53 | 16 | Q.   Did Mr. Marchan present the same request or |
| 11:00:00 | 17 | complaint that you did to Acting Chief Collazo about |
| 11:00:10 | 18 | the change in policy regarding overtime? |
| 11:00:10 | 19 | A.   I was the only one talking.  He was present, |
| 11:00:12 | 20 | but I'm the one that -- since I was the commander, I'm |
| 11:00:15 | 21 | the one that was making the -- |
| 11:00:17 | 22 | Q.   Was he there in support of your request? |
| 11:00:20 | 23 | A.   Yes, sir. |
| 11:00:21 | 24 | Q.   Were you and he working together to push this |
| 11:00:23 | 25 | matter or this issue forward? |

11:00:25 1    A.  Yes.

11:00:25 2    Q.  You and Danny Marchan?

11:00:28 3    A.  Yes.

11:00:28 4    Q.  Was Danny Marchan subjected to any type of

11:00:33 5    disciplinary action by Acting Chief Collazo?

11:00:37 6    A.  No.

11:01:01 7    Q.  Were you aware of any complaints about you or

11:01:08 8    your performance as a law enforcement officer that

11:01:12 9    could have formed the basis for Chief Collazo's

11:01:16 10   decision to remove you as captain?

11:01:19 11   A.  No, sir.

11:01:21 12   Q.  Have you asked anyone whether or not there were

11:01:25 13   any complaints existing at that time that could have

11:01:30 14   formed the basis of Chief Collazo's decision?

11:01:33 15   A.  No, sir.

11:01:33 16   Q.  You haven't asked?

11:01:34 17   A.  No.

11:01:46 18   Q.  Now, sometime after this demotion, you were

11:01:53 19   repromoted or reinstated back to sergeant?

11:01:59 20   A.  Yes, sir.

11:02:03 21   Q.  How long after you were demoted?

11:02:06 22   A.  Whenever they selected the new chief.

11:02:12 23   Q.  Being who?

11:02:13 24   A.  Joel Ochoa.

11:02:15 25   Q.  Okay.  Did it occur the same day?

11:02:17 1       A.  That first day, I was advised that I was

11:02:20 2   still -- I was going to be a patrolman.  And then I

11:02:23 3   asked if I was going to be placed back to my rank.  And

11:02:26 4   then when they came back, they came back that I was

11:02:29 5   going to be a sergeant.

11:02:31 6       Q.  Was it the same day?

11:02:32 7       A.  The same day.

11:02:33 8       Q.  Okay.  So the first day that Joel Ochoa becomes

11:02:37 9   the chief of police, then Pedro Collazo is removed as

11:02:42 10  acting chief?

11:02:44 11      A.  Yes, sir.

11:02:44 12      Q.  And that same day, you are reinstated from

11:02:48 13  patrolman to sergeant?

11:02:51 14      A.  No, sir.  I was reinstated from not having a

11:02:54 15  position to patrolman, and then in the afternoon I was

11:02:57 16  advised that I was a sergeant.

11:03:03 17      Q.  And this was all at the hands of Chief Joel

11:03:06 18  Ochoa?

11:03:07 19      A.  It was not through him.  He was going through

11:03:09 20  Pete Collazo, who was the acting chief.  I did

11:03:14 21  not -- Joel did not tell me.  It came from Pete

11:03:17 22  Collazo.

11:03:20 23      Q.  But Joel Ochoa was already the chief of police?

11:03:23 24      A.  Correct.

11:03:24 25      Q.  So Pedro Collazo was no longer acting chief,

11:03:27 1    was he?

11:03:27 2        A.  But the chief was going through him to me.

11:03:31 3        Q.  I understand that.

11:03:31 4        A.  Yes, sir.

11:03:31 5        Q.  But let's make this clear.  At the time that

11:03:33 6    Joel Ochoa became chief of police, Pedro Collazo ceased

11:03:44 7    being chief of police.

11:03:44 8        A.  Correct.

11:03:44 9        Q.  He was something else within the department?

11:03:44 10       A.  Sergeant.

11:03:44 11       Q.  Okay.  So Chief Joel Ochoa, speaking through

11:03:47 12   his sergeant, Pedro Collazo, had you eventually

11:03:52 13   reinstated to the position of sergeant on the very

11:03:56 14   first day that he became chief of police?

11:03:59 15       A.  Yes.

11:04:23 16       Q.  Now, did -- and you don't remember what date

11:04:27 17   that was?

11:04:28 18       A.  No, sir.

11:04:29 19       Q.  Do you remember -- it was still 1998?

11:04:31 20       A.  Yes, sir.

11:04:44 21       Q.  Now, did you speak at all with Chief Ochoa that

11:04:48 22   first day of his tenure as chief of police?

11:04:52 23       A.  I had spoken with Joel prior to him being

11:04:55 24   selected as chief of police.

11:04:57 25       Q.  When you say "Joel," you're speaking of Chief

11:05:02 1   Ochoa?

11:05:02 2     A.  Yes.

11:05:02 3     Q.  You had spoken to him before he became the

11:05:05 4   chief?

11:05:05 5     A.  Yes, sir.

11:05:05 6     Q.  You spoke with him privately as one person to

11:05:08 7   another, or you spoke to him professionally as one

11:05:12 8   officer to another, or what --

11:05:13 9     A.  No, privately.  One on one.

11:05:15 10     Q.  How many times did you speak with him before he

11:05:18 11   became chief?

11:05:20 12     A.  Once.

11:05:21 13     Q.  Where?

11:05:21 14     A.  It was at the Island, at Jake's Restaurant.

11:05:24 15     Q.  Okay.  How long before he became the chief of

11:05:26 16   police did you have this meeting with him?

11:05:29 17     A.  Maybe a week or two prior to him being

11:05:32 18   selected.

11:05:33 19     Q.  And was this a chance meeting where you just

11:05:36 20   ran into him, or was this a meeting that was set up

11:05:41 21   between the two of you to get together and discuss

11:05:44 22   things?

11:05:45 23     A.  No, it was a chance meeting.  The chief was

11:05:47 24   with Martin Cantu, who was a commissioner, and they

11:05:51 25   drove by the department, and I met with them, and we

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

11:05:54  1    decided to go have a cup of coffee.

11:05:56  2        Q.  Okay.  They drove by the Port Isabel

11:05:59  3    department?

11:05:59  4        A.  Yes, sir, and I was outside.

11:06:01  5        Q.  And you were invited to join them at Jake's

11:06:04  6    Restaurant?

11:06:05  7        A.  Yes.

11:06:05  8        Q.  And what did you and Chief -- and Joel

11:06:07  9    Ochoa -- he was not chief at the time, obviously.  What

11:06:09 10    did you and Joel Ochoa discuss at Jake's Restaurant?

11:06:11 11        A.  I explained to him the situation I was in and

11:06:14 12    what had happened as far as my having no title, being

11:06:18 13    there at the department, that I wished to go back to

11:06:21 14    being an investigator.

11:06:22 15        Q.  Uh-huh.

11:06:23 16        A.  And that was my intention, if he was selected,

11:06:26 17    for me to go back to doing what I was doing prior.

11:06:28 18        Q.  So was this a request that you were making?

11:06:31 19        A.  Not a request.  Just --

11:06:33 20        Q.  What would you characterize it as?

11:06:36 21        A.  Just making him aware of what was going on and

11:06:39 22    my situation only.

11:06:40 23        Q.  Did he respond to your comments where you made

11:06:42 24    him aware of your perspective on these things?

11:06:46 25        A.  He said he would look into it, if he was

43

11:07:40  1      Q.   Okay.   Did you ever have any meetings with

11:07:42  2   Chief Ochoa wherein you and he discussed what was

11:07:50  3   expected of you in your role as a member of the

11:07:54  4   department, you know, how the chief planned to run the

11:07:58  5   department, what role you might play, that type of

11:08:01  6   thing?

11:08:02  7      A.   He had a meeting with me and he asked me to

11:08:04  8   help him out, since I was one of the senior officers,

11:08:07  9   to help him out with the department.

11:08:10 10      Q.   And how long was it after he became chief of

11:08:12 11   police that you had that meeting?

11:08:15 12      A.   I'm not sure, sir.

11:08:17 13      Q.   Within a week, within two weeks?

11:08:20 14      A.   I would say within two weeks.

11:08:31 15      Q.   And what did he say to you at that meeting?

11:08:36 16      A.   That he would like for me to assist him with

11:08:40 17   the department's overall operations, since I had been

11:08:43 18   there for several years.

11:08:58 19      Q.   Did he speak more specifically than that, other

11:09:01 20   than, "I want your help in the department"?   Did he say

11:09:04 21   how?

11:09:05 22      A.   No.   But I remember during some of those

11:09:08 23   meetings -- I don't remember if it was the first,

11:09:13 24   second, the chief started telling me that Commissioner

11:09:18 25   Moore didn't want me on the department.   And, you know,

11:09:21 1    he made several comments about, you know, that he

11:09:24 2    wanted me out of the department.

11:09:25 3        Q.  Who wanted you out?

11:09:27 4        A.  The commissioner.

11:09:29 5        Q.  Okay.  Let's go back, though, to this meeting

11:09:39 6    that you mentioned that occurred within the first two

11:09:41 7    weeks where Chief Ochoa told you that he wanted you to

11:09:46 8    help him in the department.  Aside from making that

11:09:54 9    statement or that request of you, did Chief Ochoa give

11:09:58 10    you any specific instructions regarding how he would

11:10:04 11    like you to help him?

11:10:06 12        A.  No.

11:10:09 13        Q.  How long was this meeting with him?

11:10:10 14        A.  Short.

11:10:11 15        Q.  How short?

11:10:18 16        A.  I'd say ten minutes.

11:10:18 17        Q.  What else did you discuss for the other nine

11:10:21 18    minutes or so?

11:10:22 19        A.  Basically, I was just sitting there talking to

11:10:23 20    him.  Of what, I don't remember.

11:10:26 21        Q.  Okay.  Now, up until that time, you had never

11:10:31 22    taken the opportunity to speak to Chief Ochoa and

11:10:44 23    either ask him about your reinstatement as sergeant or

11:10:48 24    express some gratitude about your reinstatement as

11:10:52 25    sergeant?

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

11:10:53  1      A.   No.

11:10:55  2      Q.   Now, you said that during the context of those

11:10:59  3  meetings -- and I think this was what you said -- that

11:11:02  4  during the context of those meetings, that Chief Ochoa

11:11:05  5  told you that Commissioner Moore wanted you out.  What

11:11:08  6  meetings are you talking about?

11:11:10  7      A.   Sometimes when -- well, it's not meetings.

11:11:11  8  Sometimes when you'd pass by, the chief's door was

11:11:15  9  open.  He always had an open-door policy, and you could

11:11:18 10  go in there and sit down.  And I would sit down with

11:11:22 11  him and start talking.

11:11:23 12      Q.   When was the first time that Chief Ochoa told

11:11:25 13  you that Commissioner Moore wanted you out?

11:11:29 14      A.   I don't recall, sir.

11:11:30 15      Q.   How many times did he tell you that?

11:11:31 16      A.   I would say maybe four, five times.

11:11:36 17      Q.   Okay.  Now, aside from making the

11:11:57 18  representation that Commissioner Moore wanted you out

11:12:01 19  of the department, did Chief Ochoa ever elaborate

11:12:06 20  further, give any reasons for Commissioner Moore's

11:12:13 21  request or intention?

11:12:15 22      A.   No, other than just saying he just didn't want

11:12:19 23  me in the department.

11:12:29 24      Q.   Nothing further, no further reason?

11:12:32 25      A.   No, sir.  He had made a request to me, asking

11:12:36 1   me if I could go talk to the commissioner to see if I

11:12:39 2   could straighten out -- or try to find out what was

11:12:42 3   going on between the commissioner and myself.

11:12:44 4      Q.  Chief Ochoa suggested that you speak to the

11:12:46 5   commissioner?

11:12:47 6      A.  Yes.

11:12:48 7      Q.  Did you?

11:12:48 8      A.  No.

11:12:54 9      Q.  Now, did Chief Ochoa give you any indication

11:12:58 10   about whether he was inclined to acquiesce to

11:13:05 11   Commissioner Moore's request or not?

11:13:10 12      A.  No.

11:13:11 13      Q.  Didn't say either way?

11:13:14 14      A.  I believe he made a comment that -- he said

11:13:15 15   that if they were trying to fire me, that they would

11:13:20 16   have to fire him first.  I believe that's what he said.

11:13:24 17      Q.  Okay.  So the chief tells you during one of

11:13:40 18   these discussions that if the City wants to fire you,

11:13:47 19   they're going to have to fire him first?

11:13:50 20      A.  No, sir.  That Moore wanted me out, not the

11:13:57 21   City.

11:13:57 22      Q.  Okay.  So the chief tells you, then, that if

11:14:00 23   Moore fires you, he has to fire the chief first?

11:14:04 24      A.  Wants me out, right.  He would have to go

11:14:10 25   through him first.

BRYANT & STINGLEY, INC.
McAllen        Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

| | | |
|---|---|---|
| 11:14:25 | 1 | Q.   Did you accept this comment as a show of |
| 11:14:29 | 2 | support for you? |
| 11:14:30 | 3 | A.   No. |
| 11:14:32 | 4 | Q.   Why not? |
| 11:14:33 | 5 | A.   I didn't really think he meant it. |
| 11:14:37 | 6 | Q.   Okay.  And why did you think that? |
| 11:14:39 | 7 | A.   Just the way he presented himself about it. |
| 11:14:43 | 8 | Q.   What, specifically? |
| 11:14:46 | 9 | A.   I guess because, you know, Mr. Moore visited |
| 11:14:49 | 10 | him several times, I mean, almost on a daily basis. |
| 11:14:53 | 11 | Q.   Uh-huh. |
| 11:14:57 | 12 | A.   And I truly believed that they had a close |
| 11:15:00 | 13 | relationship. |
| 11:15:05 | 14 | Q.   Okay.  You say Moore would visit with the chief |
| 11:15:12 | 15 | daily? |
| 11:15:12 | 16 | A.   Almost on a daily basis. |
| 11:15:32 | 17 | Q.   Were you ever present during these meetings |
| 11:15:34 | 18 | with Commissioner Moore and Chief Ochoa? |
| 11:15:38 | 19 | A.   No. |
| 11:15:39 | 20 | Q.   Did you ever overhear their conversations? |
| 11:15:43 | 21 | A.   No. |
| 11:15:44 | 22 | Q.   Do you have any knowledge about what they |
| 11:15:46 | 23 | discussed during any of these meetings? |
| 11:15:48 | 24 | A.   No. |
| 11:15:48 | 25 | Q.   Okay.  Any other reason why you didn't think |

11:15:53   1    that the chief meant what he said when he said that

11:15:57   2    they would have to fire him before they fired you?

11:16:00   3        A.  No.

11:16:16   4        Q.  Let's take a quick recess.

           5            (Brief recess)

11:27:25   6        Q.  Mr. Alaniz, before the break we were talking

11:27:30   7    about some conversations you had with Chief Ochoa and

11:27:38   8    your reasons for not believing that he meant what he

11:27:43   9    said when he told you that if Commissioner Moore wanted

11:27:47  10    to fire you, that he would have to fire him first.

11:27:53  11    Aside from the fact that you saw Commissioner Moore

11:27:57  12    visit with the chief on almost a daily basis, is there

11:28:01  13    any other reason that you have for believing that?

11:28:04  14        A.  No.

11:28:07  15        Q.  Now, how long did you hold the position of

11:28:25  16    sergeant in 1998 before you were ultimately terminated?

11:28:31  17        A.  Until the day I was terminated.

11:28:34  18        Q.  Well, I know that.  I mean, what period of time

11:28:36  19    was that, a month, two months, a matter of weeks, a

11:28:39  20    matter of days?

11:28:39  21        A.  No, it was months.

11:28:41  22        Q.  Months?

11:28:42  23        A.  Yes, sir.

11:28:43  24        Q.  Okay.  During that period of months, were you

11:28:46  25    aware of any complaints about your performance as a law

11:28:51  1   enforcement officer?

11:28:53  2      A.  No, sir.

11:28:54  3      Q.  No one ever brought to your attention any

11:28:55  4   complaints about your actions as a law enforcement

11:29:00  5   officer during that period of time?

11:29:02  6      A.  No, sir.

11:29:03  7      Q.  During that period of months, however long it

11:29:07  8   was, did you have any problems or troublesome issues

11:29:18  9   that developed between you and Chief Ochoa?

11:29:23 10      A.  No.

11:29:25 11      Q.  Okay.  So as far as you could tell, things were

11:29:28 12   running smoothly?

11:29:30 13      A.  Yes.

11:29:32 14      Q.  Okay.  Now, you were terminated in September of

11:29:39 15   1998?

11:29:39 16      A.  Yes, sir.

11:29:39 17      Q.  By Chief Ochoa?

11:29:39 18      A.  Yes, sir.

11:29:39 19      Q.  Okay.  You were given a letter of termination?

11:29:41 20      A.  Eventually, yes.

11:29:43 21      Q.  Okay.  Tell me what happened on the day you

11:29:51 22   first learned that you were fired.

11:29:55 23      A.  The first day I was fired, sir, or the first

11:29:58 24   day that I was told to go home?

11:30:01 25      Q.  Well --

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

11:30:01 1    A.   Because --

11:30:02 2    Q.   When --

11:30:03 3    A.   -- it's two different --

11:30:04 4    Q.   Okay.  When did you first learn that you no

11:30:10 5    longer had a job at the Port Isabel Police Department?

11:30:18 6    A.   I was under investigation maybe three weeks.

11:30:25 7    Within that time, Danny Marchan came to my house and

11:30:29 8    dropped off an envelope, and within that envelope it

11:30:34 9    said that I had already been terminated.

10    Q.   Okay.

11:30:40 11    A.   It was a letter that was sent to my house.

11:30:41 12    Q.   Okay.  So you learned of your firing or your

11:30:44 13    termination from that letter?

11:30:46 14    A.   Correct.

11:30:46 15    Q.   That was delivered by --

11:30:48 16    A.   Danny Marchan.

11:30:50 17    Q.   Danny Marchan.  And you stated that you were

11:31:08 18    under investigation?

11:31:15 19    A.   Yes, sir.

11:31:15 20    Q.   Under investigation by whom?  Who was

11:31:18 21    investigating you?

11:31:18 22    A.   Pete Collazo.

11:31:20 23    Q.   And you had been under investigation for about

11:31:23 24    three weeks?

11:31:23 25    A.   About three weeks.

11:31:41 1     Q.  Okay.  When did you first learn that you were
11:31:44 2  the subject of an investigation?
11:31:47 3     A.  Chief Ochoa had come in around 6:00 a.m. when I
11:31:53 4  was working the late shift and asked to speak to me in
11:31:57 5  his office.
11:31:57 6     Q.  Okay.  Do you remember the date?
11:31:58 7     A.  No, sir, I don't remember the date.
11:31:59 8     Q.  This would have been three weeks before your
11:32:01 9  termination, more or less?
11:32:04 10     A.  Correct.
11:32:04 11     Q.  Okay.  And what happened?
11:32:05 12     A.  He told me that he had received a complaint
11:32:07 13  from an officer.
11:32:15 14     Q.  Did he identify the officer?
11:32:17 15     A.  Yes.  Let me see if I can remember his name.
11:32:32 16  Tommy Salazar.
11:32:36 17     Q.  Okay.  Tell me everything that you remember
11:32:38 18  Chief Ochoa telling you during this meeting early that
11:32:42 19  morning.
11:32:43 20     A.  He had told me that he received a complaint in
11:32:47 21  reference to -- or from Tommy Salazar in reference to
11:32:51 22  him doing a search on a vehicle, and which I had
11:32:55 23  stopped the search, and he was placing me on suspension
11:33:01 24  for -- pending further investigation.  So at that time
11:33:05 25  I talked to him about it and explained what had

11:33:07 1   happened.  And he then turned around and said for me

11:33:12 2   not to worry about it, that he was just going to talk

11:33:16 3   to the officer, and that he wasn't going to do the

11:33:17 4   investigation at that time.  And then I walked out from

11:33:22 5   his office and went to the sergeant's office.  And

11:33:25 6   maybe 15 minutes later he came back and said that he

11:33:30 7   was still going to place me on suspension pending an

11:33:37 8   investigation of what happened.

11:33:37 9        Q.  Okay.  So he changed his mind within a

11:33:38 10  15-minute time frame?

11:33:40 11       A.  Right.  And he came back and told me that he

11:33:42 12  was still going to suspend me.

11:33:44 13       Q.  Was this a suspension with or without pay?

11:33:46 14       A.  With pay.

11:33:51 15       Q.  And as far as you knew, the investigation

11:33:53 16  centered around Officer Salazar's complaints about you?

11:34:00 17       A.  Yes.

11:34:00 18       Q.  Anything else that you were aware was the area

11:34:02 19  of investigation?

11:34:03 20       A.  No, sir, other than me filing a complaint with

11:34:06 21  the chief as far as who was doing the investigation.

11:34:11 22       Q.  Well, that was later, wasn't it?

11:34:16 23       A.  When I found out who was investigating, I

11:34:19 24  called the chief and told him.

11:34:22 25       Q.  When did you find out who would be handling the

11:34:25 1   investigation?

11:34:25 2   A.   I'm not too sure, sir.  Within the same week,

11:34:28 3   but exactly when, I don't know -- but within the

11:34:31 4   same --

11:34:31 5   Q.   And you found out that it was Pete Collazo?

11:34:35 6   A.   Yes, sir.

11:34:35 7   Q.   And you complained?

11:34:37 8   A.   Yes, sir.

11:34:38 9   Q.   Why?

11:34:38 10   A.   I felt that my investigation wouldn't be a fair

11:34:41 11   investigation because myself and Pete Collazo already

11:34:44 12   had a conflict between us.  And I explained -- I

11:34:47 13   explained it to the chief, that I thought that it

11:34:49 14   wouldn't be a fair investigation for him to be doing

11:34:52 15   it.

11:34:56 16   Q.   And what did the chief say in response to your

11:34:59 17   comments about Mr. Collazo's objectivity?

11:35:03 18   A.   That he would look into it.

11:35:06 19   Q.   Is that it?

11:35:07 20   A.   That's it.  After that, the chief ignored my

11:35:19 21   phone calls for the next, what, two weeks.

11:35:22 22   Q.   How many times did you try to call?

11:35:27 23   A.   Maybe six, eight times.  I even called him at

11:35:31 24   his residence.

11:35:41 25   Q.   Okay.  During the context of this investigation

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

11:35:44 1   by Officer Collazo, were you contacted by Officer

11:35:52 2   Collazo?

11:35:54 3       A.  No, sir.

11:35:56 4       Q.  Do you know who was?

11:35:56 5       A.  No, sir.

11:35:56 6       Q.  Do you know how Officer Collazo handled the

11:36:01 7   investigation?

11:36:01 8       A.  No, sir.

11:36:02 9       Q.  Do you know with whom he spoke?

11:36:04 10      A.  Right now, or at that time?

11:36:05 11      Q.  Right now.  Do you know with whom he spoke?

11:36:09 12      A.  Yes, sir.

11:36:10 13      Q.  Okay.  With whom did he speak?

11:36:11 14      A.  There were several -- several.  Let me see if I

11:36:15 15  can remember the names.  I know there was Nadine, there

11:36:22 16  was Tommy Salazar, David Gorham, Isaac Juarez, Mike

11:36:39 17  Hatley, Homer Salazar -- Homer Reyna, Homer Reyna, and

11:36:56 18  Rodney Moore.  Those are the ones I can remember.

11:37:02 19      Q.  At the time -- this would have been in late

11:37:05 20  1998, was Pete Collazo next in command after Chief

11:37:13 21  Ochoa?

11:37:13 22      A.  No, sir.

11:37:17 23      Q.  Who was?

11:37:17 24      A.  I don't believe he had anybody next in command.

11:37:18 25      Q.  Well, Chief Ochoa was obviously at the top of

11:37:25 1    the hierarchy in the police department.

11:37:27 2        A.   Correct.

11:37:28 3        Q.   Who would be in the next tier?

11:37:31 4        A.   There was no chain of command established that

11:37:34 5    I'm aware of.

11:37:35 6        Q.   Okay.  Well, in his absence, who would make any

11:37:38 7    decisions on behalf of the department as they may need

11:37:41 8    to have been made?

11:37:44 9        A.   I'm not aware of that, sir.

11:37:46 10       Q.   Aside from the fact that you felt that you had

11:37:48 11   a personal problem or animosity with Pete Collazo, was

11:37:56 12   there any other reason why you felt he was an

11:37:58 13   inappropriate choice for conducting this investigation?

11:38:01 14       A.   He had no background in investigations.  The

11:38:04 15   only background he had was in patrol.  There were

11:38:08 16   several other investigators that did have -- or who had

11:38:10 17   already gone through investigations.

11:38:12 18       Q.   This wasn't a criminal investigation, was it?

11:38:15 19       A.   No, sir.

11:38:16 20       Q.   Okay.  Any other reason why you felt he was

11:38:18 21   inappropriate for this job?

11:38:21 22       A.   No, sir.

11:38:24 23       Q.   Now, you mentioned that Officer Collazo spoke

11:38:26 24   with a handful of people, Officer Salazar, Gorham,

11:38:30 25   Juarez, Nadine -- McDonald?

A.   McDowell, I think.

Q.   McDowell, Hatley, and Reyna, and Moore.  Was there anything inappropriate about Officer Collazo speaking with these individuals?

A.   As far as?

Q.   As far as conducting an investigation.

A.   My understanding is that I received the complaint, or that the chief received the complaint against me from an officer named Tomas Salazar about a certain situation.  That's the only thing I was told.  At the end, I found out it became an open-ended investigation during the whole one-year period, going back and trying to see what was going on within one year.  That's what I thought was inappropriate, that it became an open-ended investigation, not just the complaint that the officer sent and it was addressed.  It wasn't -- that's not the only thing that was being addressed.  As far as I knew, it was an open-ended investigation, who had something.  So they went to everybody.

Q.   So your criticism of Officer Collazo having spoken to all these people is not that he did it, but that the scope of the investigation went beyond the one incident involving Officer Salazar?

A.   Correct.  Plus, I wasn't notified of what the

11:39:46 1  complaints were.  And when I was trying to make contact

11:39:48 2  with the chief to find out during that time what was

11:39:51 3  going on, none of my calls were being returned.  So I

11:39:54 4  wasn't aware of anything that was going on.

11:39:56 5     Q.  Was there something, either in the departmental

11:39:58 6  policies or in the city policies, that required the

11:40:03 7  chief or anyone else to notify you of the scope of the

11:40:07 8  investigation being conducted?

11:40:08 9     A.  I'm not too sure where it's at, but I know that

11:40:14 10  there's -- it's within there, where it says if there is

11:40:14 11  a complaint, you need to be notified of what the

11:40:17 12  complaint is.  Whether it has to be in writing or not,

11:40:20 13  I'm not too sure.

11:40:22 14     Q.  Okay.  Well, those are two different things.

11:40:23 15     A.  Sure.

11:40:24 16     Q.  You were obviously notified of the Salazar

11:40:26 17  complaint.

11:40:27 18     A.  Verbally, correct.

11:40:28 19     Q.  Well, but you were aware that it was existent?

11:40:32 20     A.  Yes, yes.

11:40:32 21     Q.  All right.  Is it your position that if that

11:40:36 22  investigation spawned other investigations, that you

11:40:43 23  should have been informed of any other incidents that

11:40:48 24  were being investigated?

11:40:49 25     A.  Yes.

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

11:41:50  1       A.  Correct.  There is a policy -- there is a

11:42:03  2   department policy, and there is a city manual.

11:42:05  3       Q.  Which one is the one that you think applies?

11:42:08  4       A.  It could be in both, because I know the city

11:42:11  5   manual also has policy on the complaints.

11:42:14  6       Q.  You haven't taken the time to read through

11:42:17  7   either of these manuals and identify the policy that

11:42:19  8   you think was violated?

11:42:22  9       A.  No, sir.  No, sir.

11:42:22 10       Q.  Even though it's been more than two years since

11:42:24 11   this happened?

11:42:25 12       A.  Yes, sir.

11:42:40 13       Q.  All right.  Other than the fact that you

11:42:42 14   believe you should have been notified that you were

11:42:44 15   being investigated about other incidents, do you have

11:42:47 16   any other criticisms of the way Officer Collazo

11:42:52 17   conducted the investigation?

11:42:53 18       A.  Yes, sir.

11:42:53 19       Q.  What are the other criticisms?

11:42:55 20       A.  My criticism is that I was never interviewed.

11:42:58 21       Q.  Okay.

11:42:58 22       A.  I was never given a chance to reply, to answer

11:42:58 23   any of his questions.

11:43:23 24       Q.  Any other criticisms?

11:43:23 25       A.  Just the fact that I was never notified of what

11:43:23 1    was going on during that time.

11:43:23 2        Q.  Okay.  Well, we've already talked about that,

11:43:25 3    right?

11:43:25 4        A.  That's it.

11:43:25 5        Q.  We've talked about the fact that you weren't

11:43:26 6    notified about the scope of the investigation, and

11:43:31 7    we've talked about the fact that you were never

11:43:31 8    interviewed.

11:43:33 9        A.  And kept abreast, during the whole three weeks,

11:43:35 10   of my situation.

11:43:36 11       Q.  Was there something in the policy manual that

11:43:39 12   required you to be notified of what was being

11:43:41 13   discovered as a result of the investigation?

11:43:44 14       A.  No.

11:43:44 15       Q.  Okay.  Then on what authority do you base your

11:43:52 16   criticism that you weren't kept abreast of what was

11:43:57 17   happening during that three-week period?

11:44:00 18       A.  Not authority.  Just courtesy, I believe, would

11:44:03 19   be what I want to say.

11:44:03 20       Q.  It would have been nice, but, to your

11:44:05 21   knowledge, it wasn't legally required?

11:44:08 22       A.  Yes, correct.

11:44:11 23       Q.  Okay.  In the letter that was delivered to you

11:44:28 24   by Officer Marchan advising you of your termination,

11:44:34 25   there was some detail about the results of the

11:44:38 1    investigation conducted on you?

11:44:41 2        A.  Yes, sir.

11:44:41 3        Q.  Correct?  And, in fact, that letter identified

11:44:45 4    various incidents of wrongdoing, at least in the eyes

11:44:54 5    of the police department?

11:44:55 6        A.  Yes, sir.

11:44:55 7        Q.  Okay.  Before you received that letter, had you

11:45:02 8    been told by anyone that you were suspected of or

11:45:08 9    accused of committing some of these wrongs?

11:45:12 10       A.  No, sir.

11:45:13 11       Q.  So the first you hear of it is the letter?

11:45:15 12       A.  The letter.

11:45:16 13       Q.  Okay.  And the letter that we're discussing is

11:45:44 14   this one that I'll label Alaniz Exhibit No. 1, correct?

11:46:10 15       A.  Yes.

11:46:13 16       Q.  Okay.  Now, that, obviously, is a copy that was

11:46:15 17   faxed to my office.  So aside from the fax information

11:46:19 18   located at the very top, in all other respects is it a

11:46:25 19   true and correct copy of the letter you received back

11:46:28 20   in September of 1998?

11:46:30 21       A.  Yes.

11:46:30 22       Q.  Okay.  Now, after you received Exhibit No. 1,

11:46:38 23   did you respond to it?

11:46:41 24       A.  Yes.

11:46:41 25       Q.  What did you do?

| | |
|---|---|
| 11:46:43 1 | A. I made out a response to every one of the |
| 11:46:47 2 | accusations. |
| 11:46:49 3 | Q. Did you do so yourself or through an attorney? |
| 11:46:52 4 | A. No, through myself. |
| 11:46:57 5 | Q. And did you make this response in writing? |
| 11:46:59 6 | A. Yes. |
| 11:47:02 7 | Q. Do you still have that? |
| 11:47:03 8 | A. Sir? |
| 11:47:04 9 | Q. Do you still have that? |
| 11:47:05 10 | A. Yes. |
| 11:47:09 11 | Q. To whom did you submit the response? |
| 11:47:14 12 | A. I'm trying to remember if I gave it to -- I |
| 11:47:24 13 | don't remember who I gave it to. |
| 11:47:26 14 | Q. Did you give it to the chief, Chief Ochoa? |
| 11:47:38 15 | A. I don't remember at this time, sir, to be |
| 11:47:41 16 | honest. I don't remember. |
| 11:47:43 17 | Q. Okay. Did you submit the response by a way of |
| 11:47:47 18 | an appeal of the decision to terminate you, or was it |
| 11:47:51 19 | just, "You guys are wrong, and here is why"? |
| 11:47:57 20 | A. I believe so. It was -- |
| 11:47:58 21 | Q. You believe what? |
| 11:48:00 22 | A. That they were wrong, and that what I was being |
| 11:48:05 23 | accused of wasn't right. Like I said, I was never |
| 11:48:07 24 | given a chance to respond to it, so that's why I wrote |
| 11:48:11 25 | up my response to every accusation that was on there. |

11:48:15 1      Q. You were not afforded the opportunity to

11:48:16 2   respond to it before you were terminated, but once you

11:48:19 3   received the letter of termination, you had every

11:48:21 4   opportunity to respond, didn't you?

11:48:24 5      A. Yes, sir.

11:48:24 6      Q. And you did.

11:48:24 7      A. I did.

11:48:25 8      Q. And at this point you can't recall to whom you

11:48:28 9   made the response?

11:48:29 10     A. No. I know that after -- a couple of days

11:48:31 11  after I received it, I did go to Mr. Hoffman and ask

11:48:38 12  that he assist me with this to find out what my next

11:48:43 13  step of action would be.

11:48:44 14     Q. Mr. Hoffman, the attorney?

11:48:46 15     A. Yes.

11:48:47 16     Q. Okay.

11:48:50 17     A. He used to be the city attorney.

11:48:52 18     Q. Did you submit your response before you spoke

11:48:55 19  to Rick Hoffman?

11:49:08 20     A. I know that I already had typed it out. So I

11:49:12 21  don't know if I had already submitted it. But I know I

11:49:14 22  had it typed out before I talked to Rick, because I

11:49:18 23  believe I showed it to him so that he could see it.

11:49:21 24     Q. I certainly do not want to get into your

11:49:24 25  discussions with Mr. Hoffman, since he was at that

BRYANT & STINGLEY, INC.
McAllen          Harlingen         Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

| | |
|---|---|
| 11:49:27 1 | point acting ostensively as your attorney. |
| 11:49:30 2 | A.  Yes. |
| 11:49:30 3 | Q.  Was he city attorney at the time? |
| 11:49:31 4 | A.  No. |
| 11:49:33 5 | Q.  He was not? |
| 11:49:33 6 | A.  That's how I knew him.  He used to be a city |
| 11:49:36 7 | attorney. |
| 11:49:36 8 | Q.  Okay.  So, again, when I ask you these |
| 11:49:39 9 | questions, I'm not interested in what you and |
| 11:49:42 10 | Mr. Hoffman discussed. |
| 11:49:43 11 | A.  Sure. |
| 11:49:44 12 | Q.  I'm only interested in your actions, what steps |
| 11:49:48 13 | you took, and so forth and so on.  Do you understand |
| 11:49:50 14 | that? |
| 11:49:51 15 | A.  Yes. |
| 11:49:51 16 | Q.  Okay.  Now, at some point in time after |
| 11:49:58 17 | receiving Exhibit No. 1, did you challenge or appeal |
| 11:50:06 18 | Chief Ochoa's decision to terminate you? |
| 11:50:10 19 | A.  Yes. |
| 11:50:10 20 | Q.  To whom did you present the challenge or |
| 11:50:13 21 | appeal? |
| 11:50:13 22 | A.  To the city manager. |
| 11:50:15 23 | Q.  Who was who? |
| 11:50:18 24 | A.  Sharon Claghorn. |
| 11:50:22 25 | Q.  And did you present this challenge or appeal in |

11:50:26 1     writing?

11:50:27 2       A. Yes.

11:50:27 3       Q. Was that before or after you had submitted your

11:50:30 4     response?

11:50:38 5       A. After.

11:50:48 6       Q. Now, Ms. Claghorn was the city manager?

11:50:53 7       A. Yes.

11:50:56 8       Q. And did the City have some kind of procedure in

11:51:00 9     place for handling an appeal of a decision to

11:51:05 10     terminate?

11:51:05 11       A. Yes.

11:51:05 12       Q. And was that the procedure that you were

11:51:08 13     following?

11:51:08 14       A. Yes.

11:51:19 15       Q. After you received Exhibit No. 1, did you ever

11:51:22 16     speak with Chief Ochoa about, "Why are you firing me?"

11:51:26 17       A. No. He wouldn't return my phone calls.

11:51:31 18       Q. Okay. Did you speak with the city manager

11:51:37 19     about why Chief Ochoa had fired you?

11:51:44 20       A. No.

11:51:44 21       Q. You just presented your appeal?

11:51:44 22       A. Yes.

11:51:47 23       Q. Now, Exhibit No. 1 indicates that the chief of

11:51:51 24     police has made a decision to terminate you, correct?

11:51:59 25       A. Uh-huh. Yes, sir.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

11:52:00 1    Q.  Okay.  Do you have any evidence to

11:52:03 2    support -- well, no, let me rephrase my question.

11:52:10 3            Do you have any reason to believe that the

11:52:16 4    decision to terminate you was made, not by Chief Ochoa,

11:52:20 5    but by somebody else?

11:52:24 6    A.  No.

11:52:27 7    Q.  Okay.  So you accept as true that -- the

11:52:28 8    proposition that Chief Ochoa was the one who decided to

11:52:33 9    terminate you?

11:52:34 10   A.  Yes.

11:52:50 11   Q.  Now, in Exhibit No. 1, Chief Ochoa details

11:52:54 12   various incidents and bases for his decision to

11:53:01 13   terminate you, correct?

11:53:03 14   A.  Yes.

11:53:03 15   Q.  Okay.  You dispute some of these?

11:53:06 16   A.  Yes.

11:53:06 17   Q.  Okay.  Aside from that, do you have any reason

11:53:13 18   to believe that Chief Ochoa's decision to terminate you

11:53:18 19   was based, not on the reasons detailed in Exhibit

11:53:23 20   No. 1, but on something else?

11:53:25 21   A.  I had made contact with Commissioner Martin

11:53:30 22   Cantu, and during our conversation he had mentioned the

11:53:35 23   same thing about Mr. Moore, and that Mr. Moore was

11:53:39 24   upset about the Wage and Hour suit that had come

11:53:44 25   against the city.

1    Q.  Uh-huh.

11:53:44  2    A.  And that still, that it was -- he didn't

11:53:48  3  mention which commissioner, but that Mr. Moore and some

11:53:52  4  other commissioners wanted to terminate me.

11:53:55  5    Q.  Okay.  When did you speak with Martin Cantu and

11:53:58  6  discuss this matter?

11:54:00  7    A.  It was maybe the first week of my -- or when I

11:54:08  8  was suspended, during the time that I was suspended,

11:54:11  9  that I had talked to him about it.

11:54:13  10    Q.  But during your suspension, Mr. Cantu told you

11:54:16  11  that Commissioner Moore and some other commissioners

11:54:19  12  wanted to terminate you?

11:54:23  13    A.  Were still upset about the Wage and Hour

11:54:27  14  lawsuit.

11:54:30  15    Q.  Had you submitted a Wage and Hour lawsuit?

11:54:31  16    A.  I'm the one who did the complaint.

11:54:33  17    Q.  You're not the attorney or the claimant, are

11:54:33  18  you?

11:54:34  19    A.  No, sir.  But I'm the one that filed the

11:54:36  20  complaint.

11:54:36  21    Q.  Okay.

11:54:36  22    A.  By initiating the --

11:54:37  23    Q.  Were you joined by anybody else?

11:54:37  24    A.  No, sir.

11:54:37  25    Q.  So you filed it singularly?

11:54:37 1    A.  Yes, sir.

11:54:40 2    Q.  By one person?

11:54:42 3    A.  It had to be done in person.  Myself and Danny

11:54:43 4  Marchan were going to be going, but since it had to be

11:54:46 5  done in person, there was only one of us that could

11:54:48 6  leave the office.  So he stayed behind, and I did

11:54:52 7  the --

11:54:55 8    Q.  How many meetings did you have with Martin

11:54:58 9  Cantu where you discussed either Commissioner Moore or

11:55:03 10  any other commissioner wanting to terminate you?

11:55:05 11    A.  That's the only time.

11:55:07 12    Q.  Just once?

11:55:10 13    A.  Yes, and then I met with the mayor himself, Pat

11:55:17 14  Marchan.

11:55:19 15    Q.  Was he mayor at the time?

11:55:23 16    A.  Yes, sir.

11:55:25 17    Q.  When did you meet with Mayor Pat Marchan?

11:55:28 18    A.  After I had received this.

11:55:31 19    Q.  After you had received Exhibit 1?

11:55:33 20    A.  Yes, sir.

11:55:33 21    Q.  How long after?

11:55:37 22    A.  I would say a week after, when I was

11:55:43 23  trying -- or going for the appeal.

11:55:45 24    Q.  Uh-huh.  And what did you and Mayor Marchan

11:55:55 25  discuss?

11:55:56 1   A.   Discussed what was going on as far as the

11:55:59 2   accusations that were being made against me.   And I

11:56:00 3   also voiced my opinion as far as how the investigation

11:56:05 4   was being done, as far as the chief appointing Pete

11:56:09 5   Collazo, and my disagreements with Pete Collazo as far

11:56:14 6   as what was going on.

11:56:16 7   Q.   What was your reason for meeting with Mayor

11:56:19 8   Marchan?

11:56:19 9   A.   Just to voice -- that's the only one that I

11:56:22 10  could really make contact -- as I said, I tried to make

11:56:25 11  contact with the chief, and he wouldn't return my

11:56:27 12  calls.   So I figured he would be the next -- and I

11:56:28 13  already knew Pat Marchan.

11:56:31 14  Q.   Okay.   Did Mayor Marchan respond to your

11:56:35 15  comments?

11:56:35 16  A.   The only thing he told me in his response was

11:56:37 17  that he didn't feel it was right, and for me to go

11:56:40 18  ahead and get an attorney and sue the City.

11:56:43 19  Q.   Did he give you any information that he had

11:56:48 20  regarding the actions that Chief Ochoa or --

11:56:52 21  A.   No.

11:56:53 22  Q.   Or the investigation?

11:56:54 23  A.   No.   He tried to make contact with the chief.

11:56:57 24  He called him on the phone, but the chief didn't return

11:57:00 25  his call at that time while I was there.

11:57:34  1    Q.  Have you ever spoken with Chief Ochoa about why

11:57:37  2  you were fired in September of '98?

11:57:40  3    A.  Never have.  This is the first time I've seen

11:57:43  4  him since this incident happened.

11:57:45  5    Q.  Okay.  Has anyone ever told you that the

11:58:05  6  reasons underlying Chief Ochoa's decision to fire you

11:58:13  7  were something other than what is contained in Exhibit

11:58:18  8  No. 1?

11:58:19  9    A.  No.

11:58:25 10    Q.  You mentioned that you initiated a wage

11:58:29 11  complaint?

11:58:31 12    A.  Yes, sir.

11:58:32 13    Q.  When did you do that?

11:58:37 14    A.  Within that week that I made the complaint to

11:58:41 15  Pete Collazo and the city manager.

11:58:55 16    Q.  I'm sorry.  I don't understand you.  Within

11:58:58 17  what?

11:58:58 18    A.  Within the time that Pete Collazo had talked to

11:59:01 19  me, where I had confronted him about being paid and he

11:59:05 20  told me that we were still not going to be paid and I

11:59:10 21  went to the city manager.  The city manager said to go

11:59:13 22  ahead and take the demotion, and I told the city

11:59:16 23  manager I was going to go to Wage and Hour to file a

11:59:19 24  complaint.  So I did.  I made the phone call, set up an

11:59:20 25  appointment, and then went up there and made the

11:59:22   1   complaint.

11:59:22   2    Q.   Okay.   This was before Joel Ochoa became chief

11:59:26   3   of police?

11:59:30   4    A.   Yes, sir.

11:59:30   5    Q.   And you told Pete Collazo that you were going

11:59:30   6   to go to Wage and Hour and file a complaint?

11:59:33   7    A.   Right.

11:59:36   8    Q.   And what did you request of the Wage and Hour

11:59:38   9   Department?

11:59:40   10    A.   I filed a complaint as far as not being paid to

11:59:45   11   go out and investigate crime scenes and being called at

11:59:50   12   different parts of the night and answering questions

11:59:53   13   about certain violations.

12:00:02   14    Q.   So your complaint with Wage and Hour was not,

12:00:07   15   "I want to be paid for time I've worked in the past,"

12:00:10   16   but, rather, it was, "We're being asked to do this, and

12:00:16   17   I feel that we should be paid for this"?

12:00:18   18    A.   Yes, sir, it was a whole conversation.   It

12:00:20   19   started off as why I'm there.   "Because I went to the

12:00:22   20   chief of police and I went to the city manager and I

12:00:25   21   requested this."   And then they asked me what was the

12:00:28   22   background, "How long has this been going on?"   And

12:00:33   23   that's when it started going back.

12:00:34   24    Q.   But, again, when you filed your complaint, you

12:00:36   25   weren't asking to be compensated for time in the past.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

12:00:39  1    What you were asking Wage and Hour to do was to step in

12:00:42  2    and force a change of policy such that, from here on

12:00:46  3    forward, whenever you're asked to come in, you get paid

12:00:49  4    for it?

12:00:50  5       A.  Well, it started from saying that, but it went

12:00:53  6    back to saying that we needed to be compensated for the

12:00:56  7    time that we weren't being paid.

12:00:59  8       Q.  Okay.  Do you have -- well, was this complaint

12:01:04  9    made in writing?

12:01:05 10       A.  Yes.

12:01:05 11       Q.  Do you have that complaint?

12:01:07 12       A.  No, sir.

12:01:08 13       Q.  You didn't keep a copy of it?

12:01:11 14       A.  No, sir.  It was kept by Wage and Hour.

12:01:15 15       Q.  So when you walked out of Wage and Hour, you

12:01:18 16    did not take with you a copy of that?

12:01:23 17       A.  No, sir.  I just signed it.

12:01:27 18       Q.  Now, do you know whether or not Wage and Hour

12:01:28 19    ever notified the City of Port Isabel or any of its

12:01:34 20    agents --

12:01:34 21       A.  Yes.

12:01:34 22       Q.  -- that the complaint had been made?

12:01:37 23       A.  Yes, sir.

12:01:37 24       Q.  Okay.  Who was notified?

12:01:40 25       A.  I believe the city manager was notified, and

```
12:01:43  1    then I -- and then I don't know how it got -- but I
12:01:48  2    know Pete Collazo, the acting chief, got notified.
12:01:54  3         Q.  And how do you know that?
12:01:55  4         A.  They started, you know, asking around.  Pete
12:01:57  5    Collazo started asking different officers and myself
12:02:01  6    about the complaint that was being made, that Wage and
12:02:05  7    Hour people were going to be coming in to ask
12:02:08  8    questions.
12:02:10  9         Q.  Okay.  Do you know whether Wage and Hour ever
12:02:13 10    identified who had presented the complaint?
12:02:16 11         A.  I received a phone call during that
12:02:18 12    investigation that Pete Collazo had made some
12:02:24 13    indications that he knew that it was me the one that
12:02:28 14    made the complaint.  And then I was also given a phone
12:02:32 15    call that the City, during their -- when it was
12:02:32 16    presented to the City, that Commissioner Moore did not
12:02:36 17    want to settle out because he wanted me excluded from
12:02:40 18    this -- from this lawsuit.  I received two phone calls.
12:02:47 19         Q.  Okay.  Let's talk about the first phone call.
12:02:49 20    You said you received a phone call that Pete Collazo
12:02:55 21    knew that it was you?
12:02:56 22         A.  He was asking -- that he was asking the
12:02:57 23    investigator from Wage and Hour --
12:02:59 24         Q.  If it was you?
12:02:59 25         A.  Right.
```

12:03:01  1      Q.  Okay.  So Pete Collazo was asking?

12:03:04  2      A.  Yes, sir.

12:03:05  3      Q.  Now, who called you?

12:03:06  4      A.  I can't remember the name of the investigator.

12:03:07  5  It was from Wage and Hour.  It was the one that was

12:03:10  6  handling the case.

12:03:11  7      Q.  Okay.  Did the officer who called you tell you

12:03:13  8  that he or anybody else at Wage and Hour had confirmed

12:03:18  9  that you were the complainant?

12:03:20 10      A.  No, he said that -- well, even when I talked to

12:03:22 11  him, their policy was not to divulge who was the actual

12:03:25 12  complainant.

12:03:27 13      Q.  So, to your knowledge, they didn't divulge who

12:03:31 14  the actual complainant was?

12:03:35 15      A.  No, sir.

12:03:46 16      Q.  Did Mr. Collazo ever ask you, "Hey, are you the

12:03:49 17  complainant?"

12:03:50 18      A.  We were really not on speaking terms at that

12:03:55 19  time.

12:03:55 20      Q.  So he never asked you?

12:03:55 21      A.  No.

12:03:56 22      Q.  Did anybody else on behalf of the City ever ask

12:03:58 23  you if you were the complainant?

12:04:00 24      A.  No.

12:04:01 25      Q.  Okay.  Then you said you received a second

phone call that Commissioner Moore wanted you excluded from some settlement regarding Wage and Hour claims?

A. Right. They notified me that they couldn't do that. They wouldn't exclude me from the lawsuit, and they would have to decline the offer the City made and then go to court on it.

Q. Okay.

A. That they wouldn't drop me from the lawsuit. But I was the only one that was being excluded.

Q. Okay. Was this a lawsuit being presented by the Wage and Hour Department or by a private attorney?

A. Yes, sir. By Wage and Hour.

Q. How many claimants were in that lawsuit?

A. I can guess eight.

Q. Including yourself?

A. Nine, including myself, I would say.

Q. Who were the other eight people or so? Just give me the names you remember.

A. Michael Longoria, Adan Lopez, Pete Collazo, Martin Salinas, Danny Marchan, Mike Hatley.

Q. Michael Hatley?

A. Hatley, David Strief. That's the ones I can remember. I know there's some others. I just can't remember who they are.

Q. Okay.

```
12:06:07  1          MR. MORADO:  I think there is somebody
12:06:08  2   here.  I'm going to send them away.
          3          (Brief recess)
12:07:16  4      Q.  Now, these additional officers, Longoria, Lopez
12:07:21  5   Collazo, Salinas, Marchan, Hatley, and Strief, did they
12:07:26  6   also go to Wage and Hour and make complaints?
12:07:29  7      A.  No, sir.
12:07:30  8      Q.  Okay.  How did they become claimants in this
12:07:33  9   proceeding?
12:07:34 10      A.  When the Wage and Hour came in to investigate,
12:07:35 11   they talked to each one of these officers or the
12:07:39 12   personnel, everybody.  And I guess that's how they
12:07:42 13   ended coming up with that.
12:07:45 14      Q.  Do you know whether or not they were asked to
12:07:47 15   join?
12:07:47 16      A.  Yes, because I know that Pete Collazo had
12:07:50 17   refused to join in.  He didn't want to answer any
12:07:53 18   questions.  And, finally, they did talk to him.  So I
12:07:56 19   know they were asking, because he was refusing to --
12:08:00 20      Q.  But eventually he did join?
12:08:03 21      A.  He eventually came in, my understanding.
12:08:05 22      Q.  Okay.  All right.  And were all of their claims
12:08:07 23   eventually resolved?
12:08:08 24      A.  Yes.
12:08:08 25      Q.  Okay.  And, to your knowledge, was any
```

12:08:14 1   retaliatory action taken against any of these other

12:08:19 2   officers, Longoria, Lopez, Collazo, Salinas, Marchan,

12:08:24 3   Hatley, and Strief?

12:08:24 4        A.   No.

12:08:34 5        Q.   Has anyone ever told you that you were

12:08:40 6   responsible for the accumulation of unpaid overtime

12:08:45 7   hours on the part of these officers?

12:08:47 8        A.   No.

12:08:47 9        Q.   No one has ever said that to you?

12:08:50 10       A.   That I was responsible?

12:08:52 11       Q.   Yes.

12:08:52 12       A.   No.

12:08:53 13       Q.   Has anyone ever told you or suggested to you

12:08:56 14  that it was because of your policies or your actions

12:09:01 15  that these officers were not appropriately compensated

12:09:08 16  at the time that the work was done?

12:09:10 17       A.   I didn't have that authority.

12:09:12 18       Q.   No one has ever told you or suggested that to

12:09:14 19  you?

12:09:15 20       A.   No.

12:09:15 21       Q.   Okay.  Was your claim settled as part of the

12:09:21 22  settlement of this?

12:09:23 23       A.   Yes.

12:09:23 24       Q.   And you were paid your overtime?

12:09:25 25       A.   Yes.

12:09:26  1     Q.  Was this before or after you were terminated?

12:09:28  2     A.  Before.

12:09:29  3     Q.  How long before?

12:09:34  4     A.  Before I was terminated?

12:09:36  5     Q.  Uh-huh.

12:09:44  6     A.  What was it, six months or -- the time

12:09:47  7  period -- the settlement was reached prior to the

12:09:51  8  selection of the chief of police.

12:09:53  9     Q.  Shortly before, within a month or two?

12:09:56 10     A.  A month prior to him being selected, I believe.

12:09:59 11  Somewhere in that time.

12:10:00 12     Q.  Okay.  Now, this complaint that you filed with

12:10:17 13  the U.S. Department of Labor was filed in July of 1997,

12:10:22 14  correct?

12:10:24 15     A.  I'm not too good with the dates.

12:10:27 16     Q.  Okay.  Well, let me show you responses to

12:10:30 17  defendant's first set of interrogatories, which were

12:10:34 18  served on me on the 1st of February of this year by

12:10:40 19  your attorney.  And I'll show you my copy.  Take a look

12:10:43 20  at that.

12:10:44 21     A.  Uh-huh.

12:10:45 22     Q.  Okay.  And then I'll ask you to look at the

12:10:50 23  verification page.  Is that your signature?

12:10:54 24     A.  Yes.

12:10:56 25     Q.  Attesting that the responses are true and

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

| | |
|---|---|
| 12:10:57 1 | correct? |
| 12:10:58 2 | A. Yes, sir. |
| 12:10:58 3 | Q. Okay. And if you'll look at your answer to |
| 12:11:01 4 | interrogatory No. 2, you state that a complaint was |
| 12:11:05 5 | filed on July of 1997 with the U.S. -- United States |
| 12:11:08 6 | Department of Labor. |
| 12:11:10 7 | A. Okay. |
| 12:11:10 8 | Q. Correct? |
| 12:11:11 9 | A. Uh-huh. |
| 12:11:12 10 | Q. Now, is that a true response to this |
| 12:11:14 11 | interrogatory? |
| 12:11:19 12 | A. Yes. But, like I said, I'm not too good on the |
| 12:11:23 13 | date. But I'm pretty sure that was July 1997. |
| 12:11:26 14 | Q. Well, you wouldn't swear that this were true by |
| 12:11:29 15 | signing the affidavit unless it were, would you? |
| 12:11:33 16 | A. Correct. So that's true. |
| 12:11:34 17 | Q. Okay. Now, has anyone with the United States |
| 12:11:54 18 | Department of Labor ever told you that the identity of |
| 12:12:00 19 | the complainant, the person who initiated the complaint |
| 12:12:05 20 | with them, was ever revealed to anyone at the City of |
| 12:12:09 21 | Port Isabel? |
| 12:12:10 22 | A. No. |
| 12:12:13 23 | Q. Has anyone at the City of Port Isabel ever told |
| 12:12:16 24 | you that the U.S. Department of Labor confirmed that |
| 12:12:22 25 | you were the original complainant that started this |

| | |
|---|---|
| 12:12:25 1 | thing? |
| 12:12:25 2 | A.   No. |
| 12:12:29 3 | Q.   Have you ever confirmed to the City of Port |
| 12:12:31 4 | Isabel, aside from this deposition, that you were the |
| 12:12:37 5 | original complainant? |
| 12:12:38 6 | A.   Other than Pete Collazo and the city manager |
| 12:12:43 7 | when I -- before I went to file it.  They were the only |
| 12:12:46 8 | ones that knew I was planning to do it, and Danny |
| 12:12:49 9 | Marchan. |
| 12:13:09 10 | Q.   Now, you told the city manager and Officer |
| 12:13:14 11 | Collazo that you were planning to go to Wage and Hour. |
| 12:13:18 12 | Did you ever tell him that you actually did it? |
| 12:13:21 13 | A.   No. |
| 12:13:47 14 | Q.   Let's go back to a different issue.  You |
| 12:13:49 15 | mentioned earlier that you filed or presented an appeal |
| 12:13:53 16 | of Chief Ochoa's decision to terminate you from the |
| 12:13:58 17 | police department? |
| 12:13:58 18 | A.   Yes, sir. |
| 12:13:58 19 | Q.   And you did that following the City's appeal or |
| 12:14:02 20 | grievance procedure? |
| 12:14:03 21 | A.   Yes, sir. |
| 12:14:04 22 | Q.   Which went to the city manager? |
| 12:14:07 23 | A.   Yes, sir. |
| 12:14:07 24 | Q.   Okay.  And was there a hearing of the appeal? |
| 12:14:14 25 | A.   I delivered one to the city manager and one to |

12:15:09 1    your appeal?

12:15:11 2        A.   She heard what I had to say and she -- it was

12:15:15 3    pending her decision, but according to what she had

12:15:19 4    told me and my attorney at that time, that she would

12:15:22 5    take care of the situation as far as trying to

12:15:25 6    reinstate me back.

12:15:27 7        Q.   Okay.   Did she ever make a decision regarding

12:15:29 8    your appeal?

12:15:30 9        A.   She was terminated.

12:15:31 10       Q.   Okay.   After she was terminated, was there a

12:15:34 11   new city manager --

12:15:35 12       A.   No.

12:15:38 13       Q.   -- installed or selected?

12:15:41 14       A.   No.

12:15:42 15       Q.   There still is no city manager?

12:15:46 16       A.   It was the mayor.

12:15:47 17       Q.   The mayor is acting as city manager at this

12:15:52 18   time?

12:15:53 19       A.   Yes.

12:15:53 20       Q.   Do you know a gentleman by the name of Roberto

12:15:56 21   Garcia?

12:15:57 22       A.   No.

12:15:57 23       Q.   Okay.   Do you know what position he holds with

12:16:00 24   the City of Port Isabel?

12:16:03 25       A.   No.

| | |
|---|---|
| 12:16:03 | 1 |

Q. Okay. It's your testimony that today, March the 1st, 2001, Pat Marchan is acting city manager for the City of Port Isabel?

A. During that time, yes, sir.

Q. No, right now.

A. Oh, no, sir. They have a city manager, but I don't know who he is.

Q. Okay. When did the City of Port Isabel select a city manager after Ms. Claghorn's departure?

A. I don't know, sir. I can't answer that.

Q. After her departure, did Mayor Pat Marchan become the acting city manager?

A. Yes, sir.

Q. Okay. Mayor Marchan was the same one that, according to you, had told you to get an attorney.

A. Yes, sir.

Q. Did he ever make a decision on your appeal?

A. Yes, sir.

Q. And what did he decide?

A. He upheld my termination.

Q. Did you ever ask him why?

A. No, sir.

Q. When you spoke to Mayor Marchan earlier and he had suggested you get an attorney, did you consider him your friend?

12:17:08 1    A.   An acquaintance.   I mean, I don't know about

12:17:11 2  friendship.  We didn't -- I mean, I knew him.   An

12:17:13 3  acquaintance.

12:17:15 4    Q.   You thought enough of him to speak with him,

12:17:17 5  though?

12:17:17 6    A.   He was the next person that I knew to talk to.

12:17:21 7    Q.   And he told you that at that point he didn't

12:17:27 8  feel that what had happened was right?

12:17:27 9    A.   Correct.

12:17:27 10    Q.   Okay.  And, yet, upon considering your appeal,

12:17:32 11  he decided that he would uphold the decision to

12:17:36 12  terminate you?

12:17:38 13    A.   Correct.

12:17:38 14    Q.   Okay.  Has he ever told you why he made that

12:17:41 15  decision?

12:17:43 16    A.   No, sir.

12:17:43 17    Q.   Do you know why he made that decision?

12:17:44 18    A.   No, sir.

12:17:45 19    Q.   Okay.

12:17:50 20    A.   I know that at the end of our meeting that we

12:17:54 21  had, Chief Ochoa told him that he didn't want me to

12:17:58 22  come back.  So he made that final at the end, saying

12:18:00 23  he didn't want me back, that it would cause problems.

12:18:04 24  I don't know if that had anything to do with it.

12:18:07 25    Q.   Aside from the fact that you may disagree with

12:18:12  1    Chief Ochoa's assessment of your contribution to the
12:19:18  2    police department, you don't question his authority in
12:18:21  3    making a recommendation to the city manager or the
12:18:24  4    acting city manager that he does not want a particular
12:18:26  5    officer working within the department, do you?
12:18:29  6        A.  No.
12:18:51  7        Q.  When you made your appeal and presented your
12:18:58  8    position to Ms. Claghorn, was a tape recording made of
12:19:08  9    the proceedings?
12:19:12 10        A.  I don't recall.  I'd say no, but I don't
12:19:16 11    recall.  I'm not too sure, but I'd say no.
12:19:18 12        Q.  Have you ever heard a recording of those
12:19:21 13    proceedings?
12:19:21 14        A.  No.
12:19:22 15        Q.  Have you ever seen a transcript of those
12:19:23 16    proceedings?
12:19:23 17        A.  No.
12:19:24 18        Q.  Was there a court reporter present like what we
12:19:27 19    have today?
12:19:27 20        A.  No.
12:19:28 21        Q.  Did you submit to Ms. Claghorn any documentary
12:19:34 22    proof for your position?
12:19:39 23        A.  Yes, my response to these allegations.
12:19:42 24        Q.  Okay.  Do you still have a complete copy of
12:19:44 25    that response?

12:19:45  1     A.   Yes.

12:19:47  2     Q.   Aside from your -- well, did your response

12:19:52  3  include supporting documents, or was it just your

12:19:56  4  letter or your memo saying, "No, this is what happened,

12:20:00  5  that's what happened," so forth?

12:20:02  6     A.   Correct.  "This is what happened.  There is no

12:20:04  7  documents.  This is all just -- I'm being accused of

12:20:08  8  certain behavior."

12:20:09  9     Q.   Okay.  So, basically, your response was your

12:20:11 10  own handwritten recitation of what you believed the

12:20:19 11  facts to be?

12:20:21 12     A.   Yes.

12:20:25 13     Q.   You offered no independent witnesses to confirm

12:20:30 14  or corroborate what you were saying, correct?

12:20:36 15     A.   I wasn't given an opportunity to present

12:20:38 16  witnesses.  But in my statement, no, there was

12:20:41 17  no other than the people involved.

12:20:42 18     Q.   Did you invite any witnesses to step forward on

12:20:46 19  your behalf when you presented your appeal?

12:20:50 20     A.   No, it was just myself and the attorney and the

12:20:53 21  city manager.

12:20:54 22     Q.   Was there a reason why you didn't invite any

12:21:01 23  witnesses to step forward?

12:21:01 24     A.   I think -- my opinion on the appeal process,

12:21:01 25  it's just me going before the city manager and

12:21:03  1    explaining what had happened.  That's what I think.  I

12:21:07  2    don't know about any witnesses.  It's just one on one

12:21:09  3    on what happened.

12:21:10  4        Q.  Did you ever talk to anyone, fellow officers or

12:21:15  5    third parties, about the possibility of them coming

12:21:18  6    forward and testifying or giving a written statement on

12:21:23  7    your behalf to defend you against this termination?

12:21:27  8        A.  Yes.

12:21:28  9        Q.  Who did you talk to?

12:21:29 10        A.  I talked to Homer Reyna.  I talked to Ronnie

12:21:32 11    Moore, Danny Marchan.  I can't remember his first name.

12:21:43 12    Can I look in here?

12:21:45 13        Q.  Sure.

12:22:05 14        A.  Manuel, Juan Manuel Ayala.  That's it.

12:22:12 15        Q.  When did you speak with these gentlemen about

12:22:15 16    giving some testimony on your behalf?

12:22:18 17        A.  After -- after I had gone to the meeting -- or

12:22:23 18    terminated.

12:22:24 19        Q.  After you had been terminated?

12:22:25 20        A.  Yes, sir.

12:22:26 21        Q.  But before your appeal?

12:22:29 22        A.  No, I didn't talk to anybody before my appeal.

12:22:30 23        Q.  Was it after your appeal had been heard that

12:22:33 24    you spoke with these folks?

12:22:35 25        A.  Yes, sir.

12:22:35 1    Q. Did any of them agree to testify on your

12:22:38 2  behalf?

12:22:39 3    A. Yes, sir.

12:22:39 4    Q. Who?

12:22:40 5    A. Ayala, Ronnie Moore, Danny Marchan.  That's it.

12:22:52 6    Q. Okay.  What would -- to your knowledge, what

12:22:58 7  would you expect Officer Ayala to say on your behalf in

12:23:05 8  defense of your position that you were wrongfully

12:23:09 9  terminated?

12:23:10 10    A. That the complaint that's indicated on this

12:23:13 11  report is not true.

12:23:18 12    Q. Okay.  How about Danny Marchan?  To your

12:23:21 13  knowledge, what would he say to support your position?

12:23:23 14    A. The same thing.  That it's not true, what's

12:23:26 15  being indicated in this report.

12:23:27 16    Q. Okay.  And Officer Moore?

12:23:29 17    A. The same thing, sir.  That it's not true.

12:23:31 18    Q. All right.  You're currently earning $34,575 a

12:24:27 19  year?

12:24:27 20    A. I just received another raise.

12:24:29 21    Q. What are you making now?

12:24:34 22    A. 36,8.

12:24:37 23    Q. When you started working for the Department of

12:24:40 24  Transportation in July of '99, was your salary about

12:24:45 25  34,000 a year?

| | |
|---|---|
| 12:24:46 1 | A.  Yes, sir. |
| 12:24:48 2 | Q.  What were you earning at the Port Isabel Police |
| 12:24:53 3 | Department as sergeant before your termination? |
| 12:25:00 4 | A.  I would have to guess approximately, maybe, 24. |
| 12:25:04 5 | Q.  So is it fair to say that your position with |
| 12:25:07 6 | the Federal government pays you substantially more than |
| 12:25:11 7 | what you were earning at the City of Port Isabel? |
| 12:25:15 8 | A.  Yes. |
| 12:25:15 9 | Q.  What was the highest pay you ever received |
| 12:25:18 10 | while working for the City of Port Isabel? |
| 12:25:24 11 | A.  That was the highest, at the end. |
| 12:25:24 12 | Q.  About 24,000? |
| 12:25:24 13 | A.  Uh-huh.  Yes, sir. |
| 12:25:44 14 | Q.  You were unemployed for about nine months |
| 12:25:51 15 | between your termination from the City of Port Isabel |
| 12:25:53 16 | and your employment with the Federal government? |
| 12:25:56 17 | A.  Yes, sir. |
| 12:25:57 18 | Q.  Did you apply anywhere for employment during |
| 12:25:59 19 | that period of time? |
| 12:26:00 20 | A.  Yes, sir. |
| 12:26:00 21 | Q.  Where did you apply? |
| 12:26:02 22 | A.  Rancho Viejo Police Department and the Cameron |
| 12:26:07 23 | County sheriff's office. |
| 12:26:16 24 | Q.  How soon after your termination from the City |
| 12:26:19 25 | of Port Isabel did you apply at either of those places? |

| | |
|---|---|
| 12:26:28 1 | A.  I would say maybe a couple of months. |
| 12:26:33 2 | Q.  Why did you wait that long? |
| 12:26:35 3 | A.  Because we went through the process of doing |
| 12:26:37 4 | the appeals for the unemployment, and then I started |
| 12:26:40 5 | looking for different -- and then that opening came up |
| 12:26:43 6 | in Rancho Viejo, and the opening came up in the |
| 12:26:47 7 | sheriff's office. |
| 12:26:49 8 | Q.  Did you receive unemployment benefits for any |
| 12:26:52 9 | period of time? |
| 12:26:52 10 | A.  Yes, sir. |
| 12:26:52 11 | Q.  For how long? |
| 12:26:53 12 | A.  Six months. |
| 12:26:54 13 | Q.  And how much were you receiving in unemployment |
| 12:26:56 14 | benefits? |
| 12:27:01 15 | A.  I don't recall, sir, what the actual amount |
| 12:27:05 16 | was. |
| 12:27:09 17 | Q.  Was it more than 1,000 a month? |
| 12:27:11 18 | A.  No.  It was somewhere in that area. |
| 12:27:29 19 | Q.  Are you currently enjoying your job with the |
| 12:27:33 20 | Department of Transportation? |
| 12:27:34 21 | A.  Yes, sir. |
| 12:27:43 22 | Q.  Do you work out of Brownsville? |
| 12:27:44 23 | A.  Yes, sir.  I was just promoted two months ago, |
| 12:27:49 24 | so I'm going to be working out of the home, home office |
| 12:27:52 25 | now. |

12:27:53 1    Q.   Your home?

12:27:53 2    A.   Uh-huh.  I was promoted, yes, sir.  I was

12:27:56 3 promoted to a safety investigator.

12:28:02 4    Q.   Now, in your responses to interrogatories, you

12:28:06 5 indicate that at your hearing regarding your

12:28:12 6 termination, not only were you and your attorney

12:28:15 7 present, but Tomas Salazar, David Gorham, Homer Reyna,

12:28:24 8 Ronald Moore, Lee Hatley and Juan Ayala; is that true?

12:28:26 9    A.   No, they weren't there.

12:28:27 10    Q.   Let me show you -- let me show you the fourth

12:28:34 11 page to your responses to interrogatories.

12:28:38 12    A.   Oh, if this is the one -- if this is the one

12:28:39 13 where we went to appeal with Pat Marchan, they were

12:28:42 14 there.

12:28:44 15    Q.   Well, was there another appeal besides the one

12:28:49 16 you presented to the City?

12:28:52 17    A.   It was the first one -- there was the appeal

12:28:53 18 with Sharon Claghorn, and then the one with Pat

12:28:58 19 Marchan.

12:28:59 20    Q.   Which was just a continuation of the same

12:29:02 21 proceeding, wasn't it?  In other words, Pat Marchan

12:29:04 22 picked up where Ms. Claghorn left off?

12:29:08 23    A.   Yes.  And they were there.  They were present

12:29:10 24 there.

12:29:10 25    Q.   Okay.  Did they testify on your behalf?

12:29:15 1      A.  No.

12:29:15 2      Q.  Did they say anything in the context of that

12:29:15 3  hearing?

12:29:18 4      A.  I don't recall.  I know they were asked

12:29:21 5  questions, but I don't recall what was asked or what

12:29:24 6  was responded during that time.  But they were asked.

12:29:25 7      Q.  They were asked questions?

12:29:26 8      A.  Yes, sir.

12:29:26 9      Q.  And they did respond?

12:29:27 10     A.  Yes, sir.

12:29:28 11     Q.  Who asked them questions?

12:29:31 12     A.  The city attorney.  The city attorney asked

12:29:36 13  questions.

12:29:36 14     Q.  John Haywood?

12:29:38 15     A.  Yeah, that's what I was trying to remember.

12:29:42 16     Q.  Okay.  Now, after the city manager made the

12:30:02 17  decision to deny your appeal -- and at this point the

12:30:06 18  city manager is Pat Marchan?

12:30:08 19     A.  Uh-huh.  Yes, sir.

12:30:10 20     Q.  Did the policy provide for you to carry that

12:30:12 21  appeal forward to the city commission?

12:30:19 22     A.  I don't know.

12:30:20 23     Q.  Okay.  Did you attempt to address the city

12:30:26 24  commission on the matter?

12:30:28 25     A.  No.

12:30:34 1    Q.  Do you have any information that leads you to

12:30:37 2  believe that the city commission of the City of Port

12:30:44 3  Isabel took any action to approve Chief Ochoa's

12:30:54 4  decision to terminate you?

12:30:55 5    A.  No.

12:31:53 6    Q.  If you had still been working for the City of

12:31:57 7  Port Isabel in June of 1999 and at that time you had

12:32:16 8  been offered a position with the United States

12:32:18 9  Department of Transportation at a salary of $34,000,

12:32:23 10  would you have taken it?

12:32:24 11    A.  Yes.

12:32:26 12    Q.  Because the economics of the situation is such

12:32:30 13  that it's a much better paying job?

12:32:33 14    A.  Yes.

12:32:34 15    Q.  Correct?

12:32:34 16    A.  Yes.

12:32:44 17    Q.  How did you learn of the position within DOT?

12:32:49 18    A.  There is a motorcycle group that belongs to law

12:32:52 19  enforcement called the Blue Knights, and there is

12:32:55 20  a -- the team supervisor for DOT is a Blue Knight, and

12:33:00 21  I ride with them.  So he told me about the opening, and

12:33:05 22  that's how I ended up.

12:33:07 23    Q.  So you learned about it through an

12:33:08 24  acquaintance?

12:33:09 25    A.  Yes.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

12:33:10 1     Q.  Did you have to test for the position, in the

12:33:12 2 sense of, you know, receiving the highest score in a

12:33:16 3 particular exam in order to qualify for this position?

12:33:20 4     A.  You had to meet the SKSs, which is the skills,

12:33:24 5 in order to make it through the first cut, and then you

12:33:27 6 get selected.  And then you have to pass your academy

12:33:31 7 in order to continue.  That's the only -- but there was

12:33:33 8 not -- no preemployment test or none of that.

12:33:39 9     Q.  Uh-huh.  Do you know who made the decision to

12:33:41 10 select you for this particular position at DOT?

12:33:44 11     A.  It came from Washington.  So exactly who, I

12:33:47 12 don't know.

12:33:47 13     Q.  Okay.  Let me take a quick break and meet with

12:33:54 14 my client.

15           (Brief recess)

12:40:53 16     Q.  Before Joel Ochoa became chief of police of

12:40:59 17 Port Isabel, did you know him?

12:41:04 18     A.  Yes.

12:41:04 19     Q.  In what capacity?

12:41:04 20     A.  He was a trooper.

12:41:04 21     Q.  With the Department of Public Safety?

12:41:05 22     A.  Yes, sir.

12:41:05 23     Q.  Aside from the fact that he was a fellow law

12:41:08 24 enforcement officer, did you know him?

12:41:11 25     A.  Personally?

BRYANT & STINGLEY, INC.
McAllen         Harlingen        Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

```
12:41:11  1        Q.  Uh-huh.

12:41:12  2        A.  No.  I knew his brothers.

12:41:14  3        Q.  Okay.  Did you have a social relationship with

12:41:17  4    any of his brothers?  Were you friends with any of

12:41:20  5    them?

12:41:20  6        A.  Yes.

12:41:21  7        Q.  Who?

12:41:21  8        A.  With Froy and Ted.

12:41:23  9        Q.  Okay.  Froy, F-r-o-y?

12:41:26 10        A.  Yeah, F-r-o-y.

12:41:30 11        Q.  And Ted?

12:41:31 12        A.  Ted Ochoa, Teodoro.

12:41:34 13        Q.  Okay.  Anybody else?

12:41:34 14        A.  That's it.

12:41:34 15        Q.  Are you still friends with them?

12:41:37 16        A.  Ted died a couple of years ago, and Froy, he

12:41:39 17    moved.  I don't know where he's at.

12:41:41 18        Q.  But are you still friends with him?

12:41:45 19        A.  One passed away, and the other one, I haven't

12:41:49 20    seen him for a while.

12:41:50 21        Q.  How long?

12:41:51 22        A.  Froy, for a long time.  I haven't seen Froy,

12:41:53 23    but Ted passed away, I don't know, five years, six

12:41:57 24    years ago, somewhere in there.

12:42:00 25             MR. OCHOA:  '96.
```

12:42:04 1    Q.  At -- obviously, given the fact that one of

12:42:07 2    these gentlemen died and the other gentleman moved

12:42:14 3    away, you ceased your relationship with them because of

12:42:16 4    the circumstances.  At the time that that relationship

12:42:20 5    stopped, whether because of death or absence, were you

12:42:25 6    still friends with both of those gentlemen?

12:42:28 7    A.  Yes.

12:42:41 8    Q.  When Chief Ochoa took over as the chief of

12:42:47 9    police for Port Isabel, did he ever have a one-to-one

12:42:53 10   conversation with you where he asked you for your help

12:43:01 11   in making this a better police department?

12:43:05 12   A.  Yes.

12:43:10 13   Q.  During the time that you were working under

12:43:14 14   Chief Ochoa's supervision with him as chief of police,

12:43:22 15   was there ever an occasion in which you disobeyed or

12:43:27 16   contravened any of his orders?

12:43:30 17   A.  No.

12:43:32 18   Q.  None at all?

12:43:32 19   A.  I was accused of it.  No, I didn't.  During

12:44:11 20   that time, I followed his orders and tried to help him

12:44:15 21   out with problem officers.

12:44:33 22   Q.  When you applied with the Cameron County

12:44:37 23   sheriff's office and with the Rancho Viejo Police

12:44:41 24   Department, did you ever receive any response from

12:44:45 25   them?

```
12:44:45  1        A.  On the one from Rancho Viejo, I went to the
12:44:48  2   oral interview with the mayor and commissioner and the
12:44:52  3   chief of police, and they had contacted someone from
12:44:58  4   the City of Port Isabel in which I received a bad
12:45:01  5   recommendation and wasn't hired at all because of the
12:45:04  6   recommendation.  And with the Cameron County sheriff's
12:45:09  7   office, I ranked No. 3 in their testing, and then I
12:45:16  8   went to the obstacle course and I couldn't jump the
12:45:16  9   six-foot fence, so I was eliminated.
12:45:18 10        Q.  Did any representatives of the City of Rancho
12:45:21 11   Viejo, the town of Rancho Viejo tell you with whom they
12:45:26 12   had spoken at the City of Port Isabel?
12:45:28 13        A.  No, sir.
12:45:29 14        Q.  Do you know with whom they spoke?
12:45:31 15        A.  No, sir.
12:45:32 16        Q.  Do you know what was said to the
12:45:33 17   representatives of Rancho Viejo?
12:45:36 18        A.  No, sir, just to the point that they wouldn't
12:45:38 19   hire me.
12:45:40 20        Q.  Who told you that?
12:45:40 21        A.  The mayor from Rancho Viejo.
12:45:45 22        Q.  And who was that?
12:45:45 23        A.  I don't recall his name, sir.  I know the chief
12:45:47 24   was there also.
12:45:49 25        Q.  All right.
```

12:45:51  1          MR. MORADO:  That's all the questions I

12:45:52  2     have.  I pass the witness.

12:45:54  3          MR. ANDARZA:  We'll reserve our questions

12:45:55  4     for trial.  Thank you.

          5               (Deposition concluded)

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

ERRATA SHEET/SIGNATURE PAGE

PAGE LINE   CHANGE                                    REASON

none
_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

    I, JORGE GARCIA ALANIZ, have read the foregoing
transcript and hereby affix my signature that same is
true and correct, except as noted above.

                              _____
                              JORGE GARCIA ALANIZ

THE STATE OF TEXAS

COUNTY OF CAMERON

            SUBSCRIBED AND SWORN TO BEFORE ME, the

undersigned authority on this the ____2nd____ day of

____April____, 2001.

                              _____
                              Notary Public in and for
                              The State of Texas

ORIGINAL

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

April 16, 2001

TN-501

BRYANT & STINGLEY, INC.
RECEIVED

4-6-01
DATE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JORGE G. ALANIZ,              ) (
        Plaintiff            ) (
                             ) (
VS.                          ) (   CIVIL ACTION B-00-136
                             ) (
CITY OF PORT ISABEL, TEXAS,  ) (
        Defendant            ) (

REPORTER'S CERTIFICATION
DEPOSITION OF JORGE GARCIA ALANIZ
MARCH 1, 2001

        I, CORINNA N. GARCIA, Certified Court Reporter
in and for the State of Texas, hereby certify that the
witness, JORGE GARCIA ALANIZ, was duly sworn by me, and
that the transcript of the oral deposition is a true
and correct record of the testimony given by the
witness; that the deposition was reported by me in
stenograph and was subsequently transcribed under my
supervision.

        I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially or otherwise interested in the
outcome of the action.

        WITNESS MY HAND on this _14th_ day of
_March_____, 2001.


                        _Corinna N. Garcia_  9/11
                        CORINNA N. GARCIA, Texas CSR 5210
                        Expiration Date: 12-31-01
                        Bryant & Stingley, Inc.
                        2010 East Harrison
                        Harlingen, Texas  78550


BRYANT & STINGLEY, INC.
    McAllen           Harlingen           Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

# STIPULATIONS

Tracking No. _TN-501_

Deposition(s) of: _Jorge G. Alaniz_

Cause No.: _B-00-136_    Style: _Jorge Alaniz_

Date: _3-1-01_  Trial Date: _____  vs. _City of Port Isabel_

1. This deposition is taken pursuant to:
    _✓_ A. Notice                    ___ C. Agreement
    ___ B. Notice and Subpoena       ___ D. Court Order

2. Objections:
    _✓_ A. Objections will be made pursuant to the ~~Texas~~/Federal Rules of Civil Procedure.
    ___ B. All objections are reserved.
    ___ C. All objections will be made at the time of taking the deposition.

3. Signature and Delivery:
    _✓_ A. The original transcript will be sent to _____,
        the Custodial Attorney, and the original signature page, along with a copy of the
        transcript(s), will be submitted to _____ the witness or _✓_ the witness'
        attorney, who will return the executed signature page, including any changes, to
        Bryant & Stingley, Inc., within _____ days of transmittal.

    ___ B. Signature is waived and the reporter will deliver the original transcript and
        exhibits to the Custodial Attorney, _____.

_30 days_

I, the undersigned, do hereby agree to the stipulations as indicated above and request the
following:

1. Copy of Transcript: Yes _____ No _✓_    Video: (If Applicable) Yes _____ No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail  Yes _____ No _____  e-mail address _____

    Signature: _____  Representing: _Jorge Alaniz, Plntff_

2. Copy of Transcript: Yes _✓_ No _____    Video: (If Applicable) Yes _____ No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail  ~~Yes~~ _____ ~~No~~ _____  e-mail address _____

    Signature: _____  Representing: _City of Port Isabel_

3. Copy of Transcript: Yes _____ No _____    Video: (If Applicable) Yes _____ No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail  Yes _____ No _____  e-mail address _____

    Signature: _____  Representing: _____

4. Copy of Transcript: Yes _____ No _____    Video: (If Applicable) Yes _____ No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail  Yes _____ No _____  e-mail address _____

    Signature: _____  Representing: _____

**STATE OF TEXAS**          §

**COUNTY OF CAMERON** §

<u>**AFFIDAVIT**</u>

BEFORE ME, the undersigned authority, on this day personally appeared Jorge Alaniz, who being by me duly sworn, deposed as follows:

"My name is Jorge Alaniz, I am of sound mind, I am over 18 years of age, capable of making this affidavit, and personally acquainted with the facts herein stated. All of the facts stated in this affidavit are true:

On March 1, 2001, I gave a deposition in my case against the City of Port Isabel, Texas. On page 79 of my deposition, I stated that I was not good with dates, that fact is abundantly clear in my affidavit in referenced to the year Chief Swann retired and when I was demoted.   To clarify, the year I complained to Chief Swann and City Manager Maunel Hinojosa about not being compensated for overtime was 1997.  It was also 1997, when Chief Hinojosa retired and Pedro Collazo was appointed acting Chief of Police for the City of Port Isabel.

At this point in my affidavit I would like to response to all the allegations in the termination letter I received from the City of Port Isabel. On September 16, 1998 detective Danny Marchan called and asked if he could come over to my house to deliver a letter from Chief Joel Ochoa.  At or about 4-8 p.m. Danny arrived at my residence and gave me a brown envelope. Within this envelope was a seven page letter which was in the end a termination letter effective September 16, 1998 at 5:00 p.m. from the Port Isabel Department signed by Chief Joel Ochoa.

The following is a response to the allegations made against me within the seven page letter.

On August 31, 1998, I was working the graveyard shift (10 p.m.- 6 a.m.) along with officers Tomas Salazar and Homer Reyna. Officer Salazar had gone into the station and later went back on patrol.  After a while officer Salazar was advised by dispatcher David Gorham to public service officer Puentes of the South Padre Island Police on his

Affidavit of Jorge G. Alaniz

**EXHIBIT**
" B "

mobile number.  I did not think anything of this because it was common that they talked. A few minutes later officer Salazar advised dispatch if he could have officer Puentes call him at a phone number he gave.

Several minutes later I heard via police radio that Officer Salazar was calling out on a traffic stop on Texas Hwy 100.  After a while officer Salazar advised dispatch if anyone from the Island was in route to his location and he was advised by dispatch to hold on.  I then attempted to make contact via police radio with Officer Salazar on what his traffic was at his location since he had called for the Island Police Dept.  Officer Reyna had called out at this location but went back into service shortly after.  I then asked the dispatcher via police radio if he knew what the communication was between Officer Salazar's and the Island.  Dispatcher Gorham then advised me that he did not know what the traffic was and he attempted to make contact with officer Salazar.  Dispatcher Gorham then advised me that he was on the line with the Island and advised me to hold on.  I then arrived at the location of officer Salazar who I observed standing in front of his unit by the curb and the violator inside the truck.  I then asked officer Salazar what was going on, in which officer Salazar told me that he had stopped the vehicle because the Island wanted her.  I then asked him what she was wanted for and he replied " I think P.I.D or D.W.I., I don't know" I then asked him if he had a warrant number and he said "NO" I then told him that if he did not have any probable cause or a warrant number he could not detain her, and he would have to release the vehicle.  Officer Salazar then told me that he was not doing anything anyways and was just trying to have good relations between us and the Island.  I then told him that we had a lot of things to do not just serve warrants for other cities.  I then told him if he did not have a warrant to release the vehicle.  I then went back into service and asked dispatcher Gorham if the Island was in route to the location.  Officer Salazar then came on the radio and advised that the vehicle had been released to notify the Island.  Officer Salazar resumed patrol.

After a while I called officer Salazar to meet with me at the police department.  I then called out the station and asked dispatcher Gorham if he knew what was going on with the warrant and who had told officer Salazar to serve the warrant in which he replied, "I don't know whats going on" I then waited for officer Salazar to arrive in my office.  On his arrival I asked to sit down.  I then asked him who had told him to serve the warrant.

He then told me that he had seen the female at HEB and had called Officer Puentes at the Island to check if she had a warrant. I then told him that Officer Puentes was not his supervisor that I was his supervisor and that I needed to know what was going on. I then told him that on my shift we did things as a team and not just by himself. Officer Salazar then told me that he just wanted to have a good relation with other agencies and I told him that we did. I then asked him why he had stopped the vehicle and he told me it was for an improper signal at which time I did tell him it was a chicken shit violation. I then told him that we could get sued if he was not careful and he was told to resume patrol.

During the shift no warrant number or confirmation of warrant was ever given to myself or other officers.

During my shifts as supervisor, I have been calling in the officers to the police department in early, not to relieve them from duty but to have them complete all necessary paper work and processing of the prisoners. I have officers come in and do reports along with the mandatory activity sheet during which time I am required to either approve the reports or have them redo the reports for my approval. Officers are also requires to fingerprint and photograph prisoners and secure the cell areas which include inspection of cells and the prisoners. Chief Ochoa had told the supervisors along with employees in a meeting of the departments overtime status, and had asked that all unnecessary overtime be avoided. In an effort to avoid overtime it was necessary for me to call in the officers early to complete the required tasks in time without the officers staying overtime to finish the tasks in the proper time.

All officers are required to call out their ending mileage, and they are also required to call out whenever they check off at the station. Calling out that they are 10-42 (end of duty) does not mean that they are going home or leaving for the shift The officers do not go off duty as implied by the Chief, they are still required to answer any calls or complaints which might arise during the time allowed to do their paperwork and processing. Officers are not relieved from duty till the proper time or advised to leave by the supervisor. This processes has been in effect by myself and other supervisors.

It has been brought up to the Chief on Sgt. Pedro Collazo giving out overtime to officers staying over minutes doing reports and processing of prisoners. Chief Ochoa told me that he did not want this happening and was upset at Sgt. Collazo but has not made any effort

to stop Sgt. Collazo who continues doing overtime during his shifts. I have made every effort to avoid the officers staying over by giving them the time necessary to complete the paper work and processing of prisoners.

On May 22, 1998 officer Homer Reyna was working the 2 p.m. – 10 p.m. shift under my command. Officer Reyna came to me and said that the 95 patrol unit he was driving appeared to being having transmission trouble. The two 95 units in the fleet had been reported to the Chief as having trouble with the transmission and I told officer Reyna to go ahead and drive the unit.

At or about 5p.m. I drove by the station and officer Reyna was removing his belongings from the 95 unit to another unit. I then stopped and asked him what he was doing, and he told me that he had told the Chief about the unit and he had been told to park it and get another unit. I then asked him why he had asked the Chief since I had already told him to drive the unit. I then told him to take the 95 unit and if it broke it broke, and that I would talk to the Chief. I then attempted to talk to the Chief but he had already left for the day, and I was unable to contact him about Officer Reyna overruling my order and going to the Chief after he had been told to drive the unit. These units were being driven in these poor conditions and the Chief was aware of the existing problems with the units. . The Chief had not given the departments or supervisors orders to park or stop the units. The Chief states that this request was a cost and maintenance prevention measure, and for the safety of the officers and motorist public. The Chief was also aware that the units were being driven with very poor tires during the performance of the officer's duties. The Chief received several complaints from the officers on the safety of the units and no repairs were made for months. When I approached the Chief of the tire problems he stated that he had submitted the request to city hall and it would be the city's fault if something happened. The Chief was aware of the poor conditions of the units and the units were still used in patrol with no directive from the Chief to park the units till proper repairs could be made to ensure the safety of the officers and the public.

On the 2 p.m. –10 p.m. shift, I had assigned officer Reyna to work traffic. During the beginning of the shift officer Reyna had asked me if he could leave early since he was going to San Antonio on a trip. He stated that he was going to be leaving as soon as he

could get out of work. I then told him that I would call him in as soon as he could leave from work so that he would not be driving to late at night with his family.

Officer Reyna then went on patrol and was running errands for the department. Officer Reyna was also running errands for dispatcher Martinez on duty time. Officer Reyna was cashing personal checks and making deposits for the dispatcher, while I had given him orders to work traffic. I then confronted officer Reyna and told him that I wanted him to work traffic like I had told him and stop doing personal things on duty. Officer Reyna then disobeyed this order by going and picking up a meal for the dispatcher after I had told him to work traffic. Dispatcher Martinez had advised officer Reyna to come to the station to release a prisoner. I then advised officer Reyna to stay on the road and I would take care of the prisoner. Officer Reyna then told me that he was already in route to the station to drop off the meal to the dispatcher. I then met with the officer and asked him why he had not gone to work traffic after being told to do so. Officer Reyna had not worked traffic since told from 2 p.m. till 6 p.m. when confronted by myself on this situation. Officer Reyna was conducting personal errands on duty without authorization.

I then advised him that I wanted him to do foot patrol at the Port Isabel Housing area till further notice. I then advised the dispatcher that officer Reyna was assigned to the housing area to do foot patrol. This was not done to embarrass or humiliate him but to make the dispatcher aware of the assignment I had given the officer.

About an hour or so later, I called officer Reyna to the station since it was going to be 7:30 p.m., and he had requested to leave early on his trip. I meet with him at the station and sat down with him and explained to him that he could not be doing personal errands while on duty either for himself or the dispatchers. Officers Reyna then told me that he had enjoyed being at the project on foot making contact with the residents of the projects and the children. At no time did officer Reyna state that he had gotten offended or that he was embarrassed, by doing foot patrol on my request.

Officer Lopez had arrived early to ride with me and I told officer Reyna that he could leave early then asked if he was to claim 6 hours or 8 hours on his time sheet. I then told him to put down 8 hours and I would take care of it later. Officer Reyna left

early from work not on my request or any form of punishment, but a request from him to leave early to San Antonio, on a family reunion get together.

The issue of letting officer of early from duty had already been discussed with the Chief. The Chief had already told me that it was all right with him to work out situation where officers needed time to come in a little late or leave early, that this was no problem for him.

On August 31, 1998 Officer Salazar had made a traffic stop on a vehicle on South Shore Drive. Officer Reyna then checked out with Officer Salazar at the location. A while later I drove by the location and observed officer Reyna searching the vehicle Officer Salazar was issuing a citation to the male driver beside the patrol unit on the opposite side where Officer Reyna was conducting the search. I then drove around and stopped beside the vehicle being searched by Officer Reyna and asked him what he was doing. Officer Reyna then told me that he was searching the vehicle, I then asked him what his probable cause was for searching, in which he replied that he had sent he vehicle at the Bar. He then told me that the driver had given him permission to search, I then told him if he did not have probable cause to stop and go back on patrol. Officer Reyna did stop the search and went back on patrol. I then drove around and came back to the location with Officer Salazar since he had not gone back into service. Officer Salazar had made the subject move the vehicle onto Mata's parking lot since the driver did not have a driver license. Officer Salazar then came up to my unit and told me that he had parked the vehicle and was waiting for the owner who was coming from the Quatro Amigos Bar. He then stated and pointed to the owner who was walking towards our location. Officer Salazar then released the vehicle and went back on patrol without incident.

On July 1998, I was in command of the 10 p.m. – 6 p.m. shift working with Officer Moore. Officer Moore had called out to dispatch that he was calling out into zone 9 (Port Isabel High School/ Jr. High Area) for security checks. After a while I heard him over the police radio advise dispatch that he heard music coming form within the high school. He then asked for a unit to go by his location and also advised that he did not have any open doors at his location. Dispatcher McDowell then dispatched an officer to his location. I then advised Officer Moore that the radio was sometimes left on inside

the weight lifting room located at the rear of the High School. I had been working the late shift for some months and this situation was already reported. I then told him if there were no open doors to secure and resume patrol.

It is our procedure to have two officers check an open building or open window at a location for our safety. Officer Moore did not have open door or window, and he clearly advised dispatch of this information. He had heard music coming from within the weight lifting room at the High School, which has been found during several occasions of doing security checks. Since Officer Moore has only worked for the department a couple of months he was not aware that the radio was sometimes left on at this location, I felt that it was important to let him know over the radio that it was common to find the radio on and the building secure. At no time did Officer Moore advise of an open door or any signs of unusual activity in the area that required units to assist. Officer Moore check the area and resumed patrol without incident.

On August 1998, I was working the 10 p.m. – 6 p.m. shift along with Officer Salazar and Officer Ayala. At or about 2:45 a.m. on this early morning, Officer Ayala had mode a traffic stop on the Queen Isabella Blvd. After a while Officer Ayala radioed in that it Officer Salazar could meet him at his location. Officer Salazar then advised that he was on foot partrol, and I proceeded to his location. I then checked out at this location and observed him standing along side a young male. I then asked him what was going on and he told me that he had smelled marijuana coming from the vehicle when it had passed him on the road. He then told me that he wanted Tommy to come because he was good at finding marijuana. I then asked him if he had searched the vehicle and he asked me if I could check it for him and see if I could smell the marijuana.

I then approached the late model vehicle which was occupied by several people. There were several young females and children inside the vehicle. I then checked the area by the drivers seat and I could not detect any odor of marijuana or locate any evidence of marijuana or any other drug. The driver of the vehicle had also given permission for us to search the vehicle. I then searched the vehicle and Officer Ayala also searched the area and nothing was found. Officer Ayala then ran a check on the vehicle which came back to the owner which the driver stated was his aunt. There were no licensed person inside the vehicle and the driver stated that they were from Weslaco

and were going to the Island to sleep over.  Officer Ayala then asked me what to do in this situation and I told him that it was his traffic stop and told him that if they were in route to the Island to sleep to let them go.  The decision was then made to release the vehicle and occupants left towards the Island.

On this traffic stop, I did not take over the situation but assisted Officer Ayala who is still not familiar with doing vehicles searches and has asked other officer to assist him is traffic situations or decisions due to his inexperience.  Officer Ayala advised me that he had smelled marijuana coming from the vehicle but we could not find or smell any marijuana after properly searching the vehicle.  Officer Ayala did not advise me on any traffic violations that the driver had committed other than him not having a valid driver license.

On August 31, 1998 while checking the time cards I noticed that Office Ayala had two incomplete overtime requests in his folder.  The forms had the dates and times only and both had overtime of 30 minutes from 6:00 a.m. till 6:00 a.m.  On one of the forms I was the supervisor and I did not recall anyone staying over to work.  I then also checked the daily logs and Officer Ayala did not have any reports or incident during his shift on those dates and times.

Officer Ayala was off for the day and I later saw Sgt. Collazo in his office.  I then asked Sgt. Collazo if he knew any thing about the overtime request made by Officer Ayala.  Sgt Collazo then replied that he did not know why.  I then told him that I would check into it since it was on my shift and the other request was on his shift.

Officer Ayala then came to work on the 6 a.m. to 2 p.m. shift while I was getting out of work.  I then asked Officer Ayala why he had made out an overtime sheet for that shift.  He then told me that the reason he had made out the sheet was that he mad with Sgt. Collazo.  He said that the Sergeant had told him to re-do the fingerprint cards which he had done. I then told him that he had put down the wrong date on one of the forms, both days were on Sgt. Collazo shift.

I then told him that I had seen the daily activity reports which he had submitted and they showed that he did not have any written reports or activities during his shift.  I told him that it would not look good if City Hall saw this, and he was submitting overtime when he had no activities for those days.  I did tell Officer Ayala that it was up

to him to submit the overtime and did not tell him at any time not to submit his time. He then told me that the only reason he had done them was that he was mad with Sgt. Collazo. Officer Ayala then told me that he was not going to submit them, in which I told him to let me know that way if he needed to have some time off I would be aware of this.

"FURTHER AFFIANT SAYETH NOT."


SIGNED on July 20, 2001.

_____
Jorge Alaniz, Affiant

**SUBSCRIBED AND SWORN TO BEFORE ME** on this ___20___ day of July, 2001, A.D., to certify which witness my Hand and seal of office:

_____
Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JORGE G. ALANIZ                          :
                                         :
VS.                                      :          CIVIL ACTION B-00-136
                                         :
CITY OF PORT ISABEL, TEXAS               :

## AFFIDAVIT

BEFORE ME, the undersigned authority, on this day personally appeared **Nancy**

**Davalos**, and after being duly sworn, deposes and says:

1. My name is Nancy Davalos; I am over eighteen years old, have never been convicted of a crime, and am fully competent to make this affidavit.

2. I am the City Secretary of the City of Port Isabel , and as such, I am the official custodian of records for the City.

3. I have reviewed the official personnel file of Mr. Jorge Alaniz, the Plaintiff in this action.

4. Mr. Alaniz was first employed by the City of Port Isabel about March 1983 as a patrolman.

5. Mr. Alaniz was terminated as an employee of the City of Port Isabel by the Chief of Police, Joel Ochoa, by letter dated September 16, 1998.

6. Mr. Alaniz had no written contract of employment at the time of his termination.

7. The statements contained in this letter are true and correct and based upon my review of the official personnel file of Mr. Jorge Alaniz kept by the City of Port Isabel.

8. The records contained within the official personnel file of Mr. Jorge Alaniz were made at or near the time of the events described therein by a person with knowledge of time facts and were kept by the City in the regular course of business.


_____
NANCY DAVALOS


EXHIBIT
"C"

SUBSCRIBED AND SWORN TO BEFORE ME by the said NANCY DAVALOS, affiant,

to which witness my hand and seal of office on this the ___13th___ day of June, 2001.

_____

Notary Public, State of Texas

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **JORGE G. ALANIZ** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION B-00-136** |
| | § | **JURY** |
| **CITY OF PORT ISABEL, TEXAS** | § | |
| **Defendant** | § | |

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On this day, the Court heard the Motion for Summary Judgment filed in this cause by the City of Port Isabel, Texas, Defendant. All parties appeared by and through their respective counsel. The Court, after examining the pleadings and the summary Judgment evidence and hearing the arguments of counsel, determines that genuine issues of material fact exist that necessitate a trial by Jury and therefore Defendant's Motion for Summary Judgment should be **DENIED**.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED THAT Defendant's Motion for Summary Judgment is **DENIED**.

Signed this the _____ day of _____, 2001.


_____
United States Magistrate Judge